**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------------- X

LISHAY LAVI, NOACH NEWMAN, ADIN GESS,
MAYA PARIZER, NATALIE SANANDAJI, YONI
DILLER, HAGAR ALMOG, DAVID BROMBERG,
LIOR BAR OR, and ARIEL EIN-GAL,

                         Plaintiffs,

          -against-

UNRWA USA NATIONAL COMMITTEE, INC.,

                     Defendant.

---------------------------------------------------------------------- X

Civil Case No.
24-cv-00312 (RGA)

**DEFENDANT UNRWA USA NATIONAL COMMITTEE, INC.'s OPENING BRIEF**
**IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT**
**TO FED. R. CIV. P. 12(b)(6) and FED R. CIV. P 12(b)(1)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS ....................................................................... 2

SUMMARY OF THE ARGUMENT ...................................................................................... 2

MOTION TO DISMISS STANDARD.................................................................................... 3

STATEMENT OF FACTS ...................................................................................................... 5

    A.    Allegations that UNRWA USA Supported Hamas's Terrorist Activities ................ 5

    B.    Allegations Concerning UNRWA's Relationship with Hamas Attacks................... 7

        1.    UNRWA's Alleged Role in the October 7 Attacks ................................. 7

        2.    UNRWA's Adversarial Relationship With Hamas ............................. 10

        3.    US Government Audits of UNRWA Operations Confirm That UNRWA Is
            Not Supporting Hamas ........................................................................ 12

ARGUMENT ........................................................................................................................ 15

    I.    THE COMPLAINT FAILS TO ALLEGE THAT UNRWA USA AIDED
        AND ABETTED THE ATTACK BY HAMAS ON OCTOBER 7, 2023
        THAT INJURED PLAINTIFFS ...............................**Error! Bookmark not defined.**

        A.    Plaintiffs Have Failed to Allege that UNRWA USA Knowingly Provided
            Substantial Assistance to the October 7 Attacks ............................... 17

        B.    Plaintiffs Do Not Plausibly Allege that UNRWA USA Was Generally
            Aware of Playing a Role in Hamas's Terrorist Operations............................ 21

        C.    The Complaint Fails to Plead that UNRWA Committed a Wrongful Act
            that Caused Plaintiffs' Injury ......................................................... 26

    II.    THE COMPLAINT FAILS TO STATE A CONSPIRACY CLAIM UNDER
        THE ATA.............................................................................................. 28

    III.    THE COURT SHOULD DISMISS PLAINTIFFS' ALIEN TORT STATUTE
        CLAIM FOR FAILURE TO STATE A CLAIM AND FOR LACK OF
        SUBJECT MATTER JURISDICTION, AS PLAINTIFFS FAIL TO
        ALLEGE AN ENFORCEABLE TREATY OR LAW OF NATIONS
        VIOLATION.......................................................................................... 31

    IV.    THE COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENCE
        INFLICTION OF EMOTIONAL DISTRESS....................................................... 35

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Almog v. Arab Bank,* PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007)................................. 39

*Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60 (3d Cir. 2011)........................ 29

*Ashcroft v. Iqbal*, 556 U.S. 662(2009) ............................................................................ 3

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 224 (D.C. Cir. 2022) ......................... 25

*Aziz v. Alcolac, Inc.,* 658 F.3d 388, 398 (4th Cir. 2011).............................................. 36

*Baraka v. McGreevey*, 481 F.3d 187 (3d Cir. 2007)....................................................... 3

*Barber v. Nestle USA, Inc.,* 154 F.Supp. 3d 954 (C.D. Cal. 2015)................................. 5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)...................................... 33

*Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at \*7 (D.D.C. Nov. 16, 2020), *aff'd* 47 F.4th 856 (D.C. Cir. 2022) ................................................................. 34, 35

*Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022)..................... 24, 25, 27, 33

*Betancur v. Roark*, 2012 U.S. Dist. LEXIS 147627 (D. Mass. Oct. 12, 2012) ............. 5

*Buck v. Hampton Twp. Sch. Dis*t., 452 F.3d 256 (3d Cir. 2006)..................................... 4

*Butcher v. Linkhorst*, 2023 U.S. Dist. LEXIS 175189 (D. Del. Sep. 29, 2023) ........... 40

*Collins v. City of New York*, 923 F. Supp. 2d 462 (E.D.N.Y. 2013) ............................. 29

*Conn v. United States*, 376 F. App'x 239 (3d Cir. 2010) .............................................. 31

*Cornejo v. Cty. of San Diego*, 504 F.3d 853 (9th Cir. 2007) ........................................ 37

*D.G. v. Somerset Hills School Dist*., 559 F. Supp. 2d 484 (D.N.J. 2008)....................... 6

*Duphily v. Delaware Elec. Coop., Inc*., 662 A.2d 821 (Del. 1995)................................ 41

*Emerson v. United States*, 1998 U.S. Dist. LEXIS 6461 (D.Del.1998)......................... 41

*Freeman ex rel. Est. Freeman v. HSBC Holdings PLC,* 57 F.4th 66 (2d Cir. 2023).............. 34, 35

*Gould Electronics Inc. v. United States*, 220 F. 3d 169, 176 (3d Cir. 2000).................. 6

*H.B. v. Pittsburgh Pub. Sch.*, *Dist*., 2020 U.S. Dist. LEXIS 84950 (W.D. Pa. May 13, 2020).... 30

*Halberstam v. Welch*, 705 F. 2d 472 (D.C. Cir. 1983) ........................................ passim

*Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) .................................................. 25, 26

*In re Arab Bank PLC Alien Tort Litigation*, 808 F.3d. 144 (2d Cir. 2015) ............................... 39

*In re Chiquita Brands Int'l., Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ...................................................................................................... 39, 40

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ................................................... 4

*In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888 (N.D. Cal. 2018) ................................. 29

*Ind. Mun. Power Agency v. United States*, 156 Fed. Cl. 744, 749 n.4 (2021) .............................. 5

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir. 1987) ............................ 33

*Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018) ................................................................... 37

*Juliana v. United States*, 2018 U.S. Dist. LEXIS 236701 (D. Or. Oct. 15, 2018) ........................ 5

*Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir. 2021) ................................................................. 5

*Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1017 (D.C. Cir. 2023) ................................................................................... 20, 22

*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) .......................................... 37

*Krishanthi v. Rajaratnam*, 2010 WL 3429529 (D.N.J. Aug. 26, 2010) ................................. 38, 40

*Laws v. Webb*, 658 A.2d 1000, 1007 (Del.1995) .................................................................. 41

*Lungu v. Antares Oharma Inc.*, 2022 U.S. App. LEXIS 2117 (3d Cir. 2022) .............................. 4

*Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir. 1979) .............................. 38

*McGuirl v. United States*, 167 F. App'x 808 (D.C. Cir. 2005) ............................................... 6

*Moretz v. Trs. of Princeton*, 2023 U.S. Dist. LEXIS 230763 (D.N.J. Dec. 29, 2023) ................. 31

*Mortensen v. First Fed. Savings & Loan Association*, 549 F.2d 884 (3d Cir. 1977) ................... 6

*Mwani v. Bin Ladin*, 2006 WL 3422208 (D.D.C. Sept. 28, 2006) ............................................ 39

*Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023) ............................................. 17, 20, 26

*O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ....................... 33

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ............................................................. 4, 8, 13

*Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997) ......................... 3

*Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217,(2d Cir. 2019) ....................................... 24

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 712-14, 720 (2004) ........................................ 37

*Spence v. Cherian*, 135 A.3d 1282, 1290 (Del. Super. Ct. 2016) .................................. 40

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 , 233 U.S. App. D.C. 384 (D.C. Cir. 1984).... 39

*Tenezaca-Dutan v. Garland*, 2021 U.S. App. LEXIS 20226 (10th Cir. July 8, 2021) .................. 5

*Terrorist Attacks on September 11, 2001 v. Al Rajhi Bank (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 118 (2d Cir. 2013) .................................................................. 38

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ............................................... passim

*United States v. Benoit*, 730 F.3d 280 (3d Cir. 2013) .................................... 5

*Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100 (3d Cir. 2018) ................................ 4

*Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223 (E.D.N.Y. 2019), *aff'd* 993 F.3d 144 (2d Cir. 2021)........................................................................................ 24, 27

*Xian Ming Wu v. City of New Bedford*, 2013 WL 4858473 (D. Mass. Sept. 11, 2013) .............. 29

**Statutes**

18 U.S.C. § 2333(d) ........................................................................................ 29

18 U.S.C. § 2333(d)(2) ............................................................................. 15, 31

Justice Against Sponsors of Terrorism Act ("JASTA") § 2(a)(5), 130 Stat. 852 ........................ 16

**Rules**

Fed. R. Civ. P. 12(b)(1)............................................................................ 2, 35

Fed. R. Civ. P. 12(b)(6)......................................................................... 2, 3, 35

Fed. R. Evid. 201(b)................................................................................... 4

Fed. R. Evid. 201(c)(2) .............................................................................. 4

## INTRODUCTION

The October 7, 2023 attacks on Israeli civilians were a heinous crime. But the Complaint alleges no basis in fact or law to hold Defendant UNRWA USA National Committee, Inc. ("UNRWA USA") liable for that tragedy.

UNRWA USA is an independent US-based charity that—along with 72 countries, including the United States—provided financial contributions to the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA"), which is a humanitarian agency established by the U.N. General Assembly entrusted with providing food, shelter, education, medical care, and other humanitarian services to the 5.9 million Palestinian refugees living in the West Bank, the Gaza Strip, Jordan, Lebanon, and Syria.[1]

Plaintiffs' apparent theory of the case is that UNRWA USA aided and abetted the October 7 attacks, not by supplying funds to Hamas or directing UNRWA to use its contributions to aid Hamas's terrorist activities, but by simply providing funding to UNRWA—in other words, by doing, to a fractional degree, the exact same thing as 72 donor-governments. That theory rests on an attenuated chain, every link of which is broken. To state an aiding and abetting claim under the Anti-Terrorism Act ("ATA"), Plaintiffs must allege that UNRWA USA provided knowing and substantial assistance to a terrorist group with the intent of facilitating the terrorist attack that injured Plaintiffs.

