# EXHIBIT 11

# FINAL REPORT FOR THE
# UNITED NATIONS SECRETARY-GENERAL

## Independent Review of Mechanisms and Procedures to Ensure Adherence by UNRWA to the Humanitarian Principle of Neutrality

20 APRIL 2024

# Table of contents

| | | |
|---|---|---:|
| I. | **Executive Summary** | **3** |
| II. | **Engagement with donors** | **6** |
| III. | **Governance** | **7** |
| IV. | **Management and oversight mechanisms** | **9** |
| | Management | **10** |
| | Internal oversight | **11** |
| | Reporting and intake of allegations | **12** |
| | Investigations | **13** |
| | Disciplinary mechanism: the UNRWA Dispute Tribunal | **14** |
| | UNRWA property, procurement and project oversight | **15** |
| V. | **Neutrality of staff** | **18** |
| | Regulatory Framework | **18** |
| | Screening and vetting | **20** |
| | Training | **22** |
| | Staff care | **23** |
| VI. | **Neutrality of installations** | **25** |
| | Regular inspections | **25** |
| | Critical breaches | **26** |
| VII. | **Education** | **28** |
| VIII. | **Staff unions** | **32** |
| IX. | **Strengthened partnership with UN agencies** | **34** |
| X. | **Conclusions and recommendations** | **36** |
| XI. | **Endnotes** | **43** |
| XII. | **Annexes** | **46** |
| | Annex A: Terms of Reference | **46** |
| | Annex B: Overview of documented and alleged violations of neutrality and inviolability | **50** |

# I. Executive summary

An Independent Review Group on the UN Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) was appointed by the United Nations (UN) Secretary-General, in consultation with the UNRWA Commissioner-General, on 5 February 2024. The Group was created to assess whether UNRWA is doing everything within its power to ensure neutrality and respond to allegations of serious neutrality breaches when they are made, taking into account the […] context in which it has to work, especially in Gaza,[1] and to make recommendations for UNRWA to improve and strengthen in this area, if necessary. This followed allegations made by the Government of Israel in January 2024 that some UNRWA staff may have participated in the 7 October 2023 terror attacks on Israel. The UN Secretary-General also activated a separate investigation by the UN's Office of Internal Oversight Services (OIOS) to determine the veracity of these allegations, which, if proven true, would be horrifying in addition to being a grave violation of their obligations towards the Organization.

In the days and weeks after the allegations, 16 Member State donors suspended or paused funding, and others indicated conditionality. Overall, the suspension of funding amounted to around US$450 million. Based on initiatives already taken by UNRWA, a number of Member States have since resumed funding. However, Member States requested more information on what had occurred as well as reinforcement of UNRWA's existing neutrality mechanisms and procedures, including staff vetting and oversight.

The Review Group commenced its work on 13 February 2024. Led by Ms. Catherine Colonna, the Group included three research organizations, namely the Raoul Wallenberg Institute of Human Rights and Humanitarian Law in Sweden, the Chr. Michelsen Institute in Norway, and the Danish Institute for Human Rights.

Throughout the nine-week review, the Group extensively analysed the mechanisms and procedures currently in place within UNRWA to ensure neutrality and address potential breaches. The Group's members conducted field visits to UNRWA headquarters and facilities in Amman, Jerusalem and the West Bank, engaging with various stakeholders including UNRWA officials, donor Member States, host countries, Israel, the Palestinian Authority, Egypt, UN agencies and non-governmental organizations (NGOs). The Group

conducted meetings and interviews with more than 200 people, including with UNRWA staff in Gaza. Direct contacts were made with 47 countries and organizations.

The three institutes submitted their research to the Secretary-General through his Chef de Cabinet and to the Chair. The present document, which constitutes the final review report, is presented under the responsibility of the Chair.

Situating the review, it is significant that UNRWA continuously operates amid recurring conflicts, violence, a lack of political progress, poor socioeconomic conditions and the proliferation of armed groups. In Gaza in particular, Hamas, the de facto ruling entity until October 2023, is designated as a terrorist organization by major donors such as the United States and the European Union (EU), while other factions also actively oppose the Palestinian Authority. UNRWA's neutrality challenges differ from those of other international organizations due to the magnitude of its operations, with most personnel being locally recruited and recipients of UNRWA services.

In the absence of a political solution between Israel and the Palestinians, UNRWA remains pivotal in providing life-saving humanitarian aid and essential social services, particularly in health and education, to Palestinian refugees in Gaza, Jordan, Lebanon, Syria and the West Bank. As such, UNRWA is irreplaceable and indispensable to Palestinians' human and economic development. In addition, many view UNRWA as a humanitarian lifeline.

As a UN agency, UNRWA and its staff and personnel have a fundamental obligation to maintain neutrality to ensure the integrity of the agency's mission and the effectiveness of its operations. Neutrality is a UN commitment as one of the four humanitarian principles formally adopted by the General Assembly[1] and upheld by other UN agencies while operating in humanitarian settings. It means that humanitarian actors must not take sides in hostilities or engage in controversies of a political, racial, religious or ideological nature. Despite significant investment and efforts, UNRWA's neutrality has been consistently questioned by Palestinian and Israeli stakeholders. In the past, several allegations of neutrality breaches have taken place and disciplinary measures were taken, but allegations of neutrality breaches were never as serious as the ones that surfaced in January 2024.

The Review revealed that UNRWA has established a significant number of mechanisms and procedures to ensure compliance with the humanitarian

principles, with emphasis on the principle of neutrality, and that it possesses a more developed approach to neutrality than other similar UN or NGO entities. The UNRWA Neutrality Framework was established in 2017 "to serve as a repository of existing standards, practices and procedures with regard to neutrality and to introduce new standards and procedures."[3] The framework aims to "ensure a consistent and coherent approach, agency-wide, to key issues relating to the neutrality of UNRWA operations."[4] The Framework covers substantive areas including the neutrality of UNRWA staff and other personnel, including their use of social media; neutrality of UNRWA installations; neutrality of UNRWA assets, particularly vehicles; and other areas in relation to UNRWA operations, including donors, partners and agency assistance. Obligations for the agency's staff are set out clearly in the International Staff Regulations and the Area Staff Regulations dated 1 January 2018.

Despite this robust framework, neutrality-related issues persist. They include instances of staff publicly expressing political views, host-country textbooks with problematic content being used in some UNRWA schools, and politicized staff unions making threats against UNRWA management and causing operational disruptions. The Review identified several measures to help UNRWA address its neutrality challenges in eight critical areas requiring immediate improvement:

- Engagement with donors
- Governance
- Management and internal oversight structures
- Neutrality of staff and behaviour
- Neutrality of installations
- Neutrality of education
- Neutrality of staff unions
- Strengthened partnership with UN agencies

The measures identified in each critical area are designed to help UNRWA face the neutrality challenges stemming from the operational, political and security environment in which it operates. Given the uniqueness of this political context, these measures will have a significant impact only with the support of host countries, Israel and the Palestinian Authority.

# II. Engagement with donors

Donors expressed significant concerns over UNRWA's lack of communication and information-sharing. This has focused not only on the agency's neutrality issues but also on, for example, its budget and its financial state. UNRWA's communication efforts on neutrality are perceived as too defensive and lacking transparency.

UNRWA uses a number of forums and channels to inform donors. However, decision makers in donor capitals often feel that the information shared by UNRWA does not meet their needs. Donors require regular updates on UNRWA's financial status, the impact of the lack of funds on operations, and realistic evidence-based predictions on when the funding shortfall will take effect.

The relationship with donors needs to be deemed a strategic partnership, including on the issue of neutrality. For this, transparency is crucial. UNRWA should engage donors early with neutrality concerns and provide greater financial transparency to restore trust and confidence in the organization.

### The Chair recommends to:

1. Increase the frequency and strengthen the transparency of UNRWA's communication with donors on its financial situation and on neutrality allegations and breaches;
   a. Plan regular updates by UNRWA on its budget and the structure of this budget, including in the Commissioner-General's direct interactions with Governments.
   b. Establish 'Integrity Briefings' for donors interested in supporting UNRWA on integrity and related issues, with meetings or briefings held at UN headquarters in New York or Geneva.

# III. Governance

UNRWA was established by resolution 302 (IV), adopted by the UN General Assembly (UNGA) on 8 December 1949. The agency is therefore formally mandated by the UNGA, which gives the organization its political support at its mandate renewal every three years. The UNRWA Commissioner-General, who reports directly to the General Assembly, is responsible for all UNRWA activities as well as its administration.

UNRWA does not have an Executive Board, but it does have an Advisory Commission, created in 1949 to advise and assist the Commissioner-General, with currently 29 members and four observers. The Advisory Commission meets in June and November. Discussions of a more operational nature are conducted by a sub-committee.

The Advisory Commission is an advisory body without executive authority. The nature of its proceedings is diplomatic and aims at sharing information and providing advice to UNRWA, rather than adopting resolutions or providing oversight. Instead of meeting within the politically significant venues of the UN's headquarters in New York or Geneva, the Advisory Commission rotates its meetings within UNRWA's host countries.

UNRWA benefits from the fact that donors and host countries as key constituencies are represented in the Advisory Commission. However, this can also constitute a challenge, as political differences affect discussions of organizational and operational matters. The Advisory Commission has frequently been reluctant to consider sensitive neutrality-related issues. When Advisory Commission members are unable to reach consensus, issues are typically not tabled. Some Advisory Commission members have demanded that UNRWA remove discriminatory sentences from textbooks used in its schools, while other Advisory Commission members remain opposed to it. Over the last year, the Advisory Commission did not agree to discuss the neutrality challenges posed by UNRWA's staff unions because of political sensitivities.

These governance arrangements mean that UNRWA cannot rely on the needed political support to effectively address neutrality issues, which, if not provided by the General Assembly, should be provided by the Advisory

Commission or any other governance arrangement. The international community needs to play its part in ensuring that UNRWA fulfils its mandate.

**The Chair recommends to:**

2.  Request the Advisory Commission to fulfil its role by effectively advising and assisting UNRWA on fulfilling its mandate, including by:

    a.  Convening at the UN in New York at Permanent Representative level once a year.
    b.  Setting neutrality as a standing agenda item at its twice-yearly meeting.
    c.  Creating an Advisory Commission Working Group on neutrality and integrity issues, and inviting host countries and Israel to present their concerns.

3.  Explore additional governance arrangements to assist in providing strategic direction to UNRWA and improving external communications.