The Complaint fails in every respect. It does not allege that a single cent of UNRWA USA aid flowed to Hamas, much less to facilitate any terrorist attack. It fails to allege that UNRWA USA intended any of its aid to be used in a manner that benefited Hamas. It fails to allege that

---

[1] Compl. ¶ 35; CRS, "The United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA): Overview and the U.S. Funding Pause," (Feb. 9, 2024) at 2 (hereinafter "CRS: UNRWA Overview and the U.S. Funding Pause"), *available at* https://crsreports.congress.gov/product/pdf/IN/IN12316 (last visited May 28, 2024).

UNRWA was under Hamas's control or that the UN agency took any steps to facilitate Hamas's terrorist operations. To the contrary, the Complaint confirms that UNRWA actively thwarted efforts by Hamas to infiltrate UNRWA's workforce, influence UNRWA's operations, or misuse UNRWA facilities—and that it did so to the satisfaction of the US Government.

The same deficiencies in the Complaint that doom the ATA aiding-and-abetting claims require the dismissal of the conspiracy, Alien Tort Statute ("ATS") and Negligent Infliction of Emotional Distress claims. In addition, the Court does not have jurisdiction over the ATS claim because Plaintiffs have not alleged any violation of the law of nations or treaty of the United States. Plaintiffs' Complaint fails to state any claim against UNRWA USA, and should be dismissed in its entirety.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed the Complaint against Defendant UNRWA USA on March 8, 2024. (D.I. 1). The deadline for Defendant to respond to the Complaint was extended to May 28, 2024. (D.I. 6.) Defendant now moves to dismiss Plaintiffs' Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) as well as a lack of subject matter jurisdiction over the ATS claim pursuant to Fed. R. Civ. P. 12(b)(1).

## SUMMARY OF THE ARGUMENT

1.  Plaintiffs fail to state an ATA aiding-and-abetting claim. The Complaint fails to plead that either UNRWA USA or UNRWA played any role in the October 7 attacks: it fails to allege that UNRWA USA supplied any support to Hamas's terrorist operations; that UNRWA USA intended its financial contributions to UNRWA to reach Hamas; or that UNRWA supported or facilitated the attacks that injured Plaintiffs.

2.  Plaintiffs fail to state an ATA conspiracy claim. The Complaint fails to allege an agreement between UNRWA USA, UNRWA, and Hamas to support Hamas's terrorist activities.

3.   Plaintiffs fail to state an ATS claim, both because the Complaint fails to plead that UNRWA USA aided and abetted the attacks and because the Court lacks subject matter jurisdiction.

4.   Plaintiffs fail to state a claim for negligent infliction of emotional distress.

## MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is plausible on its face only if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court is not required to accept "unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). Nor will the court accept as true assertions that are "belied by [other] factual allegations" in the complaint. *Schuylkill Energy Res. v. Pa. Power & Light Co*., 113 F.3d 405, 417 (3d Cir. 1997).

In evaluating a motion to dismiss, the Court "may consider documents that are attached to or submitted with the complaint . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dis*t., 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks omitted); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). "When an allegation in the complaint is contradicted by a document incorporated in it by reference, the document controls and the allegation is not accepted as true." *Lungu v. Antares Oharma Inc.,* 2022 U.S. App. LEXIS 2117, n.14 (3d Cir. 2022) (citing cases); *Vorchheimer v. Philadelphian Owners Ass′n*, 903 F.3d 100, 112 (3d Cir. 2018).

A Court may "judicially notice a fact that is not subject to reasonable dispute" when such facts are "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under Rule 201(c)(2), a court "must" take judicial notice of matters if requested by a party and supplied with the necessary information. Fed. R. Evid. 201(c)(2); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002). As relevant here, the Court may take judicial notice of (i) the facts contained in reports by the Congressional Research Service ("CRS"), *see, e.g., Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021); *Juliana v. United States*, 2018 U.S. Dist. LEXIS 236701, at *8 (D. Or. Oct. 15, 2018) (citing cases); *Ind. Mun. Power Agency v. United States*, 156 Fed. Cl. 744, 749 n.4 (2021); (ii) the US-UNRWA Framework Agreement, *United States v. Benoit*, 730 F.3d 280, 285 n.8 (3d Cir. 2013) (authorizing judicial notice of international agreements); (iii) data in UN publications, *Barber v. Nestle USA, Inc.,* 154 F.Supp. 3d 954, 958 n.1 (C.D. Cal. 2015) (documents published by the United Nations "are published by a governmental entity and are not subject to reasonable dispute, and, accordingly, they are appropriate for judicial notice"); *Tenezaca-Dutan v. Garland*, 2021 U.S. App. LEXIS 20226, at *8 n.3 (10th Cir. July 8, 2021) (same) (citing cases); *Betancur v. Roark*, 2012 U.S. Dist. LEXIS 147627, at *23 (D. Mass. Oct. 12, 2012) (taking judicial notice of UNESCO statistics about educational enrollment); and (iv) public laws. *McGuirl v. United States*, 167 F. App'x 808, 809 (D.C. Cir. 2005).

A motion to dismiss under Rule 12(b)(1) for lack of subject matter may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *Gould Electronics Inc. v. United States*, 220 F. 3d 169 (3d Cir. 2000). Where a defendant brings a facial challenge—*i.e.*, an assertion that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction," *D.G. v. Somerset Hills School Dist.*, 559 F. Supp. 2d 484, 491 (D.N.J. 2008)—

the Court must consider the allegations of the complaint as true. *Mortensen v. First Fed. Savings & Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977).

## STATEMENT OF FACTS

### A.  Allegations that UNRWA USA Supported Hamas's Terrorist Activities

Plaintiffs allege that UNRWA USA aided and abetted the October 7 attacks, not by providing direct support to Hamas (the Complaint pleads no direct ties between UNRWA USA and Hamas), but by providing funds to the United Nations humanitarian organization, UNRWA. However, the Complaint fails to allege any facts that support a claim UNRWA USA's funding was linked to October 7. The Complaint's theory of the case is that UNRWA bears responsibility for October 7 because: it employed some teachers accused of being involved in the attacks; some UNRWA employees have connections to Hamas members and supporters; some UNRWA schools taught objectionable content; and some UNRWA facilities were misused by Hamas. Compl. ¶¶ 44, 54, 57, 71, 73, 79. None of these are sufficient to show that UNRWA itself bears responsibility for October 7.

But putting aside the weakness of the allegations against UNRWA itself, this case is about UNRWA USA, and the Complaint does not factually allege that a single cent of UNRWA USA's contributions was allocated for any Hamas-related activities, much less to aid and abet the October 7 attacks. In fact, the Complaint's sole factual allegations regarding the aid that UNRWA USA provided to UNRWA consists of the sum total ($11.8 million between 2020 and 2022,[2] *id*. ¶ 121) without alleging what those funds were for, and a description of a single $674,995 grant in 2022 for "education and training," which, as the UNRWA USA 2022 Annual Report cited in the

---

[2] For reference, the US Government provided UNRWA $682.4 million during the same period. CRS: UNRWA Overview and the U.S. Funding Pause, *supra* note 1, at 3.

Complaint explains, was used to provide "clean drinking water to nearly 14,000 students." *Id.* ¶ 56 n.52; Annual Report (cited in Compl. n.30).

The Complaint alleges in a conclusory fashion that "UNRWA USA raises and transfers such funds knowingly, willfully, and with the intention that the funds be used by [Hamas] and its members for terrorist purposes" but provides no factual support for that conclusion. Compl. Intro. at 2.[3] Plaintiffs ground these claims on another set of conclusory assertions that "anti-Israel sentiments . . . perniciously pervade Defendant's staff," that the "pro-Hamas sentiment of Defendant starts at the top," *id.* ¶¶ 116-17, and that UNRWA USA and Hamas share "common objectives and agenda," *id.* ¶141. But the Complaint offers no factual support for any part of this string of claims. Plaintiffs selectively quote UNRWA USA's January 29, 2024 announcement that it was still committed to funding UNRWA after learning that several UNRWA employees had been accused of participating in the October 7 attacks. *Id.* ¶ 115. But the Complaint omits the prior two paragraphs of that statement:

> **UNRWA USA is horrified by the recent allegations against twelve UNRWA staff members**. UNRWA leadership has taken prompt action to terminate the contracts of those allegedly involved. We welcome the UNRWA Commissioner General's request that the UN Office of Internal Oversight Services (the highest UN investigative authority) undertake an investigation into the allegations against the UNRWA staff who were allegedly implicated. **Anyone found to be involved in terrorism must be held accountable**.
>
> We also appreciate the far-reaching efforts UNRWA makes in vetting its own staff, including screening its staff against the UN Security Council sanctions list and sharing its employee list with the State of Israel as obligated. UNRWA has informed us that the State of Israel has not raised any concerns or objections with regard to the content of those lists.[4]

*See* Press Release (cited in Compl. n.118) (emphasis added).

---

[3] The Complaint's allegation that UNRWA USA paid the salaries of two teachers is unsupported by the document upon which Plaintiffs rely, which nowhere even references UNRWA USA. Compl. ¶ 104.

[4] Because the press release is quoted and relied upon in the Complaint, the Court may consider the press release in its totality. *Skolas*, 770 F.3d at 249.

The Complaint's only other example of UNRWA USA's alleged "pro-Hamas sentiment" is equally misleading. Plaintiffs quote a 2006 remark by then-UNRWA Commissioner-General and later-UNRWA USA Board member, Karen AbuZayd, describing UNRWA's operations: "'It doesn't make sense to reduce contacts when you've been asked to increase your activities,' she said, stressing that UNRWA had 'no intention of changing' its operations." Compl. ¶ 119. A review of the quoted language in context shows that it is not a "pro-Hamas" expression. The full text from AbuZayd, found in the document relied upon in the Complaint, makes clear that UNRWA received "no instruction from UN Headquarters on not meeting Hamas ministers,"[5] and that Hamas had recently secured control of key ministries after having won Palestinian legislative elections. *See also id.* ¶ 32. AbuZayd was thus making a practical point: that UNRWA could not fulfill its directive to increase activities if it halted communications with the newly-installed political leadership. In any event, the Complaint does not plead that UNRWA USA actually shared any views reflected in AbuZayd's 18-year-old comment.