# IV. Management and oversight mechanisms

Management and oversight play a key role in ensuring UNRWA reliably implements its organizational policies, agreed procedures and practices on neutrality. UNRWA has important management and oversight mechanisms and procedures in place. However, there is a need to strengthen and restructure relevant departments and reinforce efforts on the nascent Enterprise Risk Management System. Some changes to the modes of management of international and local staff and frameworks for project monitoring are also recommended to ensure UNRWA better manages its neutrality obligations. Of note, some of these workstreams to strengthen UNRWA's oversight and accountability functions have already been initiated.[5]

UNRWA currently implements and enforces neutrality based on the following pillars:

- A regulatory framework and policies with key elements relating to neutrality, such as International and Area Staff Regulations and Rules; a Code of Ethics; Standards of Conduct; and specialized policies, such as a social media policy.
- Operational responses, i.e. monitoring and responding to neutrality concerns in UNRWA installations and education activities.
- Outreach and training on neutrality for staff and other personnel.
- Communication and outreach to external stakeholders on neutrality.

Procedures for complaints about alleged staff misconduct and unauthorized use of the UNRWA name and logo.

UNRWA has in place three specialized bodies leading or supporting these workstreams:

- UNRWA Neutrality Task Force: A senior-level group including the Commissioner-General, convened at short notice when critical neutrality incidents occur or are alleged.
- Humanitarian Principles Team: Led by the Senior Humanitarian Principles Coordinator[6] under the Chief of Protection, this team ensures that UNRWA's operations and services are delivered in compliance with the humanitarian principles, including neutrality. The team is involved in policy development, data coordination, training and outreach.
- Humanitarian Principles Working Group: This standing body comprises department directors who engage with issues related to the humanitarian principles across the agency.

Importantly, the Senior Humanitarian Principles Coordinator is currently housed under the Protection Division, i.e. in UNRWA operations rather than its management or oversight architecture. Neutrality activites are mostly funded through voluntary contributions. Given neutrality's organizational significance to UNRWA, it is recommended that a central neutrality function be established in UNRWA's Executive Office. This would increase UNRWA's ability to effectively coordinate relevant internal entities such as the Department of Legal Affairs, communications, partnerships, human resources and risk management functions.

## Management

UNRWA has several organizational and management particularities with an impact on neutrality. Firstly, the agency shows a high degree of vertical integration, i.e. a direct delivery and implementation of the services it oversees, as opposed to outsourcing to implementing partners or suppliers. Secondly, UNRWA covers a vast range of activities, from refugee protection and curriculum development, to garbage collection in camps and communities. Thirdly, a small number of international civil servants (less than 1

per cent of UNRWA's total workforce) leads a vast majority of local area staff, mainly due to scarce resources and UNRWA's reliance on voluntary contributions. UNRWA has not sufficiently modernized its management structure, organization or internal communications to account for this organizational set-up, or to adapt to current management practices within or outside the UN. In 2020, UNRWA launched a series of measures, referred to as the 'Management Initiatives,' to reinvigorate and strengthen its management system. However, several critical areas, such as oversight, have not been sufficiently addressed, as will be further detailed below.

UNRWA's enterprise risk management is another nascent area that warrants reinforced and accelerated efforts in view of the neutrality challenges. Identifying neutrality as a central organizational risk and defining and implementing continuous monitoring and holistic mitigation measures could help more systematically control this risk. The tool could also help allocate resources to neutrality-related efforts in a more rational and efficient manner.

With regards to implementing change initiatives, there are challenges related to UNRWA's staffing structure. UNRWA area staff often remain employed at UNRWA throughout their careers, which is attributable, at least in Gaza, to mobility restrictions and the limited availability of other employment options. The fact that UNRWA is a major employer can create a culture resistant to modernization and reform across levels and roles, as such efforts could entail job cuts. This contextual factor makes change a more complex endeavour for UNRWA management. However, the ability to change and adjust must remain a high priority to ensure the organization can work effectively and efficiently, including to ensure neutrality.

## Internal oversight

The Department of Internal Oversight Services (DIOS) is UNRWA's internal oversight body.[7] Its mandate is set out in Organizational Directive 14 (2020),[8] and it consists of three divisions for the oversight functions of internal audit, evaluation and investigation. The Investigations Division is responsible for investigating allegations of neutrality breaches. DIOS exercises operational independence and has the authority to initiate, carry out and report on any action it considers necessary.[9] An Advisory Committee

on Internal Oversight (ACIO) provides expert advice to DIOS and the Commissioner-General.

The investigation mandate of DIOS is administrative in nature and covers various forms of misconduct, such as fraud and corruption, sexual exploitation and abuse, abuse of authority, or failure to observe regulations, rules and other administrative issuances, policies and procedures, including neutrality breaches. Serious misconduct constitutes grounds for summary dismissal.

DIOS overall has sound mechanisms and procedures in place to address alleged neutrality breaches. However, there are significant capacity constraints as well as indications that the structural set-up for reporting and the intake of allegations entails security concerns for staff and personnel that could also result in an underreporting of potential breaches, as further detailed below.

UNRWA is a participating organization of the Joint Inspection Unit (JIU), which provides independent oversight for efficiency, effectiveness and coordination across the UN. The JIU has undertaken reviews of the investigation function (2020)[10] and the internal pre-tribunal appeal mechanisms (2023)[11] in the UN system. The JIU overall concludes that the responsibility for UNRWA's investigation activities is fragmented at the intake, preliminary assessment and investigation stages. Of note, this led the ACIO to recommend an evaluation of DIOS in the form of a commissioned, independent assessment of the agency's investigation function.

## Reporting and intake of allegations

All UNRWA staff and personnel have an obligation to report misconduct and, in turn, a right to be protected from retaliation for making such reports in good faith and cooperating with investigations. Allegations of misconduct can be reported in a variety of ways, including anonymously through the DIOS investigation hotline, the Field Investigation Office and supervisors.

Between 2017 and 2022, the annual number of alleged neutrality breaches was between 7 and 55, with an average of 21 alleged breaches per year. Since October 2023, the number of alleged breaches has escalated significantly. Serious allegations recently led the UN Secretary-General to establish this Independent Review of Neutrality, in light of the extremely

serious reputational, financial, political and security implications of such allegations. Between January 2022 and February 2024, the Investigations Division received 151 neutrality-breach allegations. Most alleged neutrality breaches relate to social media posts, reported to UNRWA through external sources. UNRWA has reviewed all external allegations of breaches of neutrality and opened investigations where it has found prima facie evidence of misconduct, more than half of the allegations brought up.

The decentralized intake of allegations currently in place may result in inconsistent reporting of potential breaches. This is a concern first noted by the JIU report on UN internal investigations (2020), which flagged risks due to the decentralized intake and pre-assessment of allegations within UNRWA (and in nine other UN agencies). Allegations of misconduct currently have to be channelled through one of DIOS's six intake committees, established at headquarters and in the five field offices. Allegations, including unauthorized public statements and related activities that could warrant further investigation, are brought to intake committees for their pre-assessment first and to recommend the course of action.

In Gaza and its field offices, the volatile context and security challenges may prevent reporting of allegations and investigating at the local level. Neutrality allegations in the Gaza field offices are currently directly channelled to DIOS headquarters. Field office investigators in Gaza risk their personal security. To remediate this, shortly before hostilities broke out in October 2023, DIOS assigned an international investigator to Gaza. However, due to the security situation, the individual was evacuated and now works remotely.

At the present time, only sexual exploitation and abuse cases are formally required to be handled in a centralized manner across all field offices by the DIOS Investigations Division.

## Investigations

A report of an investigation is produced when the alleged facts, following investigation, indicate that the subject's conduct may constitute misconduct, based on a preponderance of evidence. Subsequently, UNRWA Legal and Management, in accordance with the relevant policy (including Personnel Directive 10 on Disciplinary Measures and Procedures), determine

whether the facts constitute misconduct and whether the investigation's conclusions demonstrate "clear and convincing evidence" for a potential sanction or dismissal. At the disciplinary stage, the subject is given a summary of the allegations against them and invited to reply, according to DIOS Investigation Policy. The range of disciplinary sanctions applied include, often in combination, loss of salary, suspension from duty and demotion, or termination of employment.

As of April 2024, 50 neutrality cases are under investigation. There is a clear capacity challenge in managing the number of neutrality allegations through existing structures and staff. Resources are scarce, limiting UNRWA's ability to attract, hire, train and retain suitable, experienced and qualified investigators. The JIU investigations report states: "UNRWA faces persistent challenges in handling the continuously growing number of complaints and new investigation cases, which lead to a growing number of ongoing investigation cases each year, adding to the backlog."

As of April 2024, there are only six international investigator posts in DIOS, two of which are vacant, along with three limited-duration contract positions based on project funding. Furthermore, there are 16 DIOS field investigator posts (11 of which are permanent investigators) based across the five field offices. Given that alleged neutrality breaches are priority concerns in DIOS, financial means are being sought to strengthen investigative capacity by establishing a specialized Neutrality Investigations Unit.

In terms of investigation tools, DIOS, due to funding challenges, does not have access to adequate investigation software, such as that used for internal investigations in the UN Secretariat's OIOS. The software available in DIOS was described as in need of updating.

## Disciplinary mechanism:  the UNRWA Dispute Tribunal

Local area staff and international staff are entitled to appeal administrative decisions, such as disciplinary measures in response to neutrality violations, first internally, before the UNRWA Dispute Tribunal,[12] and then before the UN Appeals Tribunal.

A review of relevant UNRWA Dispute Tribunal jurisprudence that was decided between 2018 and March 2024 in relation to neutrality cases indicates

that most relate to social media posts. In several instances, applicants who appealed decisions on disciplinary sanctions by UNRWA cited the lack of Arabic-language instructions and training on staff neutrality obligations. Several staff invoked their right to freedom of expression.

The recent JIU assessment report[13] on UN internal pre-tribunal-stage appeal mechanisms (2023) noted that all UNRWA administration of justice-related functions, including the Legal Office for Staff Assistance, are underresourced.[14] It furthermore urged UNRWA to improve outreach and communication, translation services and inclusivity, as well as access to internal justice.

## UNRWA property, procurement and project oversight

Undue outside influence on decisions related to UNRWA projects and activities poses a significant risk to UNRWA's neutrality. Hence it is crucial to ensure the integrity of these decisions and processes. In this regard, UNRWA has a developed system in place for external procurement, for inspections of premises, for monitoring and reporting on project progress, and for internal and external evaluations. However, there is room to further bolster existing systems, especially on monitoring.

As discussed further in the chapter on neutrality of installations, UNRWA regularly inspects its installations and reports on any violations of neutrality. Procurement is the responsibility of the Central Support Services Division, regulated by an elaborate procurement manual[15] that specifies procurement authorities and vendor vetting processes. All contracts are made public, as are UNRWA's audit reports, with a system in place to investigate reported irregularities.[16]

Responsibility for monitoring is placed with the Planning Department utilizing a results-based monitoring system and a common monitoring matrix, with dashboards that measure progress towards or deviations from UNRWA's strategic objectives and plans. However, a number of donors noted a need for strengthened project management and monitoring measures in the given operational context. This could include third-party monitoring for particularly sensitive projects, as used elsewhere in similarly fragile operating environments.