### B. Allegations Concerning UNRWA's Relationship with Hamas Attacks

#### 1. UNRWA's Alleged "Role" in the October 7 Attacks

The Complaint states in a section heading that the UN agency UNRWA "Was Directly Involved in the October 7 Hamas Terrorist Attacks." Compl. at 24. However, the only factual allegation directly linking UNRWA to October 7 is an accusation by the Israeli government that between 12 and 30 of UNRWA's 13,000 Gazan employees took part in the attacks. Compl. ¶¶ 95, 108. Even assuming these unsupported accusations are true, the Complaint fails to make any non-conclusory allegations that UNRWA played any role in the criminal actions of these individuals: it does not allege that UNRWA knew that these employees were associated with Hamas, had any

---

[5] *See Chronological Review of Events Relating to the Question of Palestine* (cited in Compl. n.120).

notice that they intended to participate in any terrorist operation, or that UNRWA condoned, encouraged, or facilitated their participation in any way. To the contrary, the Complaint acknowledges that UNRWA responded to Israel's claims by summarily terminating the accused employees. *Id*. ¶ 99. The Complaint's only other allegation intimating at UNRWA staff participation in "terrorist activities" pertains to events that preceded the October 7 attacks by two decades—namely, a report that, between 2000 and 2004, 13 employees were arrested (not charged or convicted) "for alleged involvement in terror activities." *Id*. ¶ 48.

The Complaint next makes the conclusory allegation that UNRWA was "riddled with Hamas 'activists.'" *Id.* ¶ 49. Here, too, its factual pleadings fall short. Plaintiffs base the allegation on a claim by Israeli authorities following the October 7 attacks that "around 10% of UNRWA's Gaza employees have links to the Hamas or Palestinian Islamic Jihad terrorist organizations, and 50% have close relatives who belong to those groups." Compl. ¶ 46. But Hamas is also a political party that has operated Gaza's ministries since 2007, *id.* ¶ 32—thus, even if correct,[6] these statistics would sweep up anyone involved in Hamas's myriad non-military social services and operations. And because "links" includes virtually any type of association, the 10% figure, on its face, encompasses people who have no direct involvement in *any* part of Hamas.[7] In short, these unverifiable numbers are functionally meaningless. The Complaint seeks to bolster these hollow statistics by alleging that "many countries" responded to them by suspending their UNRWA

---

[6] According to an investigation commissioned by the United Nations, as of April 20, 2024, "Israel ha[d] yet to provide supporting evidence" of its claim that "a significant number of UNRWA employees are members of terrorist organizations." *Final Report for the United Nations Secretary-General, Independent Review of Mechanisms and Procedures to Ensure Adherence by UNRWA to the Humanitarian Principle of Neutrality*, United Nations, (Apr. 20, 2024), www.un.org/sites/un2.un.org/files/2024/04/unrwa_independent_review_on_neutrality.pdf.

[7] Virtually all of UNRWA's employees are drawn from the local refugee population which has a base rate of association with Hamas; the Complaint does not plead that UNRWA staff's rate of association with Hamas is even equal to, much less higher, than the rate in the general population. *See* CRS, *U.S. Foreign Aid to the Palestinians*, (Dec. 12, 2018) at 21 (hereinafter "CRS: U.S. Foreign Aid"), https://sgp.fas.org/crs/mideast/RS22967.pdf.

8

contributions. *Id.* ¶ 46. But within months, the EU and 15 of the 17 countries that suspended funding resumed their contributions to UNRWA.[8]

The Complaint also cites a report by an NGO called "UN Watch," which claims to have identified 30 UNRWA teachers in a group chat of 3,000 who "glorified and cheered on the Hamas terrorist attacks on October 7." *Id*. ¶¶ 62-69. However, the UN Watch report acknowledged that it only uncovered evidence linking 14 of the 30 to UNRWA and that "[a]nyone can access the group."[9] And neither that report nor the Complaint allege that these individuals engaged in or offered any tangible support to assist in the perpetration of such acts, or that UNRWA in any way sponsored the chat or condoned those messages.

Finally, the Complaint attempts to draw an attenuated connection between UNRWA and October 7 by making the conclusory allegation that UNRWA's educational staff "indoctrinate future Hamas members" by "creat[ing] teaching materials that glorify terrorism, encourage martyrdom, demonize Israelis and incite antisemitism." Compl. ¶¶ 54, 57, 141. These allegations are based on a few examples from UNRWA's 700 schools.[10] *Id.* ¶¶ 58-61. In an attempt to demonstrate that UNRWA schools generate Hamas recruits, the Complaint cites a report that 118 UNRWA graduates have joined Hamas. *Id.* ¶ 72.[11] Viewed in context, that number assumes a very different meaning. Founded in 1987, Hamas has been a presence in Palestinian politics for decades,

---

[8] *See UPDATED: List of Countries Suspending UNRWA Funding*, UN Watch (updated May 26, 2024), https://unwatch.org/updated-list-of-countries-suspending-unwra-funding (cited in Compl. n.38). That document inaccurately states that New Zealand froze its funding. *See* Statement delivered by Permanent Representative of New Zealand (March 6, 2024) https://www.mfat.govt.nz/en/media-and-resources/united-nations-general-assembly-informal-meeting-of-the-plenary-to-hear-a-briefing-on-unrwa.
[9] *See UN WATCH, UNRWA'S Terrorgram at 2, 9-17 (cited in Compl. ¶ 62 n.59).*
[10] *What We Do*, UNRWA, https://www.unrwa.org/what-we-do/education (last visited March 28, 2024).
[11] The Complaint pleads that "at least 100" graduates have joined Hamas; the report from which Plaintiffs pull this allegation puts the exact number at 118. *See* IMPACT-SE*, UNRWA Education: Textbooks and Terror* at 46-97 (cited in Compl. n.71).

and has governed Gaza since 2007. *Id.* ¶¶ 31-32. Meanwhile, UNRWA schools enroll more than 500,000 students per year.[12] That only 118 UNRWA students—out of millions—are confirmed to have joined Hamas does not merely refute Plaintiffs' allegation that UNRWA schools are indoctrination centers for Hamas, it supports the inference that UNRWA's school system is effective at steering students *away* from the organization.

### 2. UNRWA's Adversarial Relationship With Hamas

Although the Complaint asserts in a conclusory fashion that UNRWA (and not Defendant UNRWA USA) worked "hand-in-hand" with Hamas "to provide Hamas members with employment, to educate future Hamas members, and to finance terrorism activities," Compl. ¶ 34, its factual allegations demonstrate the opposite.

The Complaint recounts multiple occasions when UNRWA employees were fired because of their connection to Hamas, *see, e.g.*, Compl. ¶ 55 (terminating teacher elected to Hamas leadership position); *id.* ¶ 99 (terminating employees accused of participating in October 7). Plaintiffs assert that, since 2009, Hamas has "exercise[d] a strong and direct influence over UNRWA and its personnel" through its control of the UNRWA employee union. *Id.* ¶ 50. The Complaint is devoid of facts substantiating this claim: it does not identify a single aspect of UNRWA's operations that Hamas has influenced through its employee union, and it only identifies two instances in which Hamas *possibly* wielded its influence over a personnel decision —both of which highlight the adversarial relationship between UNRWA and Hamas. *Id.* ¶ 50, n.45-46. One involved a decision to reassign UNRWA's Gaza Director after his statements praising Israel's "very precise" bombing campaign prompted protests and death threats;[13] the second involved a

---

[12] *See* FAQ, "How Many Palestine Refugees Access UNRWA Services?", UNRWA, https://www.unrwa.org/who-we-are/frequently-asked-questions (the UNRWA FAQs are generally cited in Compl. n.24).

[13] *UN agency withdraws director from Gaza after threats*, Associated Press, (June 4, 2021), https://apnews.com/article/united-nations-middle-east-b03eb29c5b9286fff1d6b80cf6539294

decision to reverse the suspension of a teacher (in Lebanon, not Gaza) after boycotts and protests "paralyzed UNRWA operations."[14] In both cases, numerous Palestinian factions (not just Hamas) participated in the protests that compelled UNRWA to act. *Id.* ¶ 50, nn.45-46 (describing how UNRWA reinstated a fired teacher and re-assigned a director in response to protests by Fatah, Hamas, Islamic Jihad, and other "Palestinian factions").

The Complaint alleges that an unidentified Palestinian group hid weapons in a handful of UNRWA schools during the 2014 war, *id.* ¶¶ 73-78, and references reports from NGO Monitor that Hamas had tunnels under or "within [the] close vicinity" of UNRWA schools. Compl. ¶ 79. But the Complaint's own factual allegations demonstrate UNRWA's commitment to *protecting* its schools from incursions by militants and *frustrating* Hamas tunnels under its facilities. The Complaint concedes that any concealment of weapons in UNRWA schools were "unauthorized" acts, *id.* ¶ 80, and the UN Board of Inquiry Report from which the Complaint draws these allegations describes (i) how teams of UNRWA Operations Support Officers conducted "unannounced inspections of UNRWA facilities, including schools, to ensure their neutrality, with each facility being visited at least once every four months,"[15] and (ii) that upon discovering a weapons cache, UNRWA management instructed that "inspections be conducted of all UNRWA schools" on a "daily" basis "to ensure that no weapons were being stored in them and that they were not being abused."[16]

---

(cited in Compl. ¶ 50 n.45).

[14] Dina Rovner, *UNRWA: A neutral agency or a political tool to attack Israel? – opinion*, Jerusalem Post, (May 11, 2023), https://www.jpost.com/opinion/article-742656 (cited in Compl. ¶ 50 n.46).