UNRWA's independent Evaluation Division is part of DIOS. Charged with generating evidence of the outcomes of UNRWA interventions, including on the efficiency and effectiveness of donor funding used, the Evaluation Division organizes and assures regular UNRWA- or donor-requested internal or external evaluations. It follows a detailed evaluation manual and annual evaluation plans. Evaluation plans and reports are published on UNRWA's website.

Neutrality is addressed in some of the recent evaluations, but so far there are no stand-alone reports on the issue. The Evaluation Division has suggested a potential future evaluation on neutrality.

### The Chair recommends to:

4.  Strengthen internal oversight capacity, especially DIOS and the Ethics Office, e.g. through the secondment of staff from OIOS or UN agencies to DIOS and the Ethics Office.
5.  Expand the reach and presence of DIOS and the Ethics Office in UNRWA fields of operations.
6.  Facilitate interactions between DIOS and external audit structures, such as the UN Secretariat's OIOS. In case of grave allegations, the Commissioner-General to request the UN Secretary-General to refer the investigation to OIOS.
7.  Implement periodic evaluations of DIOS, as per previous recommendation by ACIO.
8.  Pending an evaluation, create a centralized Neutrality Investigations Unit with international staff, that reports directly to DIOS.
9.  Roll out the updated Code of Ethics and associated training to all staff.
10. Strengthen compliance with the Outside and Political Activities Policy.
11. Address neutrality as a strategic risk in the existing Enterprise Risk Management system and assign the responsibility for UNRWA neutrality to the Deputy Commissioner-General Operational Support.

## Management

**12.** Reinforce the internationalization of UNRWA's senior managerial area staff positions.

**13.** Require managers, from the most senior levels down to senior area staff, to assume more accountability for staff neutrality, e.g. by mandating regular engagements with their teams on neutrality.

**14.** Increase the number of women in senior managerial positions among area staff.

**15.** Develop and implement tailored training programmes on management and oversight for senior area staff who are front-line managers and supervisors.

## Projects

**16.** Establish a framework with interested donors on project management and monitoring to ensure transparency and traceability of projects.

**17.** Explore the possibility of third-party monitoring for sensitive projects.

**18.** Determine safeguards to ensure that projects are in line with UNRWA's overall objectives.

# V. Neutrality of staff

UNRWA employs more than 32,000 staff and personnel, 0.8 per cent of whom are international and 99.2 per cent locally recruited. This includes over more than 5,000 daily paid workers. All categories of UNRWA personnel – international and locally recruited – must deliver their functions in compliance with the principle of neutrality.

## Regulatory Framework

The UN Staff Rules lay out the general principles for appropriate conduct of international civil servants:

> *They shall conduct themselves at all times in a manner befitting their status as international civil servants and shall not engage in any activity that is incompatible with the proper discharge of their duties with the United Nations. They shall avoid any action and, in particular, any kind of public pronouncement that may adversely reflect on their status, or on the integrity, independence and impartiality that are required by that status.*[17]

These obligations apply to locally recruited staff, as stipulated in UNRWA Area Staff Regulation (2018), article 1.4:

> *Staff members shall conduct themselves at all times in a manner befitting their status as employees of the Agency. They shall not engage in any activity that is incompatible with the proper discharge of their duties with the Agency. They shall avoid any action and in particular any kind of public pronouncement which may adversely reflect on their status, or on the integrity, independence and impartiality which are required by that status. While they are not expected to give up their national sentiments or their political and religious convictions, they shall at all times bear in mind the reserve and tact incumbent upon them by reason of their employment with the Agency.*

The conduct and obligations of UNRWA staff and personnel regarding neutrality are governed by a number of UN-wide documents, as well as UNRWA-specific guiding documents, as laid out in UNRWA's Neutrality Framework: The UN Charter; Standards of Conduct for the International Civil Service; UNRWA Area and International Staff Regulations; Area Staff Rules and International Staff Rules; personnel directives; and administrative issuances.[18]

In addition to the core regulatory frameworks, UNRWA has developed an extensive body of related standards and policies, notably a Code of Ethics (updated 2024),[19] a policy on personal use of social media and guidelines (2021, updated 2024),[20] and staff standards of conduct.[21] These are disseminated through staff information materials and training in English and Arabic.

The general principle reflected in the agency's regulatory framework is that its personnel must be neutral – and be seen to be neutral – at all times. As UN personnel, they may maintain their personal convictions. However, as humanitarian actors, their commitment to neutrality requires limits and constraints to be exercised in ensuring that these personal convictions do not interfere with their duties for the agency. Neutrality entails obligations that all personnel must follow, both on the job and during their free time. Each member of staff and personnel bears primary responsibility for "knowing, understanding and complying with the applicable parts of the regulatory framework."[22] Further, "all staff have an obligation to report misconduct and are protected from retaliation for making such reports in good faith and cooperating with investigations or audits."

A number of policies and procedures are recent or recently updated and are currently being implemented across UNRWA, from headquarters to operations in the five fields of operations. However, these measures are being carried out in the context of a financial crisis within UNRWA, where training may be underfunded.

Before employment, all UNRWA staff and personnel make a self-declaration regarding criminal offences, provide a confirmation by host authorities of a clean criminal record, and are screened against the UN sanctions list. Contracts signed by all UNRWA staff include copies of the following: Area Staff Regulations and Rules; Code of Ethics; Impartiality and Neutrality of

UNRWA staff; Prohibition of Violence; Revised Standards of Conduct; and Mandatory Learning Courses.

Daily paid workers' contracts specify that they "shall not engage in public controversies of a political, racial, religious or ideological nature... and shall opt for non-violent means of dealing with conflict."[23] They are expected to uphold these values at all times. Failure constitutes grounds for disciplinary measures, including summary dismissal for serious misconduct.

UNRWA's approach to preventing neutrality breaches focuses on the obligation of individual staff members to know and respect the principle of neutrality, as reflected in elaborate contractual arrangements and the Code of Ethics. However, the responsibility of senior management and area-based managers to ensure their teams fully understand what is expected of them on neutrality is neither articulated nor enforced.

UNRWA developed a Code of Ethics (updated on 24 February 2024) that further details the principles and expected standards of conduct.[24] It exemplifies misconduct as "Attending demonstrations or signing petitions that are political or could become politicized," which is considered a breach of the principle of neutrality. Displaying controversial flags or symbols, or holding political meetings or religious services in UNRWA installations are also breaches of the principle of neutrality.[25] Any involvement in a militarized group that promotes discrimination or violence, such as Hamas or Islamic Jihad, violates the principle of neutrality.

The Ethics Office advises staff and management on the standards of conduct expected from international civil servants across an organization of more than 32,000 staff and personnel. The Review Group notes that the Code of Ethics and Ethics Office are useful mechanisms for setting boundaries for staff conduct in terms of neutrality. However,  it is noted, that the Ethics Office consists of only three staff members and needs to be strengthened urgently.

## Screening and vetting

UNRWA has a vetting system in place to screen staff and personnel before and during employment.

Prior to employment:

- Standard vetting questions are in place on the recruitment platform, requiring all applicants to self-declare and provide details, if applicable, related to criminal offences, violations of international human rights or international humanitarian law, disciplinary measures or administrative measures, or workplace disciplinary processes or investigations.
- UNRWA screens the names of all potential recruits, irrespective of their contract type, against Clear-Check, a UN system database that includes the UN sanctions list.[26]
- UNRWA conducts checks with local authorities. Area staff are screened against criminal records through requests for non-conviction letters from the local authorities, confirming a clean criminal record or host Government security clearance.

During and after employment:

- In Gaza and the West Bank, all staff payments are processed through the Bank of Palestine, which vets against the EU sanctions list and is subject to the banking regulatory framework governed by the Palestinian Monetary Authority.
- UNRWA screens all active and recently separated personnel who receive monetary compensation from UNRWA against the UN sanctions list in a biannual screening exercise. To improve the screening process, UNRWA introduced the digital LexisNexis Risk Solutions system in 2023 to facilitate the correct matching of names against lists.

Of note, UNRWA screens names using the New Consolidated List[27] established and maintained by the Security Council Committee. However, to date, Hamas and Islamic Jihad, for example, have not been included in this list by the UN Security Council.

UNRWA shares staff lists (names and functions) annually with host countries (Lebanon, Jordan and Syria), and with Israel and the US for East Jerusalem, Gaza and the West Bank.[28] Sharing information on UN staff with host countries is a regular practice that follows the Convention on Immunity

and Privileges. It is then the responsibility of these States to alert UNRWA of any information that may deem a staff member unworthy of diplomatic immunity. Of note, the Israeli Government has not informed UNRWA of any concerns relating to any UNRWA staff based on these staff lists since 2011.

During meetings with Israeli officials, it was communicated that Israel does not consider the sharing of the staff list as a screening or vetting process, but as a standard procedure for the registration of UN and diplomatic staff to ensure their privileges and immunities.

The Israeli Ministry of Foreign Affairs informed that until March 2024, they had received staff lists without identification (ID) numbers. On the basis of the March 2024 list, which contained staff ID numbers, Israel made public claims that a significant number of UNRWA employees are members of terrorist organizations. However, Israel has yet to provide supporting evidence of this.

All UNRWA beneficiaries, contractors, vendors, non-State donors, or any other individual or organization affiliated with UNRWA are screened annually by the agency using the UN and the World Bank sanctions lists. This exercise concerns approximately 8 million records.[29] No matches have been documented to date. UNRWA also receives recommendations from the audit division of the screening process against the UN sanctions list.[30]

Despite a comprehensive set of measures to screen and vet staff and other individuals or organizations affiliated with UNRWA, these measures do not allow sufficient verifications. The UN sanctions lists are limited to a small number of individuals, and UNRWA lacks the support of intelligence services to undertake efficient and comprehensive vetting.

## Training

UNRWA established a dedicated Humanitarian Principles Team, which supports the agency in respect of neutrality. As of 2024, the team runs the following training programmes:

- All-staff mandatory neutrality and social media e-learning course.
- In-person training on the humanitarian principles, primarily aimed at area-level staff and educational personnel.

- In-person training on integrated assessments for protection team members.
- In-person training on the humanitarian principles and integrated assessments for installation managers and their deputies.

A new and improved e-learning course on the humanitarian principles, including neutrality, is being rolled out agency-wide.

The mandatory online training programme needs to be complemented with more in-person trainings. It is also advisable to foster a more systematic engagement between UNRWA managers and personnel about how to apply the humanitarian principles, particularly neutrality, in practice in their daily work.