[15] U.N. Secretary-General, *Summary by the Secretary-General of the report of the United Nations Headquarters Board of Inquiry into certain incidents that occurred in the Gaza Strip between 8 July 2014 and 26 August 2014* ("2015 UNSG Report"), U.N. DOC. S/2015/286 (Apr. 27, 2015) ¶ 54, at 89. The Court can consider information in this report because it is "explicitly relied upon in the complaint." *Skolas,* 770 F.3d at 249; *see* Compl. ¶¶ 73-78, nn.73-81.

[16] 2015 UNSG Report ¶ 64.

The same is true with respect to the tunnels. As the documents referenced in the Complaint reveal, it was *UNRWA's own investigations* that exposed the existence of tunnels, which UNRWA publicly protested.[17] In fact, the Complaint references only one tunnel that UNRWA was *not* responsible for uncovering, but fails to plausibly allege that UNRWA had any knowledge of its existence. *Id.* ¶ 110.

Attempting to establish that UNRWA is closely intertwined with Hamas, Plaintiffs cite a 20-year old statement by then-UNRWA Commissioner General, Peter Hansen, that "I am sure that there are Hamas members on the UNRWA payroll, and I don't see that as a crime," *id.* ¶ 47 but as the Complaint acknowledges, Hamas is also a political party that governs Gaza, *id.* ¶ 32, so not every member is a militant, or even part of the government. Plaintiffs also falsely allege that UNRWA's Deputy Commissioner General gave a statement in 2021 "'affirm[ing] her solidarity' with Hamas on behalf of UNRWA." *Id.* ¶ 52. What she actually affirmed was her solidarity with "all the Palestinian people."[18]

### 3. US Government Audits of UNRWA Operations Confirm That UNRWA Is Not Supporting Hamas

The judicially noticeable, public record further confirms the antagonist relationship between UNRWA and Hamas and demonstrates that UNRWA diligently resisted Hamas's attempts to infiltrate its staff, influence its operations, or requisition its facilities to further its military aims. The best evidence of this comes from the UNRWA largest financial backer—the US Government—which conditioned aid on UNRWA meeting various requirements to ensure that

---

[17] *Tunnels Under Schools: NGO Human Rights' Monitoring for Palestinian Children Ends When Israel is Not to Blame*, NGO Monitor (Jan. 18, 2023), https://www.ngo-monitor.org/tunnels-under-schools-ngo-human-rights-monitoring-for-palestinian-children-ends-when-israel-is-not-to-blame (cited in Compl. ¶ 79 n.82).

[18] *UNRWA official expresses understanding to Sinwar,* al Mayadeen, (June 3, 2021), https://english.almayadeen.net/news/politics/1485841/unrwa-official-expresses-understanding-to-sinwar (cited in Compl. ¶¶ 51-52, nn.47-48).

its resources were not being used to support terrorist organizations, and which repeatedly reauthorized UNRWA funding in the years leading up to the October 7 attacks. (In the three years prior to the attacks, Congress authorized $773 million; for fiscal year 2023, alone, it authorized $371 million.).[19]

Since at least 2003, Congress has required the U.S. Government Accountability Office ("GAO") to submit yearly reports certifying that UNRWA contributions do not run afoul of Section 301(c) of the Foreign Assistance Act, which requires the Executive to take "all possible measures to assure that no part of the United States contribution shall be used to furnish assistance to any refugee who is receiving military training as a member of . . . any other guerrilla type organization or who has engaged in any act of terrorism." 22 U.S.C. § 2221(c); *see, e.g.,* Consolidated Appropriations Resolution 2003, PL 108-7a, sec. 580. Moreover, in every appropriations bill from FY 2015 to FY 2024, Congress has included a provision requiring the Secretary of State to submit a report confirming that UNRWA, *inter alia*, (1) regularly inspects its installations and "report[s] any inappropriate use"; (2) addresses staff violations of UN "neutrality and impartiality" policies;[20] (3) implements a "no-weapons policy" in its facilities; and (4) takes steps to "ensure the content of all educational materials currently taught in UNRWA-administered schools and summer camps is consistent with the values of human rights, dignity, and tolerance and does not induce incitement." *See, e.g.,* Consolidated Appropriations Act, 2022, Public Law No. 117-103, Sec. 7048(d)(1)-(7) 136 Stat 663 (March 15, 2022).

---

[19] CRS: UNRWA Overview and the U.S. Funding Pause, *supra* note 1, at 3. Seventy-one other countries, the EU, and dozens of NGOs also made financial contributions in 2023. UNRWA, *2023 Confirmed Pledges towards UNRWA's Programmes* (last visited May, 27, 2024), https://www.unrwa.org/sites/default/files/list_of_2023_confirmed_pledges_by_all_donors.pdf.
[20] UN "neutrality" principles "dictate that humanitarian actors must not take sides in hostilities or engage in controversies of a political, racial, religious, or ideological nature." UNRWA, *Neutrality*, (last visited May 28, 2024), https://www.unrwa.org/neutrality.

In addition, a Framework Agreement in place since 2010 has required UNRWA to submit semiannual reports to the US Government outlining steps it is taking to maintain compliance with Section 301(c) of the Foreign Assistance Act. Among other things, UNRWA is required to submit proof that it: (1) conducts bi-yearly checks of all UNRWA staff against the Consolidated UN Security Council Sanctions List; (2) requires UNRWA staff to undergo yearly trainings "on humanitarian principles, including neutrality"; (3) initiates investigations "upon receipt of credible information about alleged staff/personnel misconduct" and takes "appropriate action when misconduct is found"; (4) conducts routine inspections of UNRWA properties, "[i]mmediate[ly] investigat[es] . . . incidents of misuse of installations," and takes "immediate steps . . to assure non-recurrence"; and (5) provides staff lists to Israeli authorities on an annual basis, and to UN Member States on request.[21] The Framework Agreement further provides that the State Department monitors and evaluates UNRWA's conformance with these conditions, including through "[m]onthly meetings or conversations between UNRWA and relevant State Department officials in which conformance with section 301(c) is discussed," and "[r]egular written communication between UNRWA and relevant State Department officials on section 301(c)-related issues."[22]

The single most authoritative, public appraisal of UNRWA's operations prior to October 7, 2023, was not the criticisms by elected officials cited in the Complaint, nor NGO reports[23]

---

[21] "CRS: U.S. Foreign Aid, *supra* note 7, at 22; CRS: The Palestinians at 12; Framework for Cooperation between the UNRWA and the U.S.A. 2023-2024 (signed May 30, 2023) (hereinafter "2023-2024 Framework Agreement"), https://www.state.gov/wp-content/uploads/2023/06/2023-2024-US-UNRWA-Framework-for-Cooperation-FINAL.pdf (last visited May 28, 2024); Annex to 2023-2024 Framework Agreement, https://www.state.gov/wp-content/uploads/2023/06/2023-2024-U.S.-UNRWA-Framework-for-Cooperation-Annex-FINAL.pdf (last visited May 28, 2024).
[22] Annex to 2023-2024 Framework Agreement, *supra* note 20, at 1.
[23] A non-partisan, EU-commissioned research group has described IMPACT-se reports as "marked by generalising and exaggerated conclusions based on methodological shortcomings." Georg Eckert Institute for International Textbook Research, Report on Palestinian Textbooks ("GEI Report"), at 14-15, https://www.gei.de/en/research/projects/report-on-palestinian-textbooks-

deprecating the UN Agency. Rather, it was the U.S. Government findings that UNRWA was in compliance with Section 301(c), as reflected by its decision to continuously reauthorize UNRWA funding. It is beyond doubt that UNRWA USA was entitled to rely on U.S. government sources above any others.

## ARGUMENT

### I.     The Complaint Fails to Allege that UNRWA USA Aided and Abetted the Attack by Hamas on October 7, 2023 That Injured Plaintiffs

Section 2333(d) of the ATA imposes civil liability on a defendant "who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism" that is committed by a designated foreign terrorist organization ("FTO"). 18 U.S.C. § 2333(d)(2). To satisfy this standard, a plaintiff must allege that the defendant's conduct amounted to "conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023). Culpable participation in this context requires an "affirmative act," undertaken "with the intent of facilitating the offense's commission." *Id.* at 490 (internal quotation marks omitted). Aiding-and-abetting liability will not attach to "omissions, inactions, or nonfeasance." *Id.* at 489. Rather, a plaintiff must plausibly allege that the defendants participated in the relevant attack "as something that they wishe[d] to bring about," or "sought by their action to make it succeed." *Id.* at 490.

To state an ATA aiding-and-abetting claim, it is not enough for a plaintiff to allege that a defendant gave "assistance to [the FTO's] activities in general." *Id.* at 503; *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 675 (D.C. Cir. 2023) ("Aiding and abetting requires more than the provision of

---

paltex. (The GEI Report is cited in note 20 of the "UNRWA Education: Reform or Regression" report, which is cited throughout the Complaint. Compl. nn. 54 & 126.) And investigations into UN Watch's reports alleging misconduct by UNRWA staff have shown that many of the accused are not even affiliated with UNRWA. UNRWA, "UNRWA Statement on UN Watch Allegations," 5 Aug. 2021, unrwa.org/newsroom/official-statements/unrwa-statement-un-watch-allegations.

material support to a terrorist organization.") (internal quotation marks omitted). It is "not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it."). *Twitter*, 598 U.S. at 495. Rather, the defendant must have specifically "aided and abetted the act of international terrorism that injured the plaintiffs." *Id.* at 497.