## Staff care

Neutrality breaches by UNRWA personnel often take the form of social media posts, particularly following incidents of violence affecting colleagues or relatives. One preventive action could be to ensure that personnel are given a space to discuss these traumatic incidents.

Protection and neutrality officers are a vital resource for staff, but there are only a few, with one Staff Care Officer for all of UNRWA's West Bank operations. Staff and mental health care issues should be a higher priority but are constrained by a lack of resources. UNRWA's recent appointment of the Head of Staff Care is a welcome development, but additional dedicated resources for staff care are needed.

### The Chair recommends to:

19. Update the Neutrality Framework, especially to address the challenges posed by social media and new technologies.
20. Ensure awareness of the framework and compliance through on-site training programmes in all field sites for staff and personnel.
21. Announce Standard Operating Procedures (SOPs) on how

to deal with potential future allegations of irregularities, mis-conduct or neutrality breaches by staff.

22. Identify and implement additional ways to screen UNRWA staff at an early stage of the recruitment process.

23. Implement regular sharing of digital staff lists with host countries and Israel, with all required information, including ID numbers and functional titles, to undertake additional screening. In response, host countries and Israel to provide UNRWA with screening results and evidence of any red flags.

24. Establish a continuous vetting process, especially in the event of staff promotion.

25. Strengthen UNRWA's capacities to detect public expressions of staff views on social media that are not in accordance with staff regulations.

26. Improve reporting when breaches occur, including by strengthening existing whistleblower protection.

27. Strengthen the disciplinary processes across the agency.

28. Establish the international position of Staff Care Specialist – one in each of UNRWA's five fields of operations.

# VI. Neutrality of installations

UNRWA has approximately 1,000 installations across its five fields of operations, which include schools, health centres, warehouses, and area, field and headquarters (HQ) offices.[31]

In line with UNRWA's Neutrality Framework, the agency is responsible for ensuring the neutrality of these installations, including preventing misuse for political or military objectives. In return, it is important to note that by virtue of the UN Charter and the Convention on Privileges and Immunities, which grant inviolability of UN premises and personnel, host States or de facto authorities are obliged to respect the inviolability of these installations, and to afford UN premises active protection from any outside threat or disturbance. UN premises may not be entered unauthorized, and the UN must be permitted to control activities occurring on those premises unless it requests local authorities to intervene.

UNRWA has due diligence mechanisms in place to prevent neutrality breaches in its installations, and it has established protocols to respond to breaches. However, security and capacity challenges may hamper their due implementation.

UNRWA delivers on its obligations in two ways, which will be further discussed below. Firstly, it regularly inspects and assesses the compliance of premises with the principle of neutrality. Secondly, it signals any critical breaches and reports on them to host States and donors.

## Regular inspections

In line with UNRWA's SOPs, each installation is to be inspected quarterly under the responsibility of the UNRWA Protection Division.[32] UNRWA organizes "integrated assessments" by a team that includes installation managers, protection team leaders, humanitarian principles focal points and others, supported by the relevant field management and HQ structures.[33] Actual assessments may not always occur on schedule, and teams often comprise only two staff members carrying out the inspection following specified procedures.[34] Depending on security or staffing levels, senior area officers may also be required to conduct the integrated assessments. HQ departments, including the Executive Office, are informed quarterly about the status of

integrated assessments and efforts to follow up on identified issues.[35] The most frequent issues identified during assessments are a lack of UN signboards, of no-weapons signboards and of UN flags.[36]

The SOPs for regular inspections appear to be appropriate. International staff should conduct integrated assessments whenever possible. However, quarterly inspections are insufficient to ensure the neutrality of the premises. The responsible installation managers, as well as school principals and deputy principals, may require support to carry out this function more regularly. In addition, the daily monitoring of installations needs to be more robust.

## Critical breaches

Critical breaches to the neutrality of UNRWA's installations and the inviolability of its premises could include the discovery of weapons, military activity, or cavities and tunnel openings, but also of Israeli military incursions. In such events, UNRWA protests against these breaches and immediately reports them to host countries, donors and other relevant actors.

A limiting factor to the potential discovery of critical breaches is the fact that UNRWA, as a UN agency, does not have policing, military or wider investigative capacities or competencies required to detect such breaches. As a starting point, closer dialogue between UNRWA, the Israeli Defence Forces and the Palestinian Authority should remedy some of the information gaps and attend to the shared responsibilities.

**The Chair recommends to:**

29. Train staff on the civilian nature of UNRWA's facilities.
30. Organize community-awareness campaigns on the civilian nature of UNRWA's facilities.
31. Ensure additional capacities to increase the frequency and widen the scope of installation visits to also include military misuse of UNRWA facilities.
32. Strengthen the communication and collaboration with host countries and Israel on the misuse of UNRWA's facilities, including the option of UNRWA being able to request joint visits.
33. Establish transparent reporting to donors on the misuse of UNRWA's facilities.

# VII. Education

UNRWA's education system is crucial to several hundreds of thousands of Palestinian children. UNRWA provides elementary and preparatory education for half a million pupils in 706 schools, with 20,000 educational staff. Gaza's education system, which represents 40 per cent of UNRWA's educational staff, has collapsed due to the ongoing conflict, with all children in Gaza now out of school.

UNRWA's practice is to use host-country curriculums and textbooks in accordance with UNESCO recommendations.[37] This enables Palestine refugee students to transition from UNRWA to host-country schools.[38] The textbooks are not produced by UNRWA but the agency's neutrality obligations apply, as the textbooks are being used in UNRWA or UNRWA-funded schools. In addition to textbooks, locally produced educational supplements are sometimes used in UNRWA schools.

UNRWA has received sustained criticisms, mainly from Israel and NGOs[39] over the alleged presence of hate speech, incitement to violence and antisemitism in Palestinian Authority textbooks and educational supplements. The European Parliament has recently adopted a resolution reflecting this issue. Some donors have also raised significant concerns.[40]

Upon review of three major international assessments and academic studies on the issue of Palestinian Authority textbooks, two identified bias and non-compliant content but did not provide evidence of antisemitic reference.[41] A third, the Eckert report, identified two examples that displayed antisemitic content but noted that one had already been removed; the other has been significantly altered.[42] It remains unclear whether the alteration has in fact removed the antisemitic content from the remaining example.

UNRWA has consistently worked on ensuring neutrality in its education. To that end, it has developed and implemented a range of frameworks, manuals, mechanisms and procedures to align all educational materials and methods with UN values, principles and guidelines, including:

- The Framework for Quality Analysis and Implementation of Curriculum.[43]
- A programme and policy to integrate human rights, conflict resolution and tolerance in schools.[44]

- The Neutrality Review Manual,[45] a guiding tool for reviews of learning materials and host-country curriculum content. It centres on UN principles including three assessment areas: UN Position, Educational Appropriateness, and Adherence to UNESCO Standards.
- A task force[46] to review Palestinian Authority textbooks, undertaking rapid reviews[47] to ensure alignment with UN values in textbooks and teachers' manuals.
- The Critical Thinking Approach.[48] A manualized teaching approach with explanations and questions for classroom use facilitating discussions and educating students to critically engage with available knowledge.[49] This includes teacher training and on-site support.[50]
- Digital learning platforms for self-learning materials to support distance learning, which is the only authorized source of supplemental material for teachers.[51]

The most recent UNRWA Rapid Review of textbooks from the Palestinian Authority is the 2022/2023 review. It found that 3.85 per cent of all textbook pages contain "issues of concern to UN values, guidance, or position on the conflict," either because they are deemed "educationally inappropriate" or because they are not in line with UNESCO standards.[52]

Even if marginal, these issues constitute a grave violation of neutrality. Among the various issues, recurrent ones were the use of historical maps in a non-historical context, e.g. without labelling Israel; naming Jerusalem as the capital of Palestine; naming cities in Israel as Palestinian cities; the use of the word Zionist (e.g. "Zionist occupation" referring to Israel).

Of the 30 allegations made by NGOs of neutrality breaches in educational material, eight are linked to educational material from the Palestinian Authority that is not used in UNRWA schools in Gaza. The remaining 22 allegations related to Palestinian Authority textbooks used by UNRWA are addressed in the classroom using the Critical Thinking Approach.

In addition to the procedures, frameworks and mechanisms in place, UNRWA has worked with UNESCO since 2011 to reform curricula and teaching materials, including in dialogue with national authorities. After its previous reviews and dialogue with donors, UNRWA and UNESCO, the Palestinian Authority has worked to alter the educational content that

does not meet UN values and standards. Nevertheless, the issue persists. The Chair's assessment is that UNRWA has been responsive to allegations of neutrality breaches and criticism about the textbooks and initiated a range of initiatives to ensure neutrality of its teaching material and the teaching. It has developed a range of preventive and mitigatory mechanisms and procedures, including the Critical Thinking Approach.[53] The Digital Learning Platform provides potential to streamline education across the five fields of operation. The platform increases the amount of UNRWA-approved educational content and material, some of which comes from authorized third parties, peer-to-peer support and professional dialogue. UNRWA could further develop the digital platform. The platform can also facilitate the roll-out of the 2022 UNRWA Media and Information Strategy,[54] which can better equip teachers to guide students to critically address misinformation or disinformation and promote information integrity.[55] Digital and social media are, on a global scale, major sources and channels of messaging that goes against UN principles.[56]

Despite these achievements, the presence of even a small fraction of problematic content in textbooks, supplemental material and teaching content remains a serious issue. More work needs to be undertaken between UNRWA and the Palestinian Authority to pursue the replacement of problematic content, and to avoid the promotion of discrimination and incitement to hatred and violence, and the spreading of antisemitic views that contradict UN values and UNESCO standards.

### The Chair recommends to:

**34.** Review the content of all textbooks and supplements with host countries, Israel and the Palestinian Authority.

**35.** Ban any hate speech, incitation to violence and/or antisemitic references from host-country textbooks and locally produced supplements in UNRWA schools. In the meantime, stop using such material.

**36.** Establish a yearly review of all textbooks and supplements used in UNRWA schools together with UNESCO, and ensure adherence to the 2023 UNESCO-adopted Recommendations

on Education for Peace, Human Rights and Sustainable Development.

**37.** Empower more women area staff to take managerial responsibilities within the UNRWA education system.

**38.** Establish a dedicated channel, e.g. a hotline, for UNRWA to receive alerts on problematic teaching content and to support teachers seeking advice.

**39.** Establish randomized teaching inspections in classrooms.

**40.** Continue the digitalization of educational content and pursue the use of digital teaching platforms to increase transparency.

**41.** Establish training for UNRWA Principals and teachers on neutrality and other humanitarian principles, and on human rights.