When Congress enacted Section 2333(d), it pointed to *Halberstam v. Welch*, 705 F. 2d 472 (D.C. Cir. 1983), as "provid[ing] the proper legal framework" for "civil aiding and abetting and conspiracy liability." Justice Against Sponsors of Terrorism Act ("JASTA") § 2(a)(5), 130 Stat. 852. Thus, to state an aiding-and-abetting claim under the ATA, *Halberstam* requires a plaintiff to show that "(1) the party whom the defendant aids [performed] a wrongful act that cause[d] an injury; (2) the defendant [was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance; [and] (3) the defendant . . . knowingly and substantially assist[ed] the principal violation." 705 F.2d at 477.[24]

Plaintiffs fail to satisfy any of these elements. First, they fail to allege that UNRWA USA provided knowing and substantial assistance to the October 7 attacks: they fail to plead that any UNRWA USA aid actually went to Hamas, Hamas's terrorist operations, or the October 7 attack, rather than being spent on UNRWA's humanitarian operations. They also fail to factually allege that UNRWA USA intended that its aid be used for anything but UNRWA's humanitarian operations. Second, Plaintiffs fail to factually allege that UNRWA USA was "generally aware" it was assuming a role in Hamas's terrorist operations by aiding UNRWA. To the contrary, the Complaint acknowledges, and the public record confirms, that UNRWA frustrated Hamas's

---

[24]While *Twitter* warned courts against "hew[ing] too tightly to the precise formulations *Halberstam* used," it did not invalidate that test. 598 U.S. at 493. Rather, the Court explained that "both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably "participate[d]" in a wrongful act so as to help make it succeed." *Id.*

attempts to exploit UNRWA's resources to further its criminal aims. Finally, there is no allegation that UNRWA itself committed any wrongful act that caused Plaintiffs' injury. In short, the link between UNRWA USA and the October 7 attacks is not merely attenuated—it is non-existent.

### A.  Plaintiffs Have Failed to Allege that UNRWA USA Knowingly Provided Substantial Assistance to the October 7 Attacks

The Complaint is devoid of non-conclusory allegations that UNRWA USA provided any aid whatsoever to Hamas, much less that it "consciously, voluntarily, and culpably" provided aid with the intent of facilitating Hamas's terrorist activities, much less the October 7 attacks. *Twitter*, 598 U.S. at 489-90, 505.

Plaintiffs assert in a conclusory fashion that UNRWA USA generally supported Hamas's terrorist operations by providing aid that UNRWA used to (i) pay teacher salaries, some of whom were allegedly involved in October 7, (ii) fund schools that use curriculum encouraging violence, and (iii) build or run facilities that Hamas militants exploited; Plaintiffs then baldly assert that "UNRWA USA provided direct support for Hamas on October 7, 2023." Compl. Intro at 2, ¶¶ 94, 141. But the Complaint does not offer a single factual allegation to support these claims.

To start, the Complaint fails to allege that any of UNRWA USA's aid was actually transferred—directly or otherwise—to anyone affiliated with Hamas, or that any of that aid was used to facilitate Hamas's terrorist operations, much less the October 7 attack. Indeed, apart from a reference to a single grant to provide drinking water, *id.* ¶ 56, nn. 30 & 52, the Complaint is silent as to how UNRWA USA's contributions were spent, and alleges nothing to suggest that those contributions were used for anything other than UNRWA's humanitarian operations.

Instead, Plaintiffs invite the Court to *assume* that some of UNRWA USA's aid must have passed on to Hamas. Courts have uniformly rejected that precise inference: the law is clear that, where a defendant is alleged to have aided an FTO via an intermediary with "legitimate operations," the plaintiff must specifically allege that the FTO received the defendant's funds. *See,*

*e.g.*, *Ofisi*, 77 F.4th at 675-76, 678 (because Sudan has many "legitimate operations," court cannot infer that aid to Sudan flowed to FTOs, notwithstanding Sudan's close ties to those FTOs and its status as a state sponsor of terrorism); *Siegel*, 933 F.3d at 225 (although plaintiffs alleged the provision of "hundreds of millions of dollars" to an intermediary bank with ties to terrorism, "they did not advance any non-conclusory allegation that [al Qaeda Iraq] received any of those funds"); *Bernhardt,* 47 F.4th at 871 ("Because the foreign banks are global financial institutions with legitimate operations and uncertain ties to al-Qaeda, we cannot infer substantial assistance to al-Qaeda from [appellee's] lengthy business relationships with the foreign banks."); *see also Keren Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007 (D.C. Cir. 2023) (refusing to infer that plaintiffs' aid to an intermediary that "engages in lawful civil resistance" was spent on illegal activities); *id.* at 1018 (plaintiffs' failure to plead that intermediary "provided any funds to Hamas" fatal to aiding-and-abetting claim). The Complaint's failure to plausibly allege that any UNRWA USA assistance flowed to Hamas severs the link between those two entities, and is independently sufficient grounds to dismiss Plaintiffs' claims.

Even if the Complaint had factually alleged that UNRWA USA's aid was used to pay Hamas members' salaries, fund problematic school curriculum, and operate facilities that Hamas exploited, that would *still* not qualify as "knowing and substantial" assistance for two reasons. First, the Complaint does not allege that any of the above was done with the requisite *mens rea*— *i.e.*, that UNRWA USA did so "knowingly," "with the intent of facilitating" Hamas's terrorist attacks, *Twitter*, 598 U.S. at 490. The Complaint is devoid of any facts indicating that UNRWA USA "wished" Hamas's terrorist operations "to succeed," *id.* at 490, and acknowledges that UNRWA USA condemned Hamas and called for the criminal prosecution of anyone who participated in the attacks. Press Release (cited in Compl. n.118). Second, the Complaint does not allege a "concrete nexus between [these] services" and the October 7 attacks. *Id.* at 501.

To take each "service" in turn: the Complaint is utterly devoid of facts indicating that UNRWA USA knew or understood that its aid was, or even might be, allocated to pay the wages of anyone involved in terrorism, nor does it draw any "concrete nexus" between the employees' paychecks and their alleged participation in the October 7 attacks.[25] Even if the Complaint had alleged that UNRWA USA inadvertently supplied money to some individuals who belonged to Hamas, that would not be sufficient to state a claim under Section 2333(d). *Twitter*, 598 U.S. at 489, 499-500 (aiding-and-abetting liability does not attach to inadvertent support); *id.* at 503 (general provision of aid to an FTO insufficient to establish aiding and abetting); *Ofisi*, 77 F.4th at 675 (mere provision of "material support" to FTO insufficient to state a claim). The Complaint's conclusory allegation that UNRWA USA aided the attacks by funding educational programming encouraged violence and antisemitism is similarly deficient. Compl. ¶ 57. Plaintiffs again fail to allege the requisite intent—*i.e.*, that UNRWA USA supported UNRWA schools in order to facilitate terrorism, and not as a means of providing Palestinian refugees an education. Moreover, these allegations fails to establish any nexus between lesson plans (which are only alleged to have occurred in a fraction of UNRWA schools[26]) and the October 7 attacks. Compl. ¶¶ 73-78; *Twitter*, 598 U.S. at 501.

As for the allegation that UNRWA USA's aid helped build or operate facilities that Hamas exploited, Compl. ¶¶ 73-78, the Complaint fails to allege that UNRWA USA provided such funds *intending* the facilities to be misused in that manner. To the contrary, the Complaint's acknowledgement that UNRWA took steps to fortify its installations against militants' misuse and

---

[25] Well-established tort law—which holds that employers are presumptively *not* responsible for the criminal acts of their employees, *see* Section I.C—defeats Plaintiffs' attempts to draw a nexus between the mere payment of salary and the employees' participation in the attacks.

[26] The Complaint alleges that "teachers and other staff affiliated with over 30 UNRWA schools involved in drafting, supervising, approving, printing, and distributing hateful content to students." Compl. ¶ 61. What the Complaint neglects to mention is that UNRWA operates over 700 schools. UNRWA, "What We Do," https://www.unrwa.org/what-we-do/education.

exposed and protested the tunnels demonstrate that any exploitation of UNRWA facilities by Hamas was done *against* UNRWA USA and UNRWA's wishes. Compl. ¶¶ 73-78; 2015 UNSG Report ¶¶ 64, 75 (cited in Compl. n.73).

In sum, drawing every inference in Plaintiffs' favor, the Complaint fails to establish "knowing and substantial" assistance Given these failings, the Court need not consider the six-part test that *Halberstam* articulated to assist in determining whether aid is "knowing and substantial." *Halberstam*, 705 F.2d at 484-85; *see Twitter*, 598 U.S. at 493, 497, 504 (eliminating the requirement that courts rigidly adhere to the six-factor test).[27] Regardless, applying that test to Plaintiffs' allegations yields the same result:

1) "[N]ature of the act assisted". *Halberstam*, 705 F.2d at 488. This first factor asks "whether the alleged aid . . . would be important to the nature of the injury-causing act." *Honickman*, 6 F.4th at 500. Plaintiffs do not allege that any of UNRWA USA's aid actually reached Hamas, let alone was important to or otherwise used in the October 7 attacks.

2) "[A]mount of assistance provided". *Halberstam*, 705 F.2d at 488. This factor weighs heavily against liability insofar as UNRWA USA is not alleged to have given *any* actual assistance to Hamas.

3) Whether UNRWA USA was present at the time of the principal tort. *Id.* The Complaint does not allege that UNRWA USA was present at the time of October 7 attacks.

4) UNRWA USA's "relation to" Hamas. *Id.* This factor is designed to ascertain whether the defendant occupied a "position of authority [that gives] greater force to his power of suggestion." *Id.* at 484. The Complaint does not allege any relationship whatsoever between UNRWA USA and Hamas, much less one that would give the former any power of persuasion.

---

[27] Even prior to *Twitter,* it was unnecessary to consider the six factors where, as here, the "factual allegations are so clearly deficient." *See Keren Kayemeth Leisrael-Jewish Nat'l Fund* , 66 F.4th at, 1017 n.3.

*See Bernhardt*, 47 F.4th at 872 (plaintiff "does not allege a connection between the foreign banks and al-Qaeda sufficient to infer any relationship, much less a close one, between HSBC and al-Qaeda.").

    5) <u>UNRWA USA's "state of mind"</u>. *Halberstam*, 705 F.2d at 488. This inquiry is designed to determine whether the defendant consciously provided aid with the "intent and desire to make the [unlawful] venture succeed." *Id.*; *Twitter*, 598 U.S. at 496-97. The Complaint is devoid of any non-conclusory allegations that UNRWA USA furnished aid to UNRWA with the intent of facilitating Hamas' terrorist operations.