# VIII. Staff unions

UNRWA staff unions have a significant role in the relations between UNRWA management and staff and the wider functioning of the agency. However, there are long-standing concerns over politicization and interlinkages with Palestinian political factions, with a direct impact on UNRWA's neutrality. Each of the five field offices and the headquarters in Amman and Gaza have their own distinctive union structure and related challenges, deeply engrained in the context in which they operate.

There are frequent tensions between UNRWA management and staff unions at all levels. In the past decades, UNRWA has experienced regular disputes regarding issues such as salaries, agency reform, and insubordination and disciplinary sanctions. These disputes frequently resulted in strikes and protests. Intimidation tactics and threats forced numerous UNRWA directors to be transferred to different positions and contexts for their own security.

In addition, there are a number of areas of concern regarding staff unions relating to neutrality:

- Staff unions have sometimes resisted management disciplinary actions, including on neutrality.
- Staff unions' elections are notably politicized. Local and national competing political forces can be seen to use staff unions to pressure the UNRWA leadership and influence decisions on service delivery or project implementation to gain influence or support from the population.
- UNRWA staff unions may have an undue influence on UNRWA's activities due to their role in salary negotiations. A periodical salary survey is conducted to ensure that UNRWA area staff salaries do not fall below local government pay rates. Historically, after the survey results are issued and pay-scale adjustments are made by the Commissioner-General, unions would strike for higher adjustments with backpay for the time while striking. In 2023, union actions in the West Bank lasted nearly 100 days and were ultimately met with management implementing the 'No Work, No Pay' principle for backpay. This further strained staff relations and prompts timely discussions about how pay scales should be decided, when and by whom.

- There is a long-standing concern about representativity given the lack of quotas for gender or professional representation in union leadership.

UN staff representative bodies[57] ('unions') are typically mandated to advocate for the rights, interests and welfare of UN personnel. As such, UN staff unions should be representative of the workforce and are required to uphold UN principles and values. Staff representatives have the same rights, duties, obligations and privileges as other staff members;[58] they are independent and should not receive any external influence or instruction.

To address the wide range of neutrality and general management challenges, an urgent modernization of the union statute and operational structures is needed. UNRWA's Statute of the Area Staff Union was issued and agreed upon in 1990, but it has not been updated since, despite many attempts.

### The Chair recommends to:

42. Reform the 6 November 1990 Statute of the Union of Area Staff of UNRWA to align it with UN system Staff Union Statutes and Regulations, especially as it relates to election of staff union representatives.

43. Ensure the workforce representativity of staff unions, including by increasing women representation. Women comprise half of UNRWA staff, but currently almost all staff union representatives are men.

44. Request, via an independent entity, dedicated neutrality vetting for every staff union representative, beginning with the most senior.

45. Establish vetting procedures when staff union representatives are elected.

46. Outsource all issues related to the setting of pay and pay-related benefits to an independent entity comparable to the International Civil Service Commission.

47. Explore additional options for staff representation.

# IX. Strengthened partnership with UN agencies

UNRWA has a long history of partnerships. The founding UNGA resolution 302 (1949) already calls for cooperation with other agencies and organizations. The World Health Organization has embedded experts in UNRWA HQ for decades.[59] In addition, UNRWA is engaged in a plethora of cross-agency partnerships, a concept that the UNGA fully supports, as expressed at the tri-annual extensions of the mandate.[60] UNRWA also has many field-based partnerships with UN agencies, NGOs and community-based organizations. In the context of the current hostilities in Gaza, ad hoc and temporary partnerships have been developed, such as agreements with IOM (shelter), WFP (food distribution) and UNICEF (vaccinations). Meanwhile, UNRWA retains its central and irreplaceable role of providing a platform – and in many cases infrastructure – for these specialized activities.

UNRWA's current financial and operational constraints resulted in its operations in Gaza being severely curtailed, unable to provide sufficient humanitarian assistance to people in need. One option is for UNRWA to partner more with other UN agencies and organizations on an ad hoc and temporary basis, and in full respect of UNRWA's mandate. However, partnerships are a sensitive issue for UNRWA. Some stakeholders view any substantive involvement of other organizations in UNRWA's activities as an attempt to weaken UNRWA's mandate. As such, the Commissioner-General's partnership initiative in 2022 was abandoned due to push-back from host Governments and staff associations who perceived partnerships as the beginning of the dismantling of UNRWA.

With some funding now diverted from UNRWA to other humanitarian organizations, especially for Gaza, while not modifying the agency's mandate, there is an imperative to work with these partners to ensure that immediate humanitarian needs in Gaza are met. The Inter-Agency Standing Committee (IASC) Emergency Directors Group (EDG), comprising representatives from about 20 IASC member organizations, should be asked to develop a collective operational coordination plan for Gaza.

There is also a potential for new alliances to increase UNRWA's access to additional funding. Partnerships would also be advantageous for other agencies, who would benefit from UNRWA's regional knowledge and access while they themselves bring thematic expertise and external staffing support to counter neutrality challenges.

### The Chair recommends:

**48.** The IASC EDG to develop recommendations on how other local and international humanitarian organizations can sustain and scale up support to UNRWA's humanitarian operations in Gaza.

**49.** UNRWA to enhance its participation in the humanitarian coordination system by ensuring staff in number and skills are dedicated to engaging in coordination architecture at the cluster level.

**50.** UNRWA to drive an internal cultural shift that redefines its relationship to the rest of the humanitarian community and its role within the coordination architecture, particularly within the clusters.

# X. Conclusions and recommendations

Since 2017 UNRWA has established and updated a significant number of policies, mechanisms and procedures to (a) ensure compliance with the obligation to uphold the principle of neutrality, including the provision of information and training for UNRWA staff to prevent breaches; (b) ensure rapid and adequate responses to allegations or indications of breaches, including reporting and investigation systems and routines; and (c) determine and implement disciplinary sanctions on personnel found to breach the neutrality principles.

However, important areas for further strengthening were identified. Below are the main recommendations of this final report. The Chair is confident that implementing these recommendations will help UNRWA fulfil its mandate.

**Engagement with donors**

The trust deficit between UNRWA and its donors has widened due to the serious allegations against its staff. Even in the absence of allegations, better communication with donors is required. Enhancing transparency and consultation with donors is imperative to rebuild trust and strengthen partnership.

1. Increase the _frequency and strengthen the transparency_ of UNRWA's _communication with donors_ on its financial situation and on neutrality allegations and breaches:

   a. Plan _regular updates_ by UNRWA on its budget and the structure of this budget, including in the Commissioner-General's direct interactions with Governments.

   b. _Establish 'Integrity Briefings' for donors_ interested in supporting UNRWA on integrity and related issues, with meetings or briefings held at UN headquarters in New York or Geneva.

## Governance

UNRWA does not have an Executive Board, and the Advisory Commission only advises the organization. UNRWA would benefit from stronger governance structures in support of its senior leadership's efforts. The international community should also support UNRWA in addressing neutrality issues through these governance structures.

2. _Request the Advisory Commission to fulfil_ its role by effectively advising and assisting UNRWA on fulfilling its mandate, including by:

   a. _Convening at the UN in New York at Permanent Representative_ level once a year.

   b. _Setting neutrality as a standing agenda item_ at its twice-yearly meeting.

   c. Creating an _Advisory Commission Working Group on neutrality and integrity issues_, and inviting host countries and Israel to present their concerns.

3. Explore _additional governance arrangements_ to assist in providing strategic direction to the organization and improving external communication.

## Management and internal oversight

UNRWA's management and internal oversight reform efforts are commendable and should be further expanded. Progress has been made, especially in strengthening UNRWA's DIOS and the Ethics Office, but further enhancements are necessary.Commitments made by UNRWA senior management to a number of donors, including in the Action Plan on UNRWA initiatives shared in March 2024, have to be duly implemented.

4. _Strengthen internal oversight capacity_, especially DIOS and the Ethics Office, e.g. through the _secondment of staff from OIOS_ or UN agencies to DIOS and the Ethics Office.

5. _Expand the reach and presence_ of DIOS and the Ethics Office in UNRWA fields of operations.

6.  Facilitate *interactions between DIOS and external audit structures*, such as the UN Secretariat's OIOS. In case of grave allegations, the Commissioner-General to request the UN Secretary-General to *refer the investigation to OIOS.*

7.  Implement *periodic evaluations of DIOS*, as per previous recommendation by ACIO.

8.  Pending an evaluation, create a *centralized Neutrality Investigations Unit* with international staff, that reports directly to the DIOS to oversee field office-led investigations.

9.  Roll out the updated *Code of Ethics* and associated in-person training to all staff.

10. Strengthen compliance with the *Outside and Political Activities Policy*.

11. Address neutrality as a *strategic risk in the existing Enterprise Risk Management system*, and assign responsibility for UNRWA neutrality to the Deputy Commissioner-General Operational Support.

**Management**

12. Reinforce the *internationalization* of UNRWA's senior managerial area staff positions.

13. Require managers, from the most senior levels down to senior area staff, to assume more a*ccountability for staff neutrality*, e.g. by mandating regular engagements with their teams on neutrality.

14. Increase the number of *women in senior managerial positions* among area staff.

15. Develop and implement tailored *training programmes on management* and oversight for senior area staff who are front-line managers and supervisors.

**Projects**

Political influence on decisions related to UNRWA projects poses a significant risk. Ensuring the neutrality of these decisions and processes is crucial.

16. Establish a framework with interested donors on project management and _monitoring to ensure transparency and traceability of projects_.

17. Explore the possibility of _third-party monitoring_ for sensitive projects.

18. Determine safeguards to ensure that _projects are in line with UNRWA's overall objectives._

**Neutrality of staff**

UNRWA faces challenges due to increased politicization among its staff, affecting its neutrality. Strategies for prevention, monitoring of compliance in accordance with international and area staff rules and regulations and relevant standards of conduct, as well as an appropriate response to potential breaches are crucial.

19. _Update the Neutrality Framework_, especially to address the challenges posed by social media and new technologies.

20. Ensure awareness of the framework and compliance through on-site _training programmes_ in all field sites for staff and personnel.

21. Announce Standard Operating Procedures (SOPs) on _how to deal with potential future allegations_ of irregularities, misconduct or neutrality breaches by staff.

22. Identify and implement _additional ways to screen_ UNRWA staff at an early stage of the recruitment process.

23. Implement regular _sharing of digital staff lists_ with host countries and Israel, with all required information, including ID numbers and functional titles, to undertake additional

screening. In response, *host countries and Israel to provide UNRWA with screening results* and evidence of any red flags.

24. Establish a *continuous vetting process*, especially in the event of staff promotion.

25. Strengthen UNRWA's capacity to *detect public expressions of staff views on social media* that are not in accordance with staff regulations.