    6) <u>"[D]uration of the assistance given"</u>. *Id.* 488. This factor is irrelevant to the analysis because Plaintiffs have not alleged any assistance to Hamas or any of its operations. S*ee Siegel v. HSBC N. Am. Holdings, Inc*., 933 F.3d 217, 225 (2d Cir. 2019) (25-year banking relationship did not support aiding-and-abetting liability where complaint failed to allege assistance to FTO's terrorist operations).

    Plaintiffs' failure to adequately plead conscious, culpable, and concrete assistance to Hamas's terrorist operations is independently fatal to their aiding and abetting claim.

### B. Plaintiffs Do Not Plausibly Allege that UNRWA USA Was Generally Aware of Playing a Role in Hamas's Terrorist Operations

    The Complaint also fails to plead the separate element that UNRWA USA was "generally aware of [its] role" in Hamas's terrorist activities. *Halberstam*, 705 F. 2d at 477. To satisfy *Halberstam*'s general awareness requirement, it is not enough that the defendant understood that it was generally supporting a terrorist organization; rather, the defendant must be cognizant of "assuming a role in terrorist activities." *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 231, 239 (E.D.N.Y. 2019), *aff'd* 993 F.3d 144 (2d Cir. 2021) ("Evidence that Defendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement."). Moreover, the "inquiry is not whether a defendant should

have been aware of its role"—rather, the plaintiff must establish "actual awareness." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 867 n.11 (D.C. Cir. 2022) (rejecting "extreme recklessness" standard for general awareness).

Where, as here, a plaintiff claims that the defendant aided an FTO through an intermediary, the plaintiff must plead that (1) the defendant "was aware of the [intermediary's] connections with [with the FTO] *before* the relevant attacks;" and (2) the intermediary was "so closely intertwined with [the FTO's] violent terrorist activities that one can reasonably infer [that the defendant] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to the [intermediary]." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) (emphasis added); *accord Bernhardt*, 47 F.4th at 867-68; *id.* at 870 (noting that D.C. Circuit had previously found general awareness satisfied where the intermediary and terrorist organization were "so closely intertwined . . . that they were effectively the same entity") (citing *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 224 (D.C. Cir. 2022)). The Complaint fails to allege both the requisite intertwinement and UNRWA USA's awareness thereof.

Plaintiffs anchor their claims of intertwinement on (i) unsubstantiated allegations that 12 to 30 UNRWA employees participated in the attacks, Compl. ¶¶ 95, 108; (ii) Israeli claims that 10% of its employees have "links" to Hamas or Islamic Jihad and 50% have relatives in those groups, *id.* ¶¶ 46, 96; (iii) a report that 30 UNRWA teachers praised the attacks on a Telegram channel, *id.* ¶¶ 62-69; (iv) a report that some UNRWA teachers promoted hate and violence on social media and in the classroom, *id.* ¶¶ 60, 141; (v) Hamas's alleged control over the UNRWA employees' staff union, *id.* ¶ 49; (vi) the arrest of 13 UNRWA staff members, twenty years ago, on suspicion of engaging in terrorism, *id.* ¶ 48; and (vii) misuse of UNRWA facilities by militant groups. *Id.* ¶¶ 73-79.

At the outset, Plaintiffs cannot rely on the first three of these allegations (UNRWA employee participation in the attacks, the 10%/50% charge, or the report that UNRWA staff praising the attacks) because these claims were first made after October 7. *Halberstam*, 705 F.2d at 477 (general awareness required "at the time" aid that led to the attack was furnished); *Honickman*, 6 F.4th at 501-02 (information that came to light after the attack cannot be used to support the inference that the defendant was aware "at the time it provided [its services]" to the intermediary); *accord Ofisi*, 77 F.4th at 675.

Even putting aside that temporal restriction, these seven allegations, combined, still fail to establish the requisite level of intermediary intertwinement. Viewed in context, the figures cited in the Complaint do not remotely support the Complaint's allegation that UNRWA was "riddled with Hamas activists," *id.* ¶ 49, let alone that it "so closely intertwined" with Hamas's terrorist operations that UNRWA USA was aware that its aid would benefit those operations (or that it did). Plaintiffs allege that 12 to 30 UNRWA staff, out of 13,000 UNRWA staff in Gaza, *id.* ¶ 108, participated in the attacks, and not in any way related to their work for UNRWA, much less in a manner authorized or condoned by UNRWA. The Complaint alleges that 14 to 30 staff members (again, out of tens of thousands) praised the attacks on a Telegram chat, but does not allege that they were members of Hamas, that they had anything to do with the attacks, or that UNRWA facilitated or condoned those communications. And, as explained above, the 10% with "links" broadly sweeps up everyone involved in Hamas's extensive non-military affairs, and anyone with ties to said individuals; and the 50% amounts to guilt by familial relation. This is a far cry from cases like *Atchley* where the court found the intermediary and FTO "so closely intertwined . . . that they were effectively the same entity." *Bernhardt*, 47 F.4th at 870 (citing *Atchley*, 22 F.4th at 224).

The allegations that UNRWA teachers promoted violence or antisemitism are equally deficient. To illustrate the supposed pervasiveness of pro-Hamas sentiments in UNRWA schools,

Plaintiffs cite a UN Watch/IMPACT-se report that claims to have identified, from 2015 to 2023, the following: 133 UNRWA educators and staff who "promote[d] hate and violence on social media," and 82 UNRWA teachers and staff affiliated with 30 UNRWA schools who were "involved in drafting, supervising, approving, printing, and distributing hateful content to students." *Id.* ¶ 61; *see* UN Watch & IMPACT-se, UNRWA Education: Reform or Regression 42-44 (cited in Compl. n.54) (tabulating examples from 2015 to 2023). The Complaint does not allege that these individuals belonged to Hamas; thus these numbers are irrelevant to the intertwinement inquiry. In addition, these numbers (accumulated over an 8-year period) must be seen in context; UNRWA employs around 20,000 educational staff, almost all of whom are refugees themselves, and operates over 700 schools. *Supra* note 26. Similarly, as noted above regarding the allegation that 118 graduates of UNRWA schools have joined Hamas, Compl. ¶ 72, UNRWA schools enroll over 500,000 Palestinian refugee students per year.

As for the employee union, Plaintiffs allege no facts substantiating the conclusory claim that Hamas used the union to exercise a "strong and direct influence over UNRWA and its personnel," Compl. ¶¶ 49-50, much less that it wielded that control to further its "terrorist activities," *Weiss*, 381 F. Supp. 3d at 231, 239, as opposed to furthering typical union goals like negotiating for better compensation or working conditions. The Complaint supplies only examples of Hamas potentially exerting influence over a personnel decision; by comparison it identifies at least *ten* instances in which UNRWA terminated employees for participating in Hamas's political and military activities. Compl. ¶¶ 55, 99. Finally, with respect to the misuse of UNRWA facilities, the Complaint and the documents incorporated therein show that UNRWA publicly *thwarted* these efforts by: exposing and protesting Hamas's tunnelings and any armed groups' use of UNRWA schools to conceal weapons, and taking remedial steps (*e.g.,* routine inspections) to prevent recurrences. Compl. ¶¶ 73-78; 2015 UNSG Report ¶¶ 64, 75 (cited in Compl. n.73).

24

In short, there was no entanglement between UNRWA and Hamas for UNRWA USA to be "generally aware" of. Having failed to allege any *facts* to support actual intertwinement, the Complaint resorts to third-party criticisms of UNRWA—specifically, partisan critiques leveled by Senators and disparaging reports by UN Watch and IMPACT-se. *See, e.g.,* Compl. ¶¶ 102-03; *id.* ¶¶ 112-13 (alleging that UNRWA USA was aware of public criticisms of UNRWA). But in recounting the publicly contentious conversation about UNRWA, the Complaint ignores the official position of the US Government, which signaled through its continuous reauthorization of UNRWA funding that the UN agency was meeting the requirements set forth in US laws and the US-UNRWA Framework Agreement—conditions which included (i) vetting employees against sanctions lists; (ii) subjecting employees to mandatory neutrality trainings; (iii) disciplining employees who participated in militant activities; (iv) securing UNRWA installations against misuse by militant groups; (v) and sharing its staff lists with Israel authorities.[28]

Courts have found general awareness lacking in the face of far more extensive—and credible[29]—public information linking an intermediary with an FTO than that alleged in the Complaint. For example, in *Siegel v. HSBC North America Holdings, Inc.*, the plaintiffs attempted to plead general awareness by citing to a CIA report calling the intermediary bank (ARB) a

---

[28] CRS: U.S. Foreign Aid, *supra* note 7, at 22; CRS: The Palestinians at 12; Framework Agreement; Annex to 2023-2024 Framework Agreement, *supra* note 20, at ¶¶ 4-9.

[29] The presumption of truth accorded to well-pleaded factual allegations on a Rule 12(b)(6) motion does not extend to the content of third-party accusations that are pled to show that the defendant had legally required notice. *See, e.g., Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60, 74 (3d Cir. 2011) (no notice where public sources cited in the complaint were "flawed in one way or another"); *Collins v. City of New York*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) (plaintiff's reference to a "litany of other police-misconduct cases" insufficient to plausibly allege Monell liability because they involved "unproven allegations" rather "than evidence of misconduct"); *Xian Ming Wu v. City of New Bedford*, 2013 WL 4858473, at *2 (D. Mass. Sept. 11, 2013) (plaintiff cannot plead notice based on existence of other "unproven complaints"); *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 909 (N.D. Cal. 2018) (customer complaints "merely establish the fact that some consumers were complaining," not that the defendant had actual knowledge of defect).