26. Improve *reporting* when breaches occur, including by strengthening existing *whistleblower protection*.

27. Strengthen the *disciplinary processes* across the agency.

28. Establish the international position of *Staff Care Specialist* – one in each of the five fields of operations.

## Neutrality of installations

UNRWA's facilities have sometimes been misused for political or military gains, undermining its neutrality. If the prevention of and response to the political misuse of UNRWA installations have been efficient, the agency has had more difficulty appropriately addressing the use of its installations for military purposes. Preventive measures, enhanced monitoring and transparent reporting are necessary to address this issue effectively.

29. *Train staff* on the civilian nature of UNRWA's facilities.

30. Organize *community-awareness campaigns* on the civilian nature of UNRWA's facilities.

31. Ensure additional capacities to *increase the frequency and widen the scope of installation visits* to also include military misuse of UNRWA facilities.

32. Strengthen the *communication and collaboration with host countries and Israel* on the misuse of UNRWA's facilities, including the option of UNRWA being able to request joint visits.

**33.** Establish transparent _reporting to donors_ on the misuse of UNRWA's facilities.

## Neutrality of education

UNRWA's education system is crucial to several hundreds of thousands of Palestinian children. However, it has been reported for many years that schools may have been utilized to spread political views, including antisemitic content, violating neutrality principles as well as not respecting UNESCO standards and UN values.

UNRWA has made significant progress in the past few years to mitigate the risks attached to the promotion of hate and the incitation of violence in textbooks and in the classroom. UNRWA has implemented measures to confront this issue, including by instituting a Critical Thinking Approach and digitalizing its curriculum.

Any textbooks spreading antisemitic views, promoting discrimination and incitement to hatred and violence contradict UN values and UNESCO standards. Even if marginal, this constitutes a grave violation of neutrality. In Gaza and the West Bank such textbooks are those of the Palestinian Authority, but this does not relieve UNRWA of its responsibilities when these textbooks are used in UNRWA or UNRWA-funded schools. UNRWA needs to implement a zero-tolerance policy on this issue.

**34.** _Review the content of all textbooks and supplements_ with host countries, Israel and the Palestinian Authority.

**35.** _Ban any hate speech, incitation to violence_ and/or _antisemitic references_ from host-country textbooks and locally produced supplements in UNRWA schools. In the meantime, stop using such material.

**36.** Establish a _yearly review of all textbooks and supplements_ used in UNRWA schools together with UNESCO, and ensure adherence to the 2023 UNESCO-adopted Recommendations on Education for Peace, Human Rights and Sustainable Development.

**37.** Empower *more women area staff to take managerial* responsibilities within the UNRWA education system.

**38.** Establish a *dedicated channel,* e.g. a hotline, for UNRWA to *receive alerts* on problematic teaching content and to support teachers seeking advice.

**39.** Establish *randomized teaching inspections* in classrooms.

**40.** Continue the *digitalization of educational content* and pursue the use of digital teaching platforms to increase transparency.

**41.** Establish *training for UNRWA Principals and teachers* on neutrality and other humanitarian principles, and on human rights.

## Staff unions

Over the years, political factions have used UNRWA's staff unions to pressure the agency's leadership and influence decisions on service delivery or project implementation. This is not the role of staff unions. The politicization of staff unions is considered one of the most sensitive neutrality issues and needs to be addressed with the full support of the Advisory Commission.

**42.** *Reform the 6 November 1990 Statute of the Union of Area Staff* of UNRWA to align it with UN system Staff Union Statutes and Regulations, especially as it relates to the election of staff union representatives.

**43.** Ensure the *workforce representativity of staff unions*, including by increasing women representation.
Women comprise half of UNRWA staff, but currently almost all staff union representatives are men.

**44.** Request, via an independent entity, *dedicated neutrality vetting* for every staff union representative, beginning with the most senior.

**45.** Establish *vetting procedures* when staff union representatives are elected.

46. Outsource all issues related to the _setting of pay and pay-related benefits_ to an independent entity comparable to the International Civil Service Commission.

47. Explore additional options for _staff representation_.

## Enhanced cooperation with UN agencies

Considering the ongoing crisis in Gaza, and in full respect of UNRWA's mandate, some temporary measures could be considered to help UNRWA ensure the delivery of life-saving assistance to Palestinians at this critical time, such as:

48. The _IASC EDG to develop recommendations_ on how other local and international humanitarian organizations can sustain and scale up support to UNRWA's humanitarian operations in Gaza.

49. _UNRWA to enhance its participation in the humanitarian coordination_ system by ensuring staff in number and skills are dedicated to engaging in coordination architecture at the cluster level.

50. UNRWA to drive an internal _cultural shift_ that redefines its _relationship to the rest of the humanitarian community_ and its role within the coordination architecture, particularly within the clusters.

# XI. Endnotes

1 "Terms of Reference, Group to Conduct an Independent Review of mechanisms and procedures to ensure adherence by UNRWA to the humanitarian principle of neutrality" (Annex A)

2 United Nations General Assembly, "Strengthening the Coordination of Humanitarian Emergency Assistance of the United Nations, resolution 46/182." Available at: https://digitallibrary.un.org/record/135197?v=pdf (accessed 12 April 2024).

3 Executive Office Instruction No. 1, UNRWA Neutrality Framework (2017), p. 1. (internal document)

4 Ibid.

5 UNRWA communication to donors, "Strengthening UNRWA's Oversight and Accountability Functions," February 2024.

6 In late 2021, UNRWA turned the Neutrality Coordinator position into a Senior Humanitarian Principles Coordinator position to anchor UNRWA projects and services within the broader obligations of the humanitarian principles (humanity, impartiality, independence, neutrality).

7 See DIOS website, available at dios.unrwa.org.

8 UNRWA, Organization Directive No. 14: Charter of the Department of Internal Oversight Services (1 October 2020). Available at: dios.unrwa.org/sites/default/files/revised_od14_dios_charter_1_october_2020.pdf (accessed 16 March 2024).

9 Ibid.

10 Review of the state of the investigation function: progress made in the United Nations system organizations in strengthening the investigation function: report of the Joint Inspection Unit (United Nations publication, 2020). Available at: www.unjiu.org/sites/www.unjiu.org/files/jiu_rep_2020_1_english_0.pdf (accessed 29 February 2024).

11 Review of the internal pre-tribunal-stage appeal mechanisms available to staff of the United Nations system organizations: report of the Joint Inspection Unit (United Nations publication, 2020). Available at: www.unjiu.org/sites/www.unjiu.org/files/jiu_rep_2023_2_english_0.pdf (accessed 29 February 2024).

12 "UNRWA dispute tribunal." Available at: www.unrwa.org/unrwa-dispute-tribunal (accessed 16 March 2024).
Review of the internal pre-tribunal-stage appeal mechanisms (United Nations publication, 2020).

13 UNRWA, "Joint Evaluation and Audit of the UNRWA Gender Equality Strategy 2016-2022." Available at: https://www.unrwa.org/resources/dios-and-evaluation/joint-evaluation-and-audit-unrwa-gender-equality-strategy-2016-2022 (accessed 11 April 2024).

14 United Nations, "Review of the internal pre-tribunal-stage appeal mechanisms available to staff of the United Nations system organizations, Report of the Joint Inspection Unit" (2023). Available at: https://www.unjiu.org/sites/www.unjiu.org/files/jiu_rep_2023_2_english_0.pdf (accessed 17 March 2024).

15 UNRWA (2021) UNRWA Procurement Manual. 1 November 2021. Internal document.

16 This is confirmed through a recent review commissioned by the Finnish Government shared with the Review Group; publication forthcoming.

17 United Nations Staff Rules, Rule 8.1 d). Available at: https://policy.un.org/browse-by-source/staff-rules#Rule%201.1 (accessed 15 April 2024).

18 UNRWA Neutrality Framework, p. 6.

19 UNRWA Ethics Office, "Code of Ethics (ver. 4/2023)." Available at: www.unrwa.org/sites/default/files/content/resources/unrwa-code-of-ethics-v4-2023-english_1.pdf (accessed 29 February 2024).

20 UNRWA, "Personal use of social media policy (February 2024);" "Website and social media guidelines regarding official use (August 2021);" "Website and social media guidelines regarding personal use (August 2021)." Internal documents.

21 UNRWA, "Standards of conduct." Available at: www.unrwa.org/procurement/standards-conduct (accessed 29 February 2024).

22 "Executive Office Instruction No. 1, UNRWA Neutrality Framework" (2017), p. 14 (internal document)

23 UNRWA, "Annex 3 Contract and Conditions of Service for a Daily Paid Worker." Internal document.

24 UNRWA, "Code of Ethics." Available at: https://www.unrwa.org/sites/default/files/content/resources/unrwa-code-of-ethics-v4-2023-english_1.pdf (accessed 11 April 2024).

25 UNRWA Ethics Office, "Code of Ethics." Available at: www.unrwa.org/sites/default/files/content/resources/unrwa-code-of-ethics-v4-2023-english_1.pdf (accessed 5 March 2024); "Serving Ethically – Handbook on Ethics and the Standards of Conduct Applicable to UNRWA Personnel." Internal document.

26 UNRWA, "HRD Measures on Neutrality, 11 February 2024;" International staff regulations, cod.i/61/rev.7: 1 January 2018. Available at: www.unrwa.org/sites/default/files/international_staff_regulations_effective_1jan2018.pdf (accessed 5 March 2024); Area staff regulations, Cod./A/59/Rev.25/Amend.120: 01 June 2010. Available at: www.unrwa.org/sites/default/files/area_staff_regulations_dec2015.pdf (accessed 5 March 2024).

27 United Nations Security Council, "United Nations Security Council Consolidated List." Available at: https://www.un.org/securitycouncil/content/un-sc-consolidated-list (accessed 11 April 2024).

28 UNRWA, "Standard operating procedures on screening against United Nations Consolidated Sanctions Lists and assessment of UNRWA counterparts with respect to EU restrictive measures" (2019); "2023 Q&A." Internal document.

29 UNRWA, "What we do." Available at: https://www.unrwa.org/what-we-do/eligibility-registration (accessed 11 April 2014); UNRWA, "Consolidated Eligibility and Registration Instructions." Available at: http://www.unrwa.org/sites/default/files/2010011995652.pdf; UNRWA, "Approach to Screening of Beneficiaries: Current issues, challenges, and a proposed way forward." Internal document.

30 TNA FGD analysis, "Humanitarian principles training needs assessment: preliminary analysis of focus group discussions" (November 2023), internal document; Department of Internal Oversight Services (DIOS), "Audit of screening process against the United Nations sanction list (formerly known as 'vetting')," Ref: DIOS 2023/R00x (May 2023). Internal document.

31   UNRWA defines installations as "buildings, structures, or parts thereof, that are either owned by, under the control of, or are wholly or partially occupied or used by UNRWA in connection with its official purposes." UNRWA, "Standing operating procedures for integrated assessments." Internal document.