"Conduit for Extremist Finance," an indictment charging individuals with cashing travelers checks at ARB and smuggling the money to extremists, allegations of wrongdoing at ARB in a US Senate Report, and an internal email authored by an HSBC employee expressing concerns that ARB "may have been used by terrorists." *Siegel*, 933 F.3d at 224 n.6; Third Amended Complaint ¶¶ 34-35, 63, 110, Civ. No. 17-6593(DLC) (S.D.N.Y.), dkt. no. 103. The Second Circuit deemed this insufficient, holding: "At most, the allegations, even when viewed in the light most favorable to the plaintiffs, assert that HSBC was aware that ARB was believed by some to have links to AQI and other terrorist organizations," and not that "HSBC knowingly played a role in [al Qaeda Iraq's] terrorist activities." *Siegel*, 933 F.3d at 224 (emphasis added). That analysis applies with even greater force to the instant Complaint, which provides no reason to credit partisan critics and tendentious NGO reports over the official position of the US Government.

For these reasons, Plaintiffs cannot establish either prong of the "general awareness" test.

### C. The Complaint Fails to Plead that UNRWA Committed a Wrongful Act that Caused Plaintiffs' Injury

Not only does the Complaint fail to plead the second and third *Halberstam* factors, it fails to plead the threshold requirement: that "the party whom the defendant aids [performed] a wrongful act that cause[d] an injury." *Halberstam*, 705 F.2d at 477. Here, "the party whom [UNRWA USA] aided" is UNRWA, not Hamas. Thus, the Complaint must allege that *UNRWA* performed a wrongful act that caused the October 7 attacks. It alleges none.

The allegations that Hamas historically hid weapons in UNRWA schools and had tunnels under UNRWA facilities fail on both counts: the Complaint does not identify a "wrongful act" (in fact, it concedes that UNRWA resisted Hamas's incursions) and it fails to draw a causal connection between these acts and the October 7 attacks. The Complaint's allegations that UNRWA teachers "glorified violence" is also unavailing: Plaintiffs do not attribute the isolated instances of teachers endorsing violence to any wrongdoing by UNRWA, nor, for the reasons explained above, do they

establish a nexus between these occurrences and the October 7 attacks.  Indeed, the only direct nexus alleged between UNRWA and Plaintiffs' injuries is the supposed participation of 12 to 30 UNRWA employees in the October 7 attacks. But, once again, the Plaintiffs fail to plead a "wrongful act." The law does not hold employers blameworthy for the criminal conduct of its employees, except in the narrowest of circumstances, such as where the employee was "acting in the scope of their employment," or the employer "intended the conduct or the consequences" or twas "negligent or reckless." Restatement 2d of Agency § 219(1)-(2); *see generally H.B. v. Pittsburgh Pub. Sch.*, *Dist.*, 2020 U.S. Dist. LEXIS 84950 (W.D. Pa. May 13, 2020) The Complaint does not plausibly allege any of these scenarios.

To fall "within the scope of employment," the conduct must be (1) "of the kind [the employee] is employed to perform," (2) occur on the job, (3) be "actuated, at least in part, by a purpose to serve the master," and (4) involve a use of force that is "not unexpectable by the master." Restatement 2d of Agency § 228(1) (explaining that all these conditions must be present to hold an employer liable); *see also Moretz v. Trs. of Princeton*, 2023 U.S. Dist. LEXIS 230763, at *22 (D.N.J. Dec. 29, 2023) ("Only rarely will intentional torts fall within the scope of employment.") (quotation marks omitted). None of these factors are pled here: as explained above, the Complaint concedes that UNRWA terminated staff accused of participating in the activities; the employees did not participate in the October 7 attacks while "on the job";[30] the Complaint does not allege that the employees took part in the attacks to serve UNRWA's purposes; and it does not allege that UNRWA had any reason to suspect that these employees intended to engage in any terrorist activities.

---

[30] *See, e.g., Conn v. United States*, 376 F. App'x 239 (3d Cir. 2010) (employee who crashed car while "driving on a personal errand after conclusion of the work day" did not act "within the authorized time and space limits" of her employment).

The Complaint is equally devoid of any allegation that UNRWA "intended" the October 7 attacks to occur. To the contrary, the record confirms that UNRWA trained its employees on their neutrality obligations, disciplined those that were found to have violated those obligations, shared its staff identification information with Israeli authorities, and summarily terminated the staff members who were accused of participating in the attacks. Compl. ¶¶ 55, 99; *see supra* at 12-14.

Nor does the Complaint plausibly allege that UNRWA was negligent or reckless.[31] For an employer to be held responsible under this theory, it must have breached a duty of care and foreseeably caused the plaintiff's injuries. *Belmont v. MB Inv. Partners, Inc*., 708 F.3d 470, 491 (3d. Cir. 2012). At the outset, an employer does not have an obligation to police the off-duty activities of its employees.[32] But even assuming, *arguendo*, that UNRWA had a duty to police, the Complaint does not allege any facts suggesting a breach. There is no allegation that UNRWA had any reason to suspect that these employees were Hamas members or militants, knew of the impending attacks, or had the capacity to stop them from participating. *See, e.g.*, *Anderson v. Adam's Mark Hotels & Resorts*, 2000 U.S. App. LEXIS 6949, at *6-7 (10th Cir. Apr. 18, 2000) (rejecting negligence claim where employer had no notice or reason to expect that an off-duty employee would commit assault on the employer's premises).

## II.   The Complaint Fails to State a Conspiracy Claim Under the ATA

---

[31] Even if Plaintiffs plausibly pled that UNRWA was negligent in monitoring these employees, it would not salvage Plaintiffs' claim that UNRWA aided and abetted the attacks. *See Twitter*, 598 U.S. at 489-90 (aiding and abetting requires more than nonfeasance); *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) ("negligence . . . is never sufficient" for aiding-and-abetting liability); *Aetna Cas. & Sur. Co. v. Leahey Constr. Co*., 219 F.3d 519, 536-37 (6th Cir. 2000); Restatement 3d of Torts § 28 cmt. c.

[32] *See, e.g., Belmont*, 708 F.3d at 491 ("An employer is under no duty . . . to discover, at its peril, the fraudulent machinations in which [an employee] was involved outside that and the scope of his employment.") (cleaned up); Restatement 2d of Torts § 317 (duty to exercise reasonable care only extends to instances where the employer is "upon the [employer's] premises" or "is using a chattel of [the employer], and [the employer] (i) knows or has reason to know that he has the ability to control his servant, and (ii) knows or should know of the necessity and opportunity for exercising such control").

Section 2333(d) imposes liability on anyone "who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d). To state an ATA conspiracy claim, a plaintiff must allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477.

The Complaint fails to plausibly allege "an agreement" to participate in an unlawful act. *Halberstam*, 705 F.2d at 477; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (explaining that "stating a [conspiracy] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made," and noting that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). To establish an "agreement," Plaintiffs must plausibly allege that the conspirators—*i.e.,* UNRWA USA, UNRWA, and Hamas—were "pursuing the same objective." *Bernhardt*, 47 F.4th at 873; *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987) ("[C]onspirators [must have] a unity of purpose or a common design and understanding."). In the ATA context, the object of the conspiracy is to commit an act of international terrorism. *See, e.g.*, *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019) (ATA conspiracy claim required that the parties to "share[] the common goal of committing an act of international terrorism").[33]

---

[33] *See also Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *7 (D.D.C. Nov. 16, 2020), *aff'd* 47 F.4th 856 (D.C. Cir. 2022) ("[T]o be subject to secondary liability under JASTA on the basis of a conspiracy, a defendant must have conspired to commit an act of international terrorism.") (internal quotation marks omitted); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019) (ATA conspiracy claim required that the parties to "share[] the common goal of committing an act of international terrorism"); *Cain v. Twitter Inc.*, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018) (dismissing conspiracy claim where plaintiffs pled to allege an agreement "to commit terrorist attacks.").

The Complaint, however, does not plead that the common goal was to commit an act of terrorism. Rather, Plaintiffs allege that the common objectives consisted of "paying Hamas members, employing Hamas members, building schools that stored Hamas weapons, and developing profoundly antisemitic curricula that calls for the murder of Jewish people." Compl. ¶ 141. The October 7 attacks, according to Plaintiffs, was not the agreed-upon goal but, instead, a "foreseeable" consequence. *Id.* That is insufficient as a matter of law.[34] As the Second Circuit recently reaffirmed, conspiracy liability only attaches to overt acts in furtherance of the agreed-upon objective: it does not attach to the "natural and foreseeable consequence of the conspiracy." *Freeman ex rel. Est. Freeman v. HSBC Holdings PLC,* 57 F.4th 66, 82 (2d Cir. 2023); *id*. ("To hold a defendant liable for a coconspirator's actions merely because they are foreseeable—even though wholly detached from the shared conspiratorial plan—would stretch the concept of civil conspiracy too far beyond its origin.").

Not only do Plaintiffs fail to assert a common objective to commit a terrorist act, they fail to adequately allege that the parties actually shared *any* of the "common objectives" listed in the Complaint. *See* Compl. ¶ 141. As described above, the Complaint fails to allege that UNRWA USA offered any support to Hamas, knowingly or otherwise; and the Complaint and record show that UNRWA endeavored to oust Hamas activists from its ranks, safeguard its installations from Hamas incursions, and remove curriculum that violated its neutrality guidelines. This well-documented, adversarial relationship between UNRWA and Hamas, and the absence of any allegations that UNRWA USA and Hamas shared a common design, are independently fatal to Plaintiffs' conspiracy claim. *See Freeman*, 57 F.4th at 80 (dismissing conspiracy claim where plaintiffs failed to allege that "the Banks and the terrorist groups shared any common intent"); *see*

---

[34] For the all the reasons explained above, *see supra* Sections I.A & B, Plaintiffs have failed to plausibly allege any nexus between UNRWA USA's aid and the October 7 attacks and, thus, cannot possibly establish that the October 7 attacks were a "foreseeable consequence" of that aid.

*also Bernhardt*, 47 F.4th at 873 (holding that plaintiff's "conspiracy claim [against HSBC] is inadequate" because "[t]he complaint states that HSBC was trying to make substantial profits by evading sanctions, whereas al-Qaeda sought to terrorize the U.S. into retreating from the world stage") (internal quotation marks omitted)).