32   UNRWA, "Standing operating procedures for integrated assessments;" "Standard operating procedures for installation neutrality inspections" (2017); "Installation integrated assessment 2022;" "Frequently asked questions (FAQ) Version: 0.1 (August 2022)"; "Technical guidance on new integrated assessments, 2023 release." Internal documents.

33   The integrated assessments are conducted by: Installation Manager, Protection Team Leader, Humanitarian Principles Focal Point, Area Protection Focal Point, Chief Area Officer, Field Director, Senior Humanitarian Principles Coordinator, and Chief of the Protection Division. The integrated assessments are conducted according to the Executive Advisory Group decision, 16 March 2022, 2022-01-26-DN-41; UNRWA "Installation integrated assessment: technical guidance on new integrated assessments" (2023). Internal documents.

34   Executive Advisory Group decision, 16 March 2022, 2022-01-26-DN-41; UNRWA "Installation integrated assessment: technical guidance on new integrated assessments" (2023). Internal documents.

35   Each position has distinct and defined responsibilities, including for escalation of violations of the humanitarian principles. As described in "Technical instruction on reporting critical incidents within UNRWA to the Executive Office" (28 September 2020). Internal document.

36   "Integrated assessments of UNRWA installations Q3 2023: 1 July to 30 September 2023;" "Integrated assessments of UNRWA installations Q2 2023: 1 April to 30 June 2023;" "Integrated assessments of UNRWA installations Q3 2023: 1 July to 30 September 2023." Internal documents (infographics).

37   UNESCO, "The Recommendation on Education for Peace and Human Rights, International Understanding, Cooperation, Fundamental Freedoms, Global Citizenship and Sustainable Development." Available at: https://unesdoc.unesco.org/ark:/48223/pf0000386924 (accessed 7 April 2024).

38   Kjersti G. Berg, Jørgen Jensehaugen and Åge A. Tiltnes, "UNRWA, funding crisis and the way forward," CMI report no. 4 (September 2022). Available at: www.cmi.no/publications/8574-unrwa-funding-crisis-and-the-way-forward  (accessed 17 March 2024).

39   According to information the Review Group received from UNRWA, more than 90 per cent of the allegations are raised by the organization Impact-SE.

40   Georg Eckert Institute for International Textbook Research, Report on Palestinian Textbooks (2021). Available at: www.gei.de/en/research/projects/report-on-palestinian-textbooks-paltex (accessed 16 March 2024).

41   US Government Accountability Office Report on UNRWA Textbooks (2018). Available at: https://www.un.org/unispal/wp-content/uploads/2019/02/USGAOTEXTBKRPT_070219.pdf (accessed 12 April 2024); The Council of Religious Institutions of the Holy Land, "Victims of Our Own Narratives?" Portrayal of the "Other" in Israeli and Palestinian School Books (2013).

42   Georg Eckert Institute for International Textbook Research, Report on Palestinian Textbooks (2021). Available at: www.gei.de/en/research/projects/report-on-palestinian-textbooks-paltex (accessed 16 March 2024). According to the Eckert report, in the textbooks for the academic year 2020/2021, "there is a reduction in the text and images that have escalatory potential: including the alteration of a specific teaching unit that included anti-Semitic content by several significant changes of the narrative." In addition, the Eckert report notes, "In the 2020 edition of the textbook Islamic Education 5/II this teaching unit [where antisemitic content was claimed] has been altered in several passages, thereby reducing the negative focus on Jews." Finally, the Eckert report states, "This chapter, which is discussed in detail in Chapter 3.2.1 of this Report with regard to its anti-Semitic references, has been altered at certain points for the 2020 edition."

43   UNRWA, "Framework for quality analysis and implementation of curriculum, fact sheet. January 2023." Available at: https://www.unrwa.org/sites/default/files/curriculum_factsheet_2023.pdf (accessed 17 March 2024).

44   See UNRWA policy on education for human rights, conflict resolution and tolerance. Available at: https://www.unrwa.org/sites/default/files/2013060632316.pdf (accessed 17 March 2024). UNRWA Remote Learning and
Developing Self-Learning Materials Department of Education UNRWA HQ (Amman) August 2021 (internal document).

45   UNRWA, "Neutrality Review Manual, Document No: 2021-001." Internal Document.

46   Chaired by the Deputy Commissioner-General and comprising the Departments of Education and Legal Affairs, the Protection Division, the Executive Office, the Director of Strategic Communication and representatives of field and representative offices.

47   UNRWA Education Alignment with UN Values and Preventive Measures, Note on the Monitoring of Quality Assurance Process of Rapid Review (2023-24 academic year). UNRWA Donor Briefing. Briefing on UNRWA Review of Palestinian Authority Textbooks 2022/2023, Semesters 1 and 2, Grades 1–10 Revised Version, Internal documents.

48   UNRWA, "Education Department – HQ (A)" and "Critical Thinking Approach (CTA): A Guide for Educators, April 2023," Internal documents. UNRWA, "Curriculum Framework 2013, UNRWA framework for the analysis and quality implementation of the curriculum." Available at: https://www.unrwa.org/sites/default/files/unrwa_curriculum_framework_2013.pdf (accessed 11 April 2024); UNRWA, "Framework for quality analysis and implementation of curriculum, fact sheet. January 2023." Available at: https://www.unrwa.org/sites/default/files/curriculum_factsheet_2023.pdf (accessed 17 March 2024).

49   UNRWA, "Whole School Approach to Critical Thinking Practical Activities: Handbook for UNRWA Teachers, 2021." Internal document. This approach is to be understood within the Whole School Approach that is collective and cooperative, strategic, and inclusive efforts and actions undertaken by the school community within and outside the school to improve students' learning, behaviour, and well-being, in addition to improving the environment that supports all these efforts and actions so all practices are evidence-based.

50   UNRWA, "Whole School Approach to Critical Thinking Practical Activities: Handbook for UNRWA Teachers, 2021." Internal document. Critical thinking can accordingly be defined as: "Series of higher standard-based mental processes that are performed by the student such as interpretation, analysis, evaluation, inference, explanation, and self-regulation to delve and dig deeper into a given topic or problem which requires collecting information and data in several methods and ways such as observation, experience,  thinking/reasoning, and discussion. The student then processes the information and data separating facts from opinions, analysing, and interpreting them to conclude evidence and conjecture alternatives that would help in evaluating the evidence to ensure their validity based on their assumptions, beliefs, experience, and structures of their knowledge. The findings of processing information are then organized and formulated into decision, judgement, opinion, solution to a given problem that are logically and scientifically supported by evidence." (p. 7).

51   UNRWA, "Digital Learning Platform." Available at: keeplearning.unrwa.org/en/ (accessed 16 March 2024).

52   UNRWA, Department of Internal Oversight Services Audit of the Rapid Review Process, Audit Report (02/2022), Available at: https://dios.unrwa.org/sites/default/files/results_summary_audit_of_rapid_review_process_30.03.22.pdf (accessed 16 March 2024); UNRWA, "The findings of the Rapid Review of the PA Semester 2 textbooks taught in UNRWA schools in 2022/2023. Grade 1-9 2 March 2023, Annex 2." Internal document. "The findings of the Rapid Review of the PA Semester 1 textbooks taught in UNRWA schools in 2022/2023 Grade 1-9 Submitted on 10 November 2022, Annex 1." Internal document. "Briefing on UNRWA Review of Palestinian Authority Textbooks 2022/2023, Semesters 1 and 2, Grades 1−10 Revised Version." Internal document.

53   In this regard, it is relevant to note that the UN Special Rapporteur in the field of cultural rights has stated that: "history teaching should aim at fostering critical thought, analytic learning and debate; stressing the complexity of history and should enable a comparative and multi perspective approach." UN Special Rapporteur in the field of cultural rights, A /68/296, para. 88; United Nations, "A/68/296: Report on the writing and teaching of history." Available at: https://www.ohchr.org/en/documents/thematic-reports/a68296-report-writing-and-teaching-history (accessed 11 April 2024).

54   Information pollution includes misinformation, disinformation and malinformation. For example, see UNDP, "Information Integrity." Available at: https://www.undp.org/information-integrity (accessed 11 April 2024).

55   UNRWA, "UNRWA Strategy on information and communication technologies for education (ICT4E) 2022." Available at: https://www.unrwa.org/sites/default/files/unrwa_strategy_on_information_and_communication_technology_for_education_ict4e_07.pdf (accessed 8 April 2024).

56   United Nations, "Our Common Agenda Policy Brief 8 | Information Integrity on Digital Platforms." Available at: https://www.un.org/sites/un2.un.org/files/our-common-agenda-policy-brief-information-integrity-en.pdf (accessed 5 April 2024).

57   United Nations, "Staff Rules and Regulations of the United Nations (ST/SGB/2017/1)." Available at: https://digitallibrary.un.org/record/855429?ln=en&v=pdf (accessed 13 April 2024).

58   UNRWA, "Joint Evaluation and Audit of the UNRWA Gender Equality Strategy 2016-2022." Available at: https://www.unrwa.org/resources/dios-and-evaluation/joint-evaluation-and-audit-unrwa-gender-equality-strategy-2016-2022 (accessed 11 April 2024).

59   As an example, UNESCO provides the Director for Education, and WHO provides the Director for Health.

60   UNRWA, "What is the Mandate of UNRWA?" Available at: https://www.unrwa.org/what-mandate-unrwa-0 (accessed 11 April 2024); United Nations Meetings Coverage and Press Release, "General Assembly Adopts 33 Resolutions Recommended by its Fourth Committee, Including Renewal of UNRWA Mandate until 30 June 2026." Available at: https://press.un.org/en/2022/ga12481.doc.htm (accessed 12 April 2024).

61   UNRWA, "Department of internal Oversight Services, Annual Report 2022", p. 29; available at: https://www.unrwa.org/sites/default/files/content/resources/annual_report_dios_2022_adcom_11062023.pdf

62   Report of the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East 1 January−31 December 2020 (United Nations publication, 2021). Available at: www.un.org/unispal/document/report-of-the-commissioner-general-of-unrwa-1-jan-31-dec-2020-a-76-13/ (accessed 16 March 2024).

63   Report of the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East 1 January−31 December 2021 (United Nations publication, 2022). Available at: www.un.org/unispal/document/report-of-the-commissioner-general-of-unrwa-1-jan-31-dec-2021-a-77-13/ (accessed 16 March 2024).

64   Report of the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East: 1 January−31 December 2022 (United Nations publication, 2023). Available at: reliefweb.int/report/occupied-palestinian-territory/report-commissioner-general-united-nations-relief-and-works-agency-palestine-refugees-near-east-1-january-31-december-2022-a7813-enarruzh (accessed 16 March 2024).