The Complaint fails to plead an agreement for a final reason: the ATA limits conspiracy liability to one "who conspires *with* the person who committed [the] act of international terrorism." 18 U.S.C. § 2333(d)(2) (emphasis added). The plain text of the statute requires the defendant to have directly interacted with the group that caused a plaintiff's injuries. *See also, Twitter,* 598 U.S. at 489-90 (conspiracy requires an "agreement with the primary wrongdoer to commit wrongful acts"); *Halberstam*, 705 F.2d at 481 (to infer existence of experience "courts must initially look to see if the alleged joint tortfeasors are . . . in contact with one another."). The Complaint, however, does not allege that UNRWA USA had any contact whatsoever with Hamas. For these reasons, Plaintiffs' ATA conspiracy claim must be dismissed.

### III.  The Court Should Dismiss Plaintiffs' Alien Tort Statute Claim for Failure to State a Claim and for Lack of Subject Matter Jurisdiction, as Plaintiffs Fail to Allege an Enforceable Treaty or Law of Nations Violation

This Court should dismiss Plaintiffs' Alien Tort Statute ("ATS") claim for at least two reasons. First, the facts alleged in the Complaint are insufficient to state a claim for a violation of the law of nations for the same reasons they are insufficient to state a claim for secondary liability under the ATA. The requirements for an ATS aiding-and-abetting claim are at least as strict as those of an ATA claim. *See, e.g.*, *Aziz v. Alcolac, Inc.,* 658 F.3d 388, 398 (4th Cir. 2011) (ATS claims require defendant "(1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime"). As explained in Section I of this brief, the Complaint does not

plausibly allege that UNRWA USA aided and abetted the October 7 attacks.[35]

Second, the Court does not have subject matter jurisdiction under the ATS because neither the International Convention for the Suppression of the Financing of Terrorism (the "Financing Convention") nor a claim of "terrorism" triggers ATS jurisdiction. The ATS confers jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. § 1350. The ATS does not create a cause of action, but is a strictly jurisdictional statute that affords subject matter jurisdiction over a narrow set of international law violations. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712-14, 720 (2004). To recognize a cause of action under the ATS, the threshold question is whether the international norm alleged to have been violated is "specific, universal, and obligatory." *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 258 (2018) (quoting *Sosa*, 542 U.S. at 732). If there is no such norm, the inquiry ends. *Id.*

Plaintiffs argue that the ATS provides jurisdiction over claims brought pursuant to state tort law, the Financing Convention, and customary international law. Each argument has been repeatedly rejected.  First, with respect to state torts, none of those listed in the Complaint under Plaintiffs' ATS Claim for Relief (e.g., assault, battery, negligence) constitute violations of the law of nations or U.S. treaties, and thus none satisfy subject matter jurisdiction under the ATS. Compl. ¶ 148; *see Kiobel v. Royal Dutch Petroleum Co*., 621 F.3d 111, 117-18 (2d Cir. 2010) ("the substantive law that determines our jurisdiction under the ATS is neither the domestic law of the United States nor the domestic law of any other country.").

Second, the Financing Convention does not provide subject matter jurisdiction under the "treaty" prong of the ATS. "For any treaty to be susceptible to judicial enforcement it must both

---

[35] Plaintiffs allege that UNRWA USA donated to UNRWA while "substantially aware" of its "close ties" to Hamas, Compl. ¶ 143, not that it provided any assistance "with the purpose of facilitating the commission" of any ATS violation.

confer individual rights and be self-executing." *Cornejo v. Cty. of San Diego*, 504 F.3d 853, 856 (9th Cir. 2007); *Sosa*, 542 U.S. 692, 734-35 (Universal Declaration of Human Rights and International Covenant on Civil and Political Rights are not privately enforceable in federal court because they were not self-executing); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir. 1979) ("unless a treaty is self-executing, it must be implemented by legislation before it gives rise to a private cause of action.") The Financing Convention "is neither self-executing nor does it create a private right of action." *Krishanthi v. Rajaratnam*, 2010 WL 3429529, at *10-11, *13 (D.N.J. Aug. 26, 2010); *see also* Financing Convention, arts. 4-7 (specifying that enforcement relies on adoption of implementing legislation by parties to the Convention).

Finally, neither "terrorism" nor "financing terrorism," *see* Compl. ¶¶ 149-155, constitute customary international law violations to satisfy the requirements for ATS jurisdiction.  No case has upheld a claim of either terrorism or financing terrorism as a customary international law norm cognizable under the ATS, because the concept of terrorism has not been clearly defined internationally, and cannot satisfy the *Sosa* requirements of "specific, universal and obligatory."[36] *See, e.g.*, *Terrorist Attacks on September 11, 2001 v. Al Rajhi Bank (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 118, 125 (2d Cir. 2013) (affirming district court dismissal of ATS claim because "no universal norm against 'terrorism' existed under customary international law"); *see Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795, 233 U.S. App. D.C. 384 (D.C. Cir. 1984) (Edwards, J., concurring) ("Indeed, the nations of the world are so divisively split on the legitimacy of such aggression [i.e., terrorism] as to make it impossible to pinpoint an area of harmony or consensus."); *In re Chiquita Brands Int'l., Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1317 (S.D. Fla. 2011) (rejecting plaintiffs' "attempt to group this

---

[36] U.S recognition of certain acts of "terrorism" and "financing terrorism" as *domestic* crimes does not render those acts violations of international law that trigger ATS jurisdiction.

broad, ill-defined class of conduct under the umbrella of 'terrorism,' or material support thereof, and create a cause of action against it under the ATS"); *Mwani v. Bin Ladin,* 2006 WL 3422208, at *3 n.2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations.").[37]

Plaintiffs' claim for "financing terrorism" fares no better. The Financing Convention does not define a customary international law norm sufficient to provide jurisdiction under the ATS. *See, e.g., In re Chiquita Brands Int'l,* 792 F. Supp. 2d at 1318  ("the Financing Convention does not establish a *universally accepted* rule of customary international law." (emphasis in original)); *Krishanthi,* 2010 WL 3429529, at *2, *10–11, *13 ("financing terrorism" does not state a cognizable claim under the ATS).[38] Although many states have ratified the Convention, a significant number have attached declarations and reservations indicating that they do not accept its definition of "financing terrorism."[39] As the *Chiquita* court concluded, the "disagreements, non-consents, and divergent interpretations of the Finance Convention demonstrate that the prohibitions of the convention are disputed and not well-established." 792 F. Supp. at 1319. Because Plaintiffs fail to identify a cause of action over which the ATS grants jurisdiction, their claim must fail.

---

[37] In *Almog v. Arab Bank,* PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), *see* Compl. ¶ 150,  the ATS claim based on "terrorism" was dismissed in *sub nom In re Arab Bank PLC Alien Tort Litigation*, 808 F.3d. 144 (2d Cir. 2015).

[38] *See also Jesner*, 584 U.S. at 262 (the Financing Convention "neither requires nor authorizes courts, without congressional authorization, to displace those detailed regulatory regimes [of the ATA and other federal laws] by allowing common-law actions under the ATS").

[39] The list of reservations and objections to the Financing Convention is extensive and reflects significant substantive disagreements as to the definition of terrorism. A complete list of the signatories and the reservations can be found at https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-11&chapter=18&clang=_en.

## IV.     The Complaint Fails to State a Claim for Negligence Infliction of Emotional Distress

To state an NIED claim, a plaintiff must plead: "'(1) negligence causing fright to someone; (2) that the plaintiff was within the 'zone of danger'; and (3) that the plaintiff suffered physical harm as a result.'" *Butcher v. Linkhorst*, 2023 U.S. Dist. LEXIS 175189, at \*11 (D. Del. Sep. 29, 2023) (quoting *Spence v. Cherian*, 135 A.3d 1282, 1290 (Del. Super. Ct. 2016)). Plaintiffs must identify both a duty of care and a breach. *Spence*, 135 A.3d at 1290. Plaintiffs fail to allege that UNRWA USA owed a duty to care to Israeli citizens or that it breached this duty by supporting UNRWA.

Even if they did, Delaware law recognizes the traditional "but for" test for proximate causation. *Duphily v. Delaware Elec. Coop., Inc.*, 662 A.2d 821, 828-29 (Del. 1995). To satisfy this test, "a proximate cause must be one 'which in natural and continuous sequence, unbroken by any intervening cause, produces the injury and without which the result would not have occurred.'" *Emerson v. United States*, 1998 U.S. Dist. LEXIS 6461, \*16 (D.Del.1998) (quoting *Laws v. Webb*, 658 A.2d 1000 (Del.1995)). Plaintiffs allege no nexus between UNRWA USA's donations to UNRWA and the Hamas attacks. Plaintiffs' NIED claim must fail.

## CONCLUSION

For the foregoing reasons, UNRWA USA respectfully requests that the Court dismiss the Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1).

Date: May 28, 2024                                    Respectfully submitted,


Maria LaHood (admitted *pro hac vice*)                /s/ Joseph E. Brenner
Diala Shamas (admitted *pro hac vice*)                Michael C. Heyden, Jr. (#5616)
Judith Brown Chomsky (admitted *pro hac vice*)        Joseph E. Brenner (#6643)
Beth Stephens (admitted *pro hac vice*)               GORDON REES SCULLY
MANSUKHANI, CENTER FOR CONSTITUTIONAL RIGHTS   LLP
666 Broadway, 7th Floor                               824 N. Market St., Suite 220
New York, NY 10012                                    Wilmington, DE 19801
(212) 614-6430                                        (302) 992-8955

35

mlahood@ccrjustice.org

Luna Droubi (admitted *pro hac vice*)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Ave., PH/26th Floor
New York, NY 10016

mheyden@grsm.com
jbrenner@grsm.com

Joseph Pace (admitted *pro hac vice*)
J. PACE LAW PLLC
30 Wall St, 8th Floor
New York, NY 10005
jpace@jpacelaw.com

*Attorneys for Defendant UNRWA USA National Committee, Inc.*