65   Ibid.

66   Ibid.

67   Ibid.

# XII. Annexes

## Annex A: Terms of Reference

**Group to Conduct an Independent Review of mechanisms and procedures to ensure adherence by UNRWA to the humanitarian principle of neutrality**

**General**

1.  The principle of neutrality is one of the four 'humanitarian principles' adopted by the General Assembly, alongside humanity, impartiality and independence (General Assembly Resolutions 46/182 and 58/114).  Neutrality entails that humanitarians do not take sides in hostilities and do not engage in controversies of a political, racial, religious or ideological nature.  It is important for fostering trust, security and humanitarian access to populations in need.

2.  Various non-governmental and governmental organizations, as well as State entities have been making serious allegations related to the neutrality of Agency personnel, installations and operations.  These allegations have included, most recently, allegations that UNRWA ("Agency") personnel have participated or otherwise been involved in the 7 October 2023 attacks in Israel.

3.  In light of the very serious reputational, financial, political and security implications of the allegations against the Agency's neutrality, it is crucial to have a full and independent review to assess whether the Agency is doing everything within its power to ensure neutrality and to respond to allegations of serious breaches when they are made, taking into account the Agency's mandate, its capacities and resources and the unique and frequently difficult operational, political and security context in which it has to work, particularly in Gaza.
    The Secretary-General, in consultation with the Commissioner General, has accordingly decided to establish an independent group to carry out that review.

**Composition of the Review Group**

**4.**   (a) Ms. Catherine Colonna — Chair

(b) Raoul Wallenberg Institute (Sweden)

(c) Chr. Michelsen Institute (Norway)

(d) Danish Institute for Human Rights (Denmark)

(e) Secretary from OCHA

**5.**   The members of the Review Group are independent and equal with respect to the substance of the review.  The Chair has additional organizational, coordination, and representative functions.

**Identified Tasks**

**6.**   The detailed tasks of the Review Group will be as follows:

a.   To identify the mechanisms and procedures that the Agency currently has in place to ensure neutrality and to respond to allegations or information indicating that the principle may have been breached;

b.   To ascertain how those mechanisms and procedures have, or have not, been implemented in practice and whether every practicable effort has been made to apply them to their full potential, taking into account the particular operational, political and security environment in which the Agency works;

c.   To assess the adequacy of those mechanisms and procedures and whether they are fit for purpose, including in relation to the management of risks and taking into account the particular operational, political and security context in which the Agency works;

d.   To make recommendations for the improvement and strengthening, if necessary, of the mechanisms and procedures that are currently in place or for the creation of new and alternative mechanisms and procedures that would be better fit for purpose, taking into account the

particular operational, political and security context in which the Agency works;

   e. To produce a report including its findings and recommendations.

**7.** While the Review Group may take into account and consider specific allegations that the principle of neutrality has been breached, it will not itself investigate any such allegations nor make any findings of fact in respect of them.

**8.** The Review Group will liaise with the Office of Internal Oversight Services (OIOS), if and as necessary, in order to avoid any prejudice to OIOS's ongoing or future investigations.

**Time Frame**

**9.** The Review Group will complete its assessments and submit its report in accordance with the following timeframe:

   a. 14 February 2024 — the Review Group will start its work.

   b. 14 to 16 February 2024 — briefings to the Review Group.

   c. 20 March 2024 — the Review Group will submit an interim report to the Secretary-General, through his Chef de Cabinet.

   d. 20 April 2024 — the Review Group will submit its final report to the Secretary-General, through his Chef de Cabinet.

**Administrative and logistic support**

**10.** The Agency will arrange and provide the necessary administrative and logistic support to the Review Group, including accommodation, subsistence, transport and security. The Deputy Commissioner-General (Programmes and Partnerships) will be in charge of making the necessary arrangements.

**Classification**

**11.** The Review group's interim and final reports will be marked as UNCLASSIFIED.

**12.** The Review Group will ensure that all drafts of its interim and final reports and all communications concerning those reports are marked as UN STRICTLY CONFIDENTIAL.

**13.** The Review Group will ensure the protection of all information provided to it by outside sources under an expectation of confidentiality.

### Additional instructions

**14.** The Review Group will be prepared to provide briefings to the Secretary-General and to the Commissioner-General following the submission of its interim and final reports.

**15.** The Review Group will be prepared to provide a briefing to the Agency's donors following the delivery of its interim and final reports.

**16.** Meetings sought by the Review Group with relevant officials of the Government of Israel and of the Palestinian Authority will be arranged through UNSCO.

**17.** Meetings sought by the Review Group with members of the Agency's Advisory Commission will be arranged through the Deputy Commissioner General (Programmes and Partnerships).

**18.** The Review Group will transfer all materials generated or received in the course of its work to the Agency's archives once it has submitted its report.

Dated: 14 February 2024 | António Guterres, Secretary-General | Place: New York

## Annex B: Overview of documented and alleged violations of neutrality and inviolability

**Neutrality violations registered by UNRWA DIOS since 2017[61] According to the DIOS Annual Report 2022**

### Breakdown of all investigated cases, including neutrality, (2017−2022)

| Category of Cases | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Sexual Exploitation and Abuse (SEA) | 9 | 4 | 10 | 5 | 6 | 5 |
| Sexual Harassment (SH) | 3 | 6 | 7 | 3 | 4 | 2 |
| Corporal Punishment | 87 | 62 | 86 | 23 | 23 | 88 |
| Breach of Neutrality | 55 | 10 | 9 | 7 | 27 | 18 |
| Assault (not CP) | 13 | 20 | 22 | 9 | 9 | 10 |
| Retaliation | 4 | 2 | 2 | 2 | 3 | 2 |
| Harassment/Discrimination/Abuse of Power | 52 | 18 | 52 | 43 | 43 | 28 |
| Recruitment Irregularity | 13 | 8 | 16 | 10 | 5 | 7 |
| Fraud, Theft & Loss to the Agency | 55 | 43 | 65 | 51 | 49 | 34 |
| Other Cases | 76 | 98 | 74 | 64 | 91 | 84 |
| **Total** | **367** | **271** | **282** | **172** | **210** | **225** |

## Overview of 2022 investigated cases, including breaches of neutrality

Table 15. Snapshot of DIOS ID Cases in 2022

| HQ | Total | Sexual Exploitation and Abuse | Sexual Harassment | Corporal Punishment | Breach of Neutrality | Assault (not CP) | Retaliation | Harassment/Discrimination/ Abuse of Power | Recruitment Irregularity | Fraud, Theft & Loss to the Agency | Other Cases |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Open Cases | 20 | 4 | 2 | 0 | 2 | 1 | 2 | 2 | 0 | 3 | 9 |
| Cases Opened | 21 | 5 | 1 | 0 | 4 | 0 | 2 | 2 | 0 | 8 | 3 |
| Cases Closed | 23 | 7 | 3 | 0 | 3 | 1 | 2 | 3 | 0 | 2 | 9 |
| Currently Open | 18 | 2 | 0 | 0 | 3 | 0 | 2 | 1 | 0 | 9 | 3 |

| | | | | | |
|---|---|---|---|---|---|
| Age of Currently Open Cases (Average Days) | 353 | Age of Closed Cases (Average Days) | 328 | Percentage of Cases Closed within 6 Months | 17% |

**Breakdown of neutrality cases by field office (2022):**

- Gaza: zero cases submitted, no open cases.
- West Bank: three cases opened, two cases closed, one case open.
- Lebanon: four cases opened, six cases closed, 13 cases open.
- Jordan: six cases opened, six cases closed, three cases open.
- Syria: one case opened, zero cases closed, seven cases open.

## Violations of the inviolability of the United Nations

UNRWA Annual Reports to the General Assembly (2020, 2021, 2022) list breaches of the inviolability of the UN. These reports document that violations, to a large degree, concern the inviolability of UNRWA installations. Here we summarize reported incidents in the West Bank and Gaza in 2020, 2021 and 2022. UNRWA protested all these instances of breaches of its privileges and immunities with the relevant authorities. Reported cases from Jordan, Syria and Lebanon are not included here for the sake of space.

**West Bank**

- In 2020, in the West Bank, including East Jerusalem, one example was reported of Israeli Security Forces (ISF) entering UNRWA premises, and eight occasions of (for example) tear gas canisters, stun grenades and live ammunition landing on or damaging UNRWA property. In 2020, no incursions were reported into UNRWA premises by Palestinian militant groups. UNRWA premises and services were disrupted at least 28 times by forced closures or protests.[62]
- In 2021, at least 11 occasions of tear gas canisters, stun grenades, plastic coated metal bullets or live ammunition used by the ISF landed in UNRWA premises, including schools. This year, there were three reported incidents of Palestinian militant groups' incursions into

UNRWA premises. On 21 occasions, UNRWA premises and services were disrupted due to forced closures or protests.[63]

- In 2022, UNRWA reported 129 incidents, with 53 cases involving ammunition landing on or striking an UNRWA installation, affecting schools. Most incidents happened during exchanges of fire between Palestinian militant groups and the ISF, but the source of ammunition is not conclusive. In 48 instances, UNRWA had to close its installations due to ISF operations or strikes by local communities. UNRWA installations had to be evacuated seven times to prevent exposing children to tear gas during ISF operations. There was one reported instance of unauthorized Palestinian armed forces actors entering UNRWA premises and four incidents involving the unauthorized entrance of ISF into UNRWA premises.[64]

**Gaza**

- In 2020, ammunition fired by the ISF landed inside or damaged UNRWA premises twice. One incursion was reported into UNRWA premises by the de facto authorities in Gaza. Moreover, shrapnel landed inside UNRWA installations as a result of Hamas or other armed groups. On one occasion, a hand grenade and a military vest were identified inside an UNRWA school. Bullets from unknown sources hit UNRWA installations twice.[65]

- In 2021, four incursions by Hamas into UNRWA installations were reported, and two pieces of unexploded ordnance were found in two UNRWA installations. In January 2021, bullets from an unknown source hit an UNRWA school, and three schools and a health centre were affected by an accidental explosion of live ammunition in an adjacent house in northern Gaza. Fifty-seven other incidents were reported, related to the hostilities between Israel and Hamas in May 2021, mainly related to Israeli air strikes (injuries, damages). On two of these occasions, UNRWA discovered two tunnels (the tunnels were filled). There was one instance of threats from Hamas directed at senior UNRWA management.[66]

- In 2022, there were eight incursions into UNRWA installations by Hamas, and a large cavity was discovered under an UNRWA school in November 2022 (the cavity was filled). In August 2022, an UNRWA school suffered minor damage due to Israeli fire, and agency personnel was injured by shrapnel from a nearby Israeli air strike while guarding an UNRWA school. A rocket fired by a Palestinian militant group damaged an UNRWA school, but no injuries were reported.[67]