# EXHIBIT A

2025 WL 605594
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Judith RAANAN, et al., Plaintiffs,

v.

BINANCE HOLDINGS LIMITED, et al., Defendants.

24-cv-697 (JGK)
|
Signed February 25, 2025

**Attorneys and Law Firms**

Dov Byron Gold, Seiden Law, LLP, New York, NY, Edward MacAllister, Perles Law Firm, PC, Washington, DC, Jacob Nachmani, Amiad Moshe Kushner, Seiden Law LLP, New York, NY, for Plaintiffs Judith Raanan, Natalie Raanan, Uri Raanan, Oren Glisko, Liat Rasel Glisko, Y.G., Ori Glisko, Jeffrey Ludmir.

Edward MacAllister, Perles Law Firm, PC, Washington, DC, Jacob Nachmani, Amiad Moshe Kushner, Seiden Law LLP, New York, NY, for Plaintiffs Meira Semama, Nevo Shoulian, Yeshayahu Mathias, H.B., Dorian Bosi, Ian Troen, R.B., Susan Troen, S.B., Amos Semama, Rachel Troen, D.B., Deborah Ben, Aderet, Yosef Ben Aderet, Adi Bosi, R.M., Rachel Ohnona, Shakked Sarah Mathias, L.B., Revital Mathias, Yosef Benveniste, Tzafrir Mathias, Vered Benveniste, Abraham Troen, Shir Tziporah Mathias, Bar Yuval Shani, Hadassah Troen, Judah Troen, Sanda Mathias, Chaya Benveniste, Aron Troen, Eran Shani.

Anirudh Bansal, Ivan Torres, Jason Michael Ecker, Lauren Riddell, Samson Aaron Enzer, Sesi V. Garimella, Cahill Gordon & Reindel LLP, New York, NY, for Defendant Binance Holdings Limited.

Anirudh Bansal, Ivan Torres, Jason Michael Ecker, Lauren Riddell, Samson Aaron Enzer, Sesi V. Garimella, Cahill Gordon & Reindel LLP, New York, NY, Joanna Felice Wasick, Marco Molina, Baker & Hostetler LLP, New York, NY, for Defendant Changpeng Zhao.

**MEMORANDUM OPINION AND ORDER**

JOHN G. KOELTL, District Judge:

**\*1** The plaintiffs sued the defendants, Binance Holdings Limited ("Binance") and Changpeng Zhao, under the civil liability provision of the Antiterrorism Act ("ATA"), Pub. L. No. 101-519, § 132, 104 Stat. 2250 (1990) (codified at 18 U.S.C. § 2333(a)), and the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 144-222, 130 Stat. 852 (2016) (codified at 18 U.S.C. § 2333(d)). The plaintiffs, who are 40 alleged victims, or representatives of victims, of the October 7, 2023 attacks perpetrated by Hamas and Palestine Islamic Jihad ("PIJ") in Israel, allege that the defendants' provision of financial services to Hamas and PIJ substantially contributed to those attacks. The plaintiffs assert claims under the ATA and JASTA against the defendants for primary liability, see 18 U.S.C. §§ 2333(a), 2339A, 2339B, and for secondary liability, see id. § 2333(d).

The defendants now move to dismiss the Amended Complaint for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2), and for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the defendants' motion to dismiss for lack of personal jurisdiction is **denied** without prejudice to renewal following jurisdictional discovery, and the defendants' motion to dismiss for failure to state a claim is **granted in part** and **denied in part**.

**I.**

Unless otherwise indicated, the following facts are taken from the Amended Complaint and are accepted as true for purposes of deciding this motion.

The plaintiffs are United States citizens and their family members who were killed, taken hostage, or otherwise injured in the October 7, 2023 terrorist attacks in Israel committed by Hamas, PIJ, and other groups. Am. Compl. ¶¶ 1, 19–64, ECF No. 17.

Binance operates a cryptocurrency platform and offers cryptocurrency trading services, among other financial products and services, to over 100 million customers around the world. Id. ¶¶ 66, 139. It holds itself out as the world's "largest crypto exchange by trade volume." Id. ¶ 139. Binance is registered in the Cayman Islands. Id. ¶ 65. Binance has stated that it does not have a corporate headquarters, and it refuses to disclose the location of its main exchange. Id. The plaintiffs allege that Binance nonetheless had extensive ties to New York. Id. ¶¶ 68–73. In particular, the plaintiffs allege

that many of Binance's "VIP" customers were located in New York, and that some of those customers acted as market makers and provided necessary liquidity to the platform. Id. ¶ 68.

Zhao is the primary founder, majority owner, and former CEO of Binance. Id. ¶ 74. He is a Canadian citizen who resides in the United Arab Emirates. Id.

Hamas and PIJ have been designated by the United States State Department as Foreign Terrorist Organizations ("FTOs") since 1997. Id. ¶¶ 76–85. The plaintiffs allege that Hamas, PIJ, and other groups have used cryptocurrency to fund their terrorist activities since at least 2019. Id. ¶¶ 132–38.

 *2  The plaintiffs allege that, because cryptocurrency transactions are pseudonymous, they can identify at least some of the transactions between Binance and specific third parties, such as Hamas and PIJ, by reviewing public blockchain information. Id. ¶¶ 144–45. Based on the plaintiffs' analysis of publicly available blockchain data, Binance allegedly processed thousands of transactions between 2019 and September 2023, valued at nearly $60 million, involving cryptocurrency "wallets" belonging to Hamas and PIJ. Id. ¶¶ 194, 209.

In order to prevent terrorist entities from accessing the United States financial system, Binance was required by laws and regulations to establish anti-money laundering ("AML") programs, perform due diligence on customers through "Know Your Customer" ("KYC") investigations, and file suspicious activity reports ("SARs") with regulators, among other things. See id. ¶¶ 158–73.

However, the plaintiffs allege that the defendants knowingly flouted these obligations. See id. ¶ 174. Binance allegedly engaged in what its then-Chief Compliance Officer ("CCO") termed "the international circumvention of KYC" by, for example, encouraging certain customers to submit false KYC information, allowing customers to open accounts with no KYC information whatsoever, and failing to implement any processes to review high-volume accounts for suspicious activity. See id. ¶¶ 179–80, 183–86. Indeed, in 2020, Binance's CCO, in response to having been presented with evidence of criminal transactions on Binance, purportedly stated, "Like come on. They are here for crime." Id. ¶ 187. And another compliance employee allegedly sought to advertise Binance to drug cartels, writing, "[W]e need a

banner 'is washing drug money too hard these days – come to [B]inance we got cake for you.' " Id. ¶ 188.

The plaintiffs further allege that the defendants knew, or at least willfully disregarded, that Hamas and PIJ were using Binance to finance their terrorist activities. Id. ¶¶ 182–231. For example, an armed unit of Hamas allegedly solicited cryptocurrency donations from the public in 2019, advising its online supporters to create an account on one of several cryptocurrency trading platforms—including Binance—in order to make donations. See id. ¶¶ 201–02. The plaintiffs also allege that, in February 2019, news media reported that Hamas had received funds through transactions on Binance. Id. ¶ 205. In addition, a Financial Crimes Enforcement Network ("FinCEN") investigation allegedly revealed that, in April 2019 and July 2020, Binance received reports from a third-party service provider that Hamas-associated transactions were taking place on its platform, but Binance failed to file any SARs, even though it was required by law to do so. Id. ¶¶ 213–14. FinCEN also concluded that, in July 2020, Binance's CCO instructed personnel to let a customer—who had been flagged as associated with Hamas—leave the platform with his funds and to tell the customer that he had been flagged as a Hamas associate. Id. ¶ 215.

According to the plaintiffs, Binance's willful failure to implement the necessary internal controls and disclosure requirements—misconduct that Zhao allegedly supervised and directed—enabled Hamas and PIJ to use the platform to fund their terrorist activities, including the October 7, 2023 attacks. Id. ¶¶ 4, 176, 180–82. The plaintiffs accordingly assert three claims against the defendants: (1) Count One: aiding and abetting designated FTOs in violation of 18 U.S.C. § 2333(d)(2); (2) Count Two: providing material support to terrorists in violation of 18 U.S.C. §§ 2333(a) and 🚩 2339A; and (3) Count Three: providing material support to FTOs in violation of 18 U.S.C. §§ 2333(a) and 🚩 2339B(a)(1).

 *3  The defendants have moved to dismiss, arguing that the Amended Complaint fails to allege personal jurisdiction over the defendants. The defendants further claim that 18 of the plaintiffs have no cause of action under the ATA. Finally, the defendants contend that the Amended Complaint fails to state a claim for either primary liability (Counts Two and Three) under the ATA or secondary liability (Count One) under JASTA.

## II.

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the Court has personal jurisdiction over the defendants. 🚩 Friedman v. Bloomberg L.P., 884 F.3d 83, 90 (2d Cir. 2017). When the Court does not hold an evidentiary hearing and "relies solely on the pleadings and supporting affidavits, the plaintiff need only make a prima facie showing of jurisdiction." [1] 🚩 Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) "In determining whether a plaintiff has met this burden, [the Court] will not draw argumentative inferences in the plaintiff's favor" but will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." Id.

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. 🚩 McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." 🚩 Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 🚩 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See 🚩 Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## III.

Before the Court may exercise personal jurisdiction over a defendant, three requirements must be satisfied: (1) "the plaintiff's service of process upon the defendant must have been procedurally proper"; (2) "there must be a statutory basis for personal jurisdiction that renders such service of process effective"; and (3) "the exercise of personal jurisdiction must comport with constitutional due process principles." 🚩 Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci I"), 673 F.3d 50, 59–60 (2d Cir. 2012).

### A.

The defendants focus on the second of these requirements, contending that there is no statutory basis for personal jurisdiction. The plaintiffs, for their part, argue that the Court may exercise personal jurisdiction over the defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and New York Civil Practice Law and Rules ("N.Y. CPLR") § 302(a) or, in the alternative, Federal Rule of Civil Procedure 4(k)(2).

### 1.

**\*4** Rule 4(k)(1)(A) provides that serving a summons establishes personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). Under N.Y. CPLR § 302(a)(1), as relevant in this case, a court may exercise personal jurisdiction where (1) "the defendant transacts any business in New York, and, if so, (2) "th[e] cause of action arises from such a business transaction." 🚩 Licci I, 673 F.3d at 60. [2] With respect to section 302(a)(1)'s "arising from" requirement, "a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Id. at 66. Section 302(a)(1) "does not require a causal link between the defendant's New York business activity and a plaintiff's injury." 🚩 Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II"), 732 F.3d 161, 168 (2d Cir. 2013). Rather, "it requires a relatedness between the transaction and the legal claim such that the latter is not completely unmoored

from the former." Id. at 168–69. "This inquiry is a fact-specific one, and when the connection between the parties' activities in New York and the claim crosses the line from 'substantially related' to 'mere coincidence' is not always self-evident." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006).

The defendants do not dispute that the Amended Complaint sufficiently alleges that Binance transacted business in New York, and that Zhao, as Binance's CEO, exercised control over these transactions. Instead, the defendants contend that the Amended Complaint's allegations fail to tie these New York-based transactions to the plaintiffs' claims.

It is unclear from the facts alleged in the Amended Complaint whether the plaintiffs' claims are substantially related to Binance's alleged transactions in New York. The plaintiffs allege that, upon information and belief, Binance's transactions with certain VIP "market maker" customers based in New York "provided necessary liquidity" to the Binance platform. Am. Compl. ¶ 68. Without this New York business, the plaintiffs argue, there would have been no viable Binance platform for Hamas and PIJ to use to finance their terrorist activities. See id. ¶¶ 11–12, 68–69. The plaintiffs also allege that Binance employed the same deceptive practices to hide VIP customers located in New York from regulators as it used to permit FTOs to transact on the platform. See id. ¶¶ 180–81.

But to rely on these broad-brush assertions is to lean upon a slender reed. The plaintiffs' contention that Binance's alleged provision of financial services to Hamas and PIJ depended on Binance's transactions with VIP customers in New York is unsupported by specific facts. See Licci II, 732 F.3d at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy. In this case, the correspondent account at issue is alleged to have been used as an instrument to achieve the very wrong alleged."). Likewise, the relationship between Binance's alleged circumvention of regulatory requirements involving its New York customers and Binance's similar alleged misconduct involving FTOs is not apparent from the Amended Complaint's allegations. [3]

**\*5** Similarly, it is unclear whether there is an articulable nexus between Zhao's alleged activities in New York and the

plaintiffs' claims. The plaintiffs allege that Zhao supervised and controlled Binance's New York-based activity, Am. Compl. ¶ 17, but as with respect to Binance, those allegations are insufficient at this point to establish personal jurisdiction over Zhao. Further, the plaintiffs allege that Zhao "also owned and controlled multiple offshore entities that maintained accounts at Signature Bank in New York," which were "the counterparties to many large transactions with Binance." Id. But the relationship between the accounts maintained by Zhao at Signature Bank and the plaintiffs' claims is not apparent from the Amended Complaint's allegations.

However, jurisdictional discovery is warranted. "[E]ven where [a] plaintiff has not made a prima facie showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." Leon v. Shmukler, 992 F. Supp. 2d 179, 194–95 (E.D.N.Y. 2014); see also, e.g., Ayyash v. Bank Al-Madina, No. 04-cv-9201, 2006 WL 587342, at \*5 (S.D.N.Y. Mar. 9, 2006) ("District courts have considerable discretion in determining how best to handle jurisdictional questions, ... and generally may permit a plaintiff to conduct limited discovery with respect to the jurisdictional issue."). In this case, the plaintiffs have "made a sufficient start" toward establishing personal jurisdiction. Strategem Dev. Corp. v. Heron Int'l N.V., 153 F.R.D. 535, 547 (S.D.N.Y. 1994). Discovery may clarify the character and extent of the connection, if any, between the alleged market-making activities of Binance's New York-based VIP customers and Binance's ability to provide financial services to Hamas and PIJ. Therefore, the plaintiffs may conduct limited jurisdictional discovery.

### 2.

The plaintiffs argue in the alternative that the Court may exercise personal jurisdiction over the defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). Rule 4(k)(2) was "designed to fill a gap in the enforcement of federal law" and allows courts to exercise personal jurisdiction over defendants "having sufficient contacts with the United States to justify the application of United States law but having insufficient contact with any single state to support jurisdiction under state long-arm legislation." Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 760 (S.D.N.Y. 2004).

Under Rule 4(k)(2), serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if three requirements are met: "(1) the claim must arise under federal law; (2) the defendant must not be subject to jurisdiction in any state's courts of general jurisdiction; and (3) the exercise of jurisdiction must be consistent with the United States Constitution and laws." Porina v. Marward Shipping Co., 521 F.3d 122, 127 (2d Cir. 2008).

As to the second requirement, courts in this District have held that "plaintiffs need to certify that the foreign defendants are not subject to jurisdiction in any other state." In re SSA Bonds Antitrust Litig., 420 F. Supp. 3d 219, 240 (S.D.N.Y. 2019); see also Astor Chocolate Corp. v. Elite Gold Ltd., 510 F. Supp. 3d 108, 134 (S.D.N.Y. 2020); 7 W. 57th St. Realty Co. v. Citigroup, Inc., No. 13-cv-981, 2015 WL 1514539, at *13 (S.D.N.Y. Mar. 31, 2015), aff'd, 771 F. App'x 498 (2d Cir. 2019).

In this case, the plaintiffs have not satisfied the second requirement of Rule 4(k)(2). Because the plaintiffs argue in the first instance that personal jurisdiction in New York is proper pursuant to N.Y. CPLR § 302(a)(1), it would be premature to conclude that the defendants are not subject to jurisdiction in any state—especially in view of the possibility that, after jurisdictional discovery, the plaintiffs might be able to establish that the defendants are subject to jurisdiction in New York. Furthermore, the plaintiffs have not certified that the defendants are not subject to jurisdiction in any other state. See Minden Pictures, Inc. v. Grupo Televisa, S.A.B., 738 F. Supp. 3d 458, 469 (S.D.N.Y. 2024). Therefore, the plaintiffs "have not met all of the elements of Rule 4(k)(2), and this Court can decline to apply the provision here." SSA Bonds, 420 F. Supp. 3d at 240. [4]

**\*6** At oral argument, the defendants contended that the exercise of personal jurisdiction under Rule 4(k)(2) would not comport with constitutional due process. See Oral Arg. Tr. at 51–52, ECF No. 47. However, the defendants forfeited this argument by failing to raise it in their opening brief. See, e.g., JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) (observing that arguments not made in an opening brief are deemed abandoned). And in their reply brief, the defendants merely assert in a single, conclusory sentence that the plaintiffs have not shown that personal jurisdiction would comport

with due process. See Defs. Reply at 10, ECF No. 28. It is well-settled that issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." Tolbert v. Queens Coll., 242 F.3d 58, 75 (2d Cir. 2001); see also Grystyk v. Morales, 527 F. Supp. 3d 639, 651 (S.D.N.Y. 2021).

**B.**

The plaintiffs next contend that the defendants, by filing a motion to transfer a separate case to this District, waived their personal jurisdiction challenge in this case. One month after the complaint was filed in this case, a different set of plaintiffs filed a substantially similar complaint against the same defendants in the Middle District of Alabama. See Gess v. BAM Trading Servs., Inc., No. 24-cv-134 (M.D. Ala.). The Gess complaint relies on the same theories of liability and includes many of the same factual allegations contained in the Amended Complaint. The defendants moved to transfer Gess to this Court pursuant to 28 U.S.C. § 1404(a) (the "Gess transfer motion"). See No. 24-cv-134 (M.D. Ala.), ECF No. 31. The Gess transfer motion is fully briefed and pending in the Middle District of Alabama. See No. 24-cv-134 (M.D. Ala.), ECF Nos. 31–39.

28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." A motion to transfer venue "necessarily involves an inquiry into whether the action 'might have been brought' in the proposed district ..., and that inquiry includes a determination whether the proposed district court would have personal jurisdiction over the defendants."

Sole Resort, 450 F.3d at 105 n.3; see also Posven, C.A. v. Liberty Mut. Ins. Co., 303 F. Supp. 2d 391, 401 (S.D.N.Y. 2004) ("For the purposes of section 1404(a), an action might have been brought in another forum if, at the time the action was originally filed, the transferee court would have had subject matter jurisdiction and personal jurisdiction over the defendants, and if venue would have been proper in the transferee court."); 15 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3845 (4th ed. June 2024 Update) ("[C]ourts [considering motions to transfer venue under section 1404(a)] are uniform in requiring that the transferee have personal jurisdiction over the defendant and

constitute a proper venue, independent of waiver or consent by the defendant.").

In support of the Gess transfer motion, the defendants argued that Gess "might have been brought" in this District because venue would have been proper in this District. See No. 24-cv-134 (M.D. Ala.), ECF No. 32 at 7; 28 U.S.C. § 1404(a). However, the defendants stressed that they "[were] not conceding that personal jurisdiction is appropriate" in this District, and that "personal jurisdiction may well be inappropriate in both Gess and Raanan in any federal district court in this country." No. 24-cv-134 (M.D. Ala.), ECF No. 32 at 7 n.6.

 **7** The plaintiffs complain that the defendants "cannot simultaneously file a motion that is predicated on the existence of personal jurisdiction over them in a transferee district while 'reserving rights' to challenge personal jurisdiction in the transferee district." Pltfs.' Ltr. at 1, ECF No. 42. However, that objection bears on whether the transfer of Gess to this District would be proper under section 1404(a), an issue that is the subject of the motion that is pending in the Middle District of Alabama. That question is not before this Court on this motion.

Rather, the question presented to this Court is whether the defendants' conduct and statements in connection with the Gess transfer motion constitute an implicit waiver of any personal jurisdiction defense in this case. There was no such waiver. In bringing the Gess transfer motion, the defendants took pains to preserve any personal jurisdiction challenge in this case (whatever effect that preservation might have on the outcome of the Gess transfer motion). This litigation conduct cannot be said to evince an intentional relinquishment of a personal jurisdiction defense.

The case that the plaintiffs rely on does not instruct otherwise. In Olvera-Morales v. International Labor Management Corp., the court granted the defendants' motion to transfer the action from the Northern District of New York to the Middle District of North Carolina pursuant to section 1404(a). No. 02-cv-1589, 2005 WL 8167435, at *6–7 (N.D.N.Y. June 15, 2005). The Olvera-Morales court concluded: "By making the motion to transfer, [the non-resident defendant] has implicitly waived any defense it might have on the ground of lack of in personam jurisdiction in North Carolina. Accordingly, in view of the Court's ruling, any such defense is deemed waived." Id. at *7. However, Olvera-Morales is distinguishable from this case because in that case, the court

deemed any personal jurisdiction challenge implicitly waived only after it had granted the defendants' motion to transfer. Id. at *6–7. Because transfer pursuant to section 1404 is proper only if the transferee court has personal jurisdiction over the defendant, the Olvera-Morales court's conclusion that any challenge to personal jurisdiction was waived followed naturally from its grant of the transfer. Also, there is no indication that the relevant defendant in Olvera-Morales, when moving to transfer, attempted to preserve any personal jurisdiction challenge it might raise in the transferee court. By contrast, in this case, the Gess transfer motion has not yet been decided, and the defendants, in their filings in connection with that motion, expressly sought to preserve any personal jurisdiction defense in this action. Accordingly, under these circumstances, the defendants have not waived their challenges to personal jurisdiction in this case by filing the Gess transfer motion.

For the reasons explained above, the motion to dismiss for lack of personal jurisdiction is **denied** without prejudice to renewal following jurisdictional discovery.

## IV.

The defendants also move to dismiss the Amended Complaint for failure to state a claim. To begin, the defendants argue that 18 of the plaintiffs cannot sue under the ATA. On the merits, the defendants contend that the Amended Complaint fails to state a claim for primary liability (Counts Two and Three) or for secondary liability (Count One) under the ATA and JASTA.

### A.

As an initial matter, the defendants contend that the claims of 18 plaintiffs should be dismissed because those plaintiffs have no cause of action under the ATA. [5] These plaintiffs fall into one (or more) of three categories: (1) immediate family members of United States nationals who were injured in but survived the attacks; (2) more remote family members of United States nationals who were killed in the attacks; or (3) foreign national family members of United States nationals killed or injured in the attacks.

 **8** The ATA provides, in relevant part, that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or

his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States" and recover treble damages as well as costs and attorney's fees. 18 U.S.C. § 2333(a). "[T]he 'by reason of' language of the statute restricts the imposition of [ATA] liability to situations where plaintiffs plausibly allege that defendants' actions proximately caused their injuries." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 118, 125 (2d Cir. 2013). "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence." Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) (emphasis omitted), superseded in other part by statute, as recognized in Twitter, Inc. v. Taamneh, 598 U.S. 471 (2023).

### 1.

Two plaintiffs are family members of survivors of the attacks. The defendants argue that these plaintiffs cannot sue under the ATA because these plaintiffs, as family members of individuals who were injured but not killed in the attacks, are not "survivors" of "[a]ny national of the United States injured ... by reason of an act of international terrorism." 18 U.S.C. § 2333(a).

Plaintiff Uri Raanan is the father of plaintiff Natalie Raanan. Am. Compl. ¶ 21.[6] Natalie Raanan was taken hostage by Hamas during the attacks; she was held captive for two weeks and then released. Id. ¶ 20. The Amended Complaint alleges that Uri Raanan "suffered severe mental anguish and extreme emotional pain and suffering as a result" of the fact that his daughter was attacked and taken hostage by Hamas and PIJ. Id. ¶ 21.

Plaintiff H.B., a United States citizen, is the child of plaintiffs Adi and Dorian Bosi, both of whom survived the attacks. Id. ¶¶ 55–59. Adi Bosi, a United States citizen, hid in a bomb shelter with her husband and two of their toddlers while her city was attacked. Id. ¶ 55. When the attacks took place, Adi Bosi was pregnant; H.B. was born to Adi Bosi after the attacks. See id. ¶¶ 55, 59. The Amended Complaint alleges that H.B. "suffered severe mental anguish and extreme emotional pain and suffering" as a result of the attacks' "deep impact on her family." Id. ¶ 59.

Plaintiffs Uri Raanan and H.B. cannot sue as "survivors" under the ATA. The statute limits recovery to "[a]ny national of the United States injured ... by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a) (emphasis added). The ATA does not define "survivors" or "heirs," but the dictionary definitions of the terms are instructive. "Heirs" means "[a] person who succeeds, by the rules of law, to an estate in lands, tenements, or hereditaments, upon the death of his ancestor, by descent and right of relationship." Heirs, Black's Law Dictionary (6th ed. 1990) (emphasis added). A "survivor" is "[o]ne who outlives another." Survivor, Black's Law Dictionary (6th ed. 1990) (emphasis added). Thus, "under the ATA, someone who survived the attack has no 'survivors' or 'heirs' that can recover for his injuries on his behalf." Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S., 495 F. Supp. 3d 144, 152 (E.D.N.Y. 2020). Plaintiffs Uri Raanan and H.B. are not "survivors" or "heirs" under the ATA because their respective family members—Natalie Raanan and Adi Bosi—were injured but not killed in the attacks. See Brown v. Nat'l Bank of Pak., No. 19-cv-11876, 2022 WL 1155905, at *2 (S.D.N.Y. Apr. 19, 2022) ("The four plaintiffs who allege a familial relationship with U.S. nationals that only were injured are thus neither survivors nor heirs and cannot state a claim for relief under JASTA."); see also Miller v. Arab Bank, PLC, 372 F. Supp. 3d 33, 42 (E.D.N.Y. 2019) (concluding that a United States national who survived a suicide bombing has no survivors or heirs).[7]

**\*9** However, the question whether Uri Raanan and H.B. may sue under the ATA as principal victims themselves is given short shrift by the parties. The Amended Complaint alleges that Uri Raanan himself suffered emotional distress when his daughter was injured and taken hostage in the attacks. See Am. Compl. ¶ 21. Likewise, the Amended Complaint alleges that H.B. herself suffered mental anguish due to the "deep impact" the attacks had on her family. Id. ¶ 59. But there is no allegation that Uri Raanan was physically present during the attacks, and H.B. was not yet born when the attacks occurred, id.

Courts have consistently held that United States nationals may recover for non-physical, emotional injuries under the ATA, even when those individuals were not physically present at the site of the terrorist attack. See, e.g., Sokolow v. Palestine Liberation Org., 60 F. Supp. 3d 509, 516 n.8 (S.D.N.Y. 2014) ("Courts ... universally allow ATA claims based on

the emotional distress that U.S. nationals experience as a result of the death or injury of their family members."). In relevant part, the statute permits "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism" to sue. 18 U.S.C. § 2333(a) (emphasis added). Because the ATA "does not specifically require that a plaintiff suffer physical harm prior to filing suit," and instead requires only that a plaintiff properly allege an "injur[y] in ... her person," "mental anguish, emotional pain and suffering, and loss of society" are cognizable injuries "under the plain language, as well as a common-sense interpretation, of the ATA." 🔖 Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 182 (D.D.C. 2004); see also 🔖 Lelchook v. Commerzbank AG, No. 10-cv-5795, 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2, 2011) ("[P]ermitting Plaintiffs to pursue claims for solatium damages is consistent with both the purpose of the ATA, and Congress's intention to incorporate traditional tort-law principles into the statute."); 🔖 Goldberg v. UBS AG, 660 F. Supp. 2d 410, 426 (E.D.N.Y. 2009) (finding that "damages stemming from the emotional and pecuniary injuries resulting from [the plaintiffs' husband and father's] death" qualify as an injury to "person, property or business" within the meaning of § 2333(a)); 🔖 Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 588–89 (E.D.N.Y. 2005) (holding that a United States national could recover under the ATA for "various non-physical injuries, such as emotional distress and loss of consortium, after their family members ... became victims of acts of international terrorism." At least one court has held that a United States national may sue under the ATA for such nonphysical injuries even if the plaintiff's family member survived the attack. See 🔖 Morris v. Khadr, 415 F. Supp. 2d 1323, 1338 (D. Utah 2006). "Spouses and relative[s] in direct lineal relationships are presumed to suffer damages for mental anguish." 🔖 Knox v. Palestine Liberation Org., 442 F. Supp. 2d 62, 78 (S.D.N.Y. 2006).

Interpreting the ATA to permit plaintiffs in Uri Raanan's position to sue for emotional injuries accords with the "broad remedial purpose" of the statute. 🔖 Id. at 76. In enacting the ATA, Congress's purpose was "to grant a remedy to U.S. nationals and their families who suffered from injury to an individual or property as a result of international terrorism." 🔖 Linde, 384 F. Supp. 2d at 589; see also Ests. of 🔖 Ungar ex rel. Strachman v. Palestinian Auth., 304 F. Supp. 2d 232, 262–63 (D.R.I. 2004) (observing that the legislative history

"suggests that Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly").

**\*10** Accordingly, the emotional trauma that plaintiff Uri Raanan allegedly suffered because of the attacks—which injured his daughter and caused her to be held captive for two weeks—is an "injur[y] in his ... person" under the ATA. 18 U.S.C. § 2333(a). He has plausibly alleged that this cognizable injury was proximately caused by an "act of international terrorism"—namely, the attacks. It would have been reasonably foreseeable to Hamas and PIJ that the attacks would harm not only individuals who were physically present at the sites of the attacks but also their immediate family members, even if those family members were not physically present. Indeed, as courts analyzing ATA claims and addressing injuries caused by acts of terrorism more broadly have recognized, "a terrorist attack—by its nature—is directed not only at the victim but also at the victims' families." 🔖 Est. of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 27 (D.D.C. 2009); see also 🔖 Miller, 372 F. Supp. 3d at 41 ("Family members do not need to be present for the terrorist attacks to recover under the ATA, because a terrorist attack is precisely the sort of situation in which presence at the time is not required in light of the severity of the act and the obvious range of potential grief and distress that directly results from such a heinous act."); cf. 🔖 Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 50 (D.D.C. 2001) ("[W]hen an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family."). Uri Raanan therefore can sue under the ATA as a principal victim.

On the other hand, plaintiff H.B. cannot sue as a principal victim under the statute because she was born after the attacks. The Amended Complaint alleges that H.B. suffered emotional pain "due to the deep impact" the attacks had on H.B.'s family, who were present at and injured in the attacks—and who are also plaintiffs in this case. Am. Compl. ¶¶ 55–59. Future emotional distress experienced by unborn family members cannot be said to be "reasonably foreseeable or anticipated as a natural consequence" of a terrorist attack. 🔖 Rothstein, 708 F.3d at 91.

The plaintiffs rely on inapposite cases. In Goldstein v. Islamic Republic of Iran, the court held in the Foreign Sovereign Immunities Act ("FSIA") context that the after-born plaintiff in that specific case could recover for solatium damages

caused by a terrorist bombing that killed that plaintiff's brother. 🚩 383 F. Supp. 3d 15, 22–23 (D.D.C. 2019). But *Goldstein* involved "special circumstances" not present in this case. 🚩 Id. at 23. The *Goldstein* plaintiff was born just two days after the terrorist bombing. Id. Also, there was evidence that the *Goldstein* plaintiff "was born prematurely as a result of his mother's emotional shock and distress after she learned that her son ... was on the bus that had been bombed." Id. By contrast, in this case, although the Amended Complaint alleges that H.B.'s mother, plaintiff Adi Bosi, was already pregnant when the attacks occurred, Am. Compl. ¶ 55, it is unclear precisely when after the attacks H.B. was born. In addition, there is no allegation, for example, that H.B. was born prematurely as a result of the distress suffered by H.B.'s mother due to the attacks.[8] Accordingly, the motion to dismiss is **granted** as to plaintiff H.B.

**2.**

The defendants argue that six of the plaintiffs—Eran Shani, Susan Troen, Hadassah Troen, Revital Mathias, Amos Semama, and Jeffrey Ludmir—are too remotely related to victims of the attacks to have a cause of action under the ATA.

Shachar Deborah Troen Mathias ("Shachar"), who was a United States citizen, and Shachar's husband, Shlomi David Mathias ("Shlomi"), were killed in the attacks.[9] Id. ¶ 22. Plaintiff Eran Shani is an Israeli citizen and the brother-in-law of Shachar and Shlomi. Id. ¶ 31. Plaintiff Susan Troen, a United States citizen, is the sister-in-law of Shachar and Shlomi. Id. ¶ 33. Plaintiff Hadassah Troen, a United States citizen, is the sister-in-law of Shachar and Shlomi. Id. ¶ 35. Plaintiff Revital Mathias is an Israeli citizen and the sister-in-law of Shachar and Shlomi. Id. ¶ 40. Plaintiff Amos Semama is an Israeli citizen and the brother-in-law of Shachar and Shlomi. Id. ¶ 42.[10] Plaintiffs Eran Shani, Susan Troen, Hadassah Troen, Revital Mathias, and Amos Semama allege that they suffered mental anguish and emotional pain because of the attacks that claimed the lives of Shachar and Shlomi. Id. ¶¶ 31, 33, 35, 40, 42.

 **\*11** Plaintiff Jeffrey Ludmir, a United States citizen, is the uncle of Dr. Daniel Levi Ludmir ("Daniel Levi"), a native of Peru, who was killed in the attacks. Id. ¶ 53. The Amended Complaint alleges that Daniel Levi's father abandoned the family when Daniel Levi was a young boy and

was absent for over 25 years, and that Jeffrey Ludmir thus assumed the role of a father figure for his nephew. Id. ¶ 54. Because of the attacks that claimed his nephew's life, Jeffrey Ludmir allegedly suffered severe mental anguish and extreme emotional pain. Id. ¶ 53.

The question is whether these six plaintiffs—brothers-in-law, sisters-in-law, and an uncle—are sufficiently related to victims of the attacks to sue under the ATA, either for their own alleged emotional injuries caused by the attacks or as "survivors" of victims Shachar, Shlomi, or Daniel Levi.[11] As explained above, in the ATA context, "[s]pouses and relative[s] in direct lineal relationships are presumed to suffer damages for mental anguish." 🚩 Knox, 442 F. Supp. 2d at 78 (emphasis added). Along the same lines, courts uniformly agree that immediate family members of a United States citizen killed by an act of terrorism—a decedent's spouse, parents, siblings, and children—can sue under the statute as "survivors" or "heirs."[12] See, e.g., 🚩 id. at 75–76 ("[A] victim's parents and adult siblings properly fall within the class of individuals that may claim damages under § 2333 as survivors."); 🚩 Morris, 415 F. Supp. 2d at 1337 (concluding that the decedent's wife and children were the decedent's "heirs"); 🚩 Weiss v. Nat'l Westminster Bank PLC, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006) ("[I]t is not necessary that plaintiffs specifically use the terms 'heirs' or 'survivors' in alleging their relationship to U.S. nationals. Rather, it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national."); Ests. of 🚩 Ungar, 304 F. Supp. 2d at 261–64 (finding that the decedent's parents and siblings were the decedent's "survivors" under the ATA). For a plaintiff who is related to a decedent but is not part of the decedent's immediate family, however, it is less clear when (or whether) that plaintiff may sue for the plaintiff's own emotional damages resulting from the decedent's death, or sue derivatively as the decedent's "survivor."

Cases from the District of Columbia Circuit addressing this issue in an analogous context are instructive. Courts in that Circuit have considered which family members may recover for emotional distress claims brought pursuant to the FSIA's terrorism exception, 🚩 28 U.S.C. § 1605A.[13] Because these claims are "indistinguishable from an [intentional infliction of emotional distress ("IIED")] claim," courts have looked to the discussion of common-law IIED in the Restatement (Second)

of Torts to determine which family members may recover solatium damages. Fritz v. Islamic Republic of Iran, 324 F. Supp. 3d 54, 62–63 (D.D.C. 2018); see also, e.g., Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35–37 (D.D.C. 2001).

**\*12** Taking into account both the Restatement and the uniquely extreme nature of terrorism, courts in the District of Columbia Circuit have generally drawn the line at members of the victim's immediate family. Est. of Heiser, 659 F. Supp. 2d at 28–29. These courts have "generally adopted the strict meaning of 'immediate family,' defined as one's spouse, parents, siblings, and children." Id. at 29; see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 335–38 (D.C. Cir. 2003) (holding that nieces and nephews are not "immediate family" members of victims within the meaning of the Restatement). That said, this "immediate family" requirement can be relaxed in certain rare circumstances: for relatives who "were members of the victim's household, and ... were viewed as the functional equivalents of immediate family members." Bettis, 315 F.3d at 337; see also Est. of Heiser, 659 F. Supp. 2d at 29 ("[I]n those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement ...."). Accordingly, in some cases, courts in that jurisdiction have found certain non-biological or half-family members to be the functional equivalents of immediate family members. See, e.g., Est. of Heiser, 659 F. Supp. 2d at 29 (non-adoptive stepfathers); Fritz, 324 F. Supp. 3d at 62–63 (stepparents and half- or stepsiblings).

In this District, at least one court has adopted this "immediate family members (and functional equivalents of immediate family members)" test in the ATA context. In re Terrorist Attacks on Sept. 11, 2001, No. 03-mdl-1570, 2023 WL 2711126, at \*4 (S.D.N.Y. Mar 30, 2023).[14] In another case, the court concluded that a victim's stepchildren, who resided in the victim's household and to whom the victim had "acted as a de facto father," could sue as the victim's "survivors" under the ATA. Knox, 442 F. Supp. 2d at 75–76.

This line of reasoning is persuasive. A plaintiff must be a direct family member (or functional equivalent) of a United States national who was injured by reason of an act of international terrorism to sue under the ATA based on that plaintiff's emotional damages. In the alternative, a plaintiff must be a direct family member (or functional equivalent) of a United States national who was killed by reason of an act of international terrorism to sue as the decedent's "survivor" under the ATA.

Applying the "functional equivalents of immediate family members" test in this case, five of the plaintiffs—Eran Shani, Susan Troen, Hadassah Troen, Revital Mathias, and Amos Semama—are too remotely related to victims of the attacks to have a cause of action under the ATA. The Amended Complaint alleges only that these plaintiffs were the brothers- or sisters-in-law of victims Shachar and Shlomi and that the plaintiffs suffered severe emotional distress. These allegations fail to show that these plaintiffs were the functional equivalents of Shachar's or Shlomi's immediate family members. Compare Bettis, 315 F.3d at 337 (finding insufficient a "mere[ ] claim that the nieces and nephews enjoyed a close relationship with [the victim]"), with Fritz, 324 F. Supp. 3d at 63 (finding evidence that the victim had "lived in the same household" as his stepsibling and that the stepsibling had "treated [the victim] as his little brother" sufficient to satisfy the "functional equivalent" test).

However, plaintiff Jeffrey Ludmir can sue under the ATA for his own alleged emotional distress. The Amended Complaint alleges that, after Daniel Levi's father abandoned the family when Daniel Levi was a young boy, Jeffrey Ludmir served as a father figure for Daniel Levi for over 25 years, providing financial support to Daniel Levi's mother—Jeffrey Ludmir's sister—to help raise her children. Am. Compl. ¶ 54. These allegations indicate that Jeffrey Ludmir acted as a "de facto father" to Daniel Levi. Knox, 442 F. Supp. 2d at 76. Accordingly, as the functional equivalent of the immediate family member of a victim of the attacks, Jeffrey Ludmir can sue under the ATA to recover for his own emotional injury.[15]

**\*13** For these reasons, the motion to dismiss is **granted** as to plaintiffs Eran Shani, Susan Troen, Hadassah Troen, Revital Mathias, and Amos Semama. Plaintiff Jeffrey Ludmir, however, has a cause of action under the ATA.

### 3.

The defendants contend that plaintiffs Dorian Bosi, Yosef Ben Aderet, Sanda Mathias, Yeshayahu Mathias, Tzafrir Mathias,

Meira Semama, Oren Glisko, Liat Rasel Glisko, Y.G., and Ori Glisko have no cause of action under the ATA because these plaintiffs are Israeli citizens, not United States citizens. [16]

At oral argument, the plaintiffs conceded that Dorian Bosi and Yosef Ben Aderet lack the ability to sue. See Oral Arg. Tr. at 49–50. Therefore, the claims of Dorian Bosi and Yosef Ben Aderet are **dismissed**.

Plaintiff Sanda Mathias is the mother of Shlomi, who was killed in the attacks, mother-in-law of Shachar, who was also killed, and grandmother of plaintiffs R.M., Shakked Sarah Mathias, and Shir Tziporah Mathias, who were injured by the attacks. Id. ¶ 37. As a result, Sanda Mathias allegedly suffered severe mental anguish and emotional pain and suffering. Id.

Plaintiff Yeshayahu Mathias is Shlomi's father, Shachar's father-in-law, and plaintiffs R.M.'s, Shakked Sarah Mathias's, and Shir Tziporah Mathias's grandfather. Id. ¶ 38. The Amended Complaint alleges that Yeshayahu Mathias suffered severe mental anguish and extreme emotional pain and suffering as a result of the attacks. Id.

Plaintiff Tzafrir Mathias is Shachar's brother-in-law and Shlomi's brother. Id. ¶ 39. The Amended Complaint alleges that Tzafrir Mathias suffered severe mental anguish and extreme emotional pain and suffering as a result of the attacks that killed his brother and sister-in-law. Id.

Plaintiff Meira Semama is Shachar's sister-in-law and Shlomi's sister. Id. ¶ 41. The Amended Complaint alleges that Meira Semama suffered severe mental anguish and extreme emotional pain and suffering as a result of the attacks that killed her brother and sister-in-law. Id.

Plaintiff Oren Glisko is the father of United States citizen Itay Glisko. Id. ¶ 44. Itay Glisko was killed in the attacks. Id. ¶ 43. The Amended Complaint alleges that Oren Glisko suffered severe mental anguish and extreme emotional pain and suffering as a result of the attacks. Id. ¶ 44.

Plaintiff Liat Rasel Glisko is Itay Glisko's mother. Id. ¶ 45. The Amended Complaint alleges that Liat Rasel Glisko suffered severe mental anguish and extreme emotional pain and suffering as a result of the attacks. Id.

Plaintiffs Y.G. and Ori Glisko are Itay Glisko's brothers. Id. ¶¶ 46, 47. The Amended Complaint alleges that Y.G. and Ori Glisko suffered severe mental anguish and extreme emotional pain and suffering as a result of the attacks. Id.

The defendants argue that foreign nationals who are related to United States nationals killed or injured in terrorist attacks cannot sue under the ATA, but the defendants are only half right. The statute provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor" in federal court. 18 U.S.C. § 2333(a) (emphasis added). The first phrase of section 2333(a) "defines the injury that forms the basis for the cause of action, and the word 'therefor' appears to refer back to that defined injury, confining the ambit of liability to injuries to U.S. nationals." Averbach v. Cairo Amman Bank, No. 19-cv-0004, 2020 WL 486860, at *9 (S.D.N.Y. Jan. 21, 2020), report and recommendation adopted, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020). The proper plaintiffs to recover for this defined injury—an injury to a United States national—are: (1) the United States national who suffered the alleged injury, or, if that United States national is deceased, (2) the United States national's estate, survivors, or heirs.

**\*14** As to that second category of proper plaintiffs, the ATA requires only that the plaintiff be the "estate, survivor[ ], or heir[ ]" of a United States national injured by an act of international terrorism. 18 U.S.C. § 2333(a). The statute "contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States." Est. of Henkin, 495 F. Supp. 3d at 153; see also Weiss, 453 F. Supp. 2d at 620 (finding that an Israeli citizen and a French citizen sufficiently alleged that they were the heirs or survivors of United States nationals and thus could sue under the ATA in a representative capacity). [17]

Accordingly, a foreign national plaintiff cannot sue under the ATA based on that plaintiff's own personal injuries. See Lelchook v. Lebanese Canadian Bank, No. 18-cv-12401, 2024 WL 967078, at *9 (S.D.N.Y. Mar. 6, 2024) ("[B]ecause Ester Lelchook is not an American citizen, she may only sue in a representative capacity and is thus precluded from bringing her own personal claims [under the ATA]."); Averbach, 2020 WL 1130733, at *2 ("[A]ny United States national, or his estate, survivors, or heirs, may sue for any injuries that the national receives to his person, property, or business by reason of an act of international terrorism. Nowhere in the statute does Congress provide remedies for

non-nationals claiming damages for personal injuries."). But that same plaintiff may bring a claim under the ATA on behalf of a United States national to recover for that United States national's personal injuries, so long as the plaintiff is the United States national's survivor or heir. See Est. of Henkin, 495 F. Supp. 3d at 153; Weiss, 453 F. Supp. 2d at 620.

Plaintiffs Oren Glisko, Liat Rasel Glisko, Y.G., and Ori Glisko have a cause of action under the ATA to sue on behalf of their slain son and brother, Itay Glisko, a United States national. Although these plaintiffs, who are Israeli citizens, cannot bring ATA claims based on their own alleged emotional injuries, they are the immediate family members of a United States national killed in the attacks, and therefore they are "survivors" for purposes of an ATA claim. They can sue under the ATA in a representative capacity; their nationality "makes no difference." Est. of Henkin, 495 F. Supp. 3d at 153.

However, plaintiffs Sanda Mathias, Yeshayahu Mathias, Tzafrir Mathias, and Meira Semama lack the capacity to sue under the ATA. As Israeli citizens, these plaintiffs cannot sue under the ATA based on their own alleged emotional injuries. Nor can they sue as the heirs or survivors of a United States national, because they are not the immediate family members of a deceased United States national injured in the attacks. Sanda Mathias, Yeshayahu Mathias, Tzafrir Mathias, and Meira Semama are the immediate relatives of Shlomi, (presumably) a non-United States national killed in the attacks, but only the mother-in-law, father-in-law, brother-in-law, and sister-in-law, respectively, of Shachar, a United States national killed in the attacks. See Am. Compl. ¶¶ 37–39, 41. Without any allegations to suggest that these plaintiffs were the functional equivalents of Shachar's immediate family members, these plaintiffs are not Shachar's "survivors" under the ATA. Therefore, the motion to dismiss is **granted** as to plaintiffs Sanda Mathias, Yeshayahu Mathias, Tzafrir Mathias, and Meira Semama.

**B.**

**\*15** Turning to the merits, the defendants argue that the Amended Complaint insufficiently alleges that the defendants committed a primary violation of the ATA.

To plead a claim for primary liability under the ATA, plaintiffs must allege plausibly that they were injured "by reason of an act of international terrorism." Linde v. Arab Bank, PLC, 882 F.3d 314, 325 (2d Cir. 2018) (quoting 18 U.S.C. § 2333(a)). The statute defines "international terrorism" to mean:

activities that—

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

Id. § 2331(1). The words "by reason of" in section 2333(a) "restrict[ ] the imposition of [ATA] liability to situations where plaintiffs plausibly allege that defendants' actions proximately caused their injuries." In re Terrorist Attacks, 714 F.3d at 125.

**1.**

For an act to constitute "international terrorism," "it must violate federal or state law if committed within this country," and it "must also involve violence or endanger human life." Linde, 882 F.3d at 325–26 (citing 18 U.S.C. § 2331(1) (A)). "Further, the act must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." Id. at 326 (citing 18 U.S.C. § 2331(1) (B)). Even if the alleged conduct violates a material support

statute, see 📖 18 U.S.C. §§ 2339A, 📖 2339B, "provision of material support to a terrorist organization does not invariably equate to an act of international terrorism," because "providing financial services to a known terrorist organization may afford material support to the organization even if the services do not involve violence or endanger life and do not manifest the apparent intent required by 📖 § 2331(1)(B)." 📖 Linde, 882 F.3d at 326. Finally, the act "must have occurred primarily outside the territorial jurisdiction of the United States or transcend national boundaries." Id. (citing 📖 18 U.S.C. § 2331(1)(C)).

The defendants contend that their alleged conduct— providing financial services to Hamas, PIJ, and their affiliates through the Binance platform—does not amount to acts of "international terrorism." As a general matter, "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to ... compel a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." 📖 Id. at 327; see also 📖 Weiss v. Nat'l Westminster Bank, PLC, 993 F.3d 144, 162–63 (2d Cir. 2021) ("[P]roof of the provision of banking services, in and of itself, is insufficient either to show that the services involved an act of violence or threat to human life or to give the appearance that such services were intended to intimidate or coerce a civilian population or government.").

 *16  That general guidance is applicable in this case. The plaintiffs' allegations do not support the conclusion that the defendants committed a terrorist act. The Amended Complaint alleges that Hamas and the defendants enabled customers associated with Hamas and PIJ to engage in cryptocurrency transactions. The plaintiffs do not contend that the defendants' conduct was violent; rather, the plaintiffs claim that the defendants committed "acts dangerous to human life." 📖 18 U.S.C. § 2331(1)(A). Courts in this Circuit addressing similar allegations on a motion to dismiss have held that providing such services, without more, does not constitute an act dangerous to human life. See 📖 King v. Habib Bank Ltd., No. 20-cv-4322, 2022 WL 4537849, at *4–5 (S.D.N.Y. Sept. 28, 2022) (dismissing primary liability claims against defendant banks where the plaintiffs alleged only that the defendants provided financial services to terrorists but did not "allege the kind of direct connection to violence or endangerment of human life that would render such financial services 'acts

of international terrorism' themselves"); 📖 Averbach v. Cairo Amman Bank, No. 19-cv-0004, 2022 WL 2530797, at *17–19 (S.D.N.Y. Apr. 11, 2022) (concluding that, although the plaintiffs alleged facts plausibly suggesting that the defendant bank was "generally aware some of its customers were, in addition to other charitable work, supporting martyrdom and funding martyr payments," the complaint "f[ell] short on specific acts in which [the defendant] engaged that could fall within the definition of an act of international terrorism");

📖 Bartlett v. Société Générale de Banque Au Liban SAL, No. 19-cv-00007, 2020 WL 7089448, at *7–8 (E.D.N.Y. Nov. 25, 2020) (concluding that providing wire transfer and other financial services to customers allegedly affiliated with Hezbollah was not an act dangerous to human life as contemplated by the ATA); 📖 O'Sullivan v. Deutsche Bank AG, No. 17-cv-8709, 2019 WL 1409446, at *7–8 (S.D.N.Y. Mar. 28, 2019) (holding that the complaint did not allege plausibly that the defendants' provision of financial services to the government of Iran and various Iranian entities with connections to terrorist organizations could be considered acts dangerous to human life, even though that same conduct violated United States sanctions).[18]

The cases that the plaintiffs cite are not binding and are, in any event, distinguishable. For example, in Boim v. Holy Land Foundation for Relief and Development, the Seventh Circuit Court of Appeals held that the defendants' direct donations to Hamas constituted acts dangerous to human life. See 📖 549 F.3d 685, 690 (7th Cir. 2008) (en banc) ("Giving money to Hamas, like giving a loaded gun to a child ..., is an act dangerous to human life."). In this case, by contrast, the plaintiffs allege only that Hamas and PIJ (or wallets associated with Hamas and PIJ) were able to transact on the Binance platform, not that the defendants donated money directly to Hamas or PIJ. Furthermore, Boim was decided before 2016, when Congress enacted JASTA, which expressly provided for secondary liability under the ATA. The Second Circuit Court of Appeals has since found Boim "inapposite," observing that the framework that JASTA adopted for aiding-and-abetting claims had replaced the analysis in Boim. 📖 Honickman v. BLOM Bank SAL, 6 F.4th 487, 499 n.14 (2d Cir. 2021).

And in Miller v. Arab Bank, the court denied a motion to dismiss a claim for primary liability under the ATA. 📖 372 F. Supp. 3d at 44–46. The plaintiffs in Miller alleged that Arab Bank administered a terrorist insurance scheme that made

"martyr payments" totaling over $35 million to "martyrs" and their families. Id. at 39–40. In order to administer this insurance scheme, Arab Bank allegedly received detailed lists with the names of the "martyrs" and their violent causes of death, which, the Miller court found, indicated that Arab Bank was at least on notice that it was "doing business with terrorists who were going to use violence to attack civilians." Id. at 45. The Miller court reasoned that Arab Bank's administration of the insurance scheme endangered human life because it rewarded acts of terrorism and incentivized prospective "martyrs" to commit violent acts. Id. In this case, unlike in Miller, there are no allegations that the defendants facilitated transactions explicitly identified as payments to "martyrs" or otherwise clearly earmarked for terrorist activity.

In short, post-JASTA district court cases have found that "primary liability may ... lie where banking services are directed at a specifically identifiable violent or dangerous act." King, 2022 WL 4537849, at *5. However, the plaintiffs in this case fail to allege any such "direct connection" between the financial services that the defendants purportedly provided and the acts of international terrorism, and therefore the defendants' actions are more "properly analyzed under JASTA's aiding-and-abetting provision." Id. Accordingly, because the plaintiffs have failed to allege that the defendants themselves committed acts dangerous to human life, the Amended Complaint fails to state a claim for primary liability against the defendants.

**2.**

*17 Moreover, the Amended Complaint fails to allege that the defendants' conduct proximately caused the plaintiffs' injuries. This defect is an independent basis to dismiss the plaintiffs' primary liability claims.

Whether a defendant's conduct proximately caused a plaintiff's injury turns on whether the defendant's "acts were a substantial factor in the sequence of responsible causation," and whether the plaintiff's injury "was reasonably foreseeable or anticipated as a natural consequence." Rothstein, 708 F.3d at 91 (emphasis omitted).

As alleged, the causal link between Binance's provision of financial services and the plaintiffs' injuries is too attenuated to support a plausible finding of proximate cause. Although the plaintiffs "are not required to trace

specific dollars to specific attacks to satisfy the proximate cause standard," Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013), they are required to supply nonconclusory allegations that the defendants' actions were a "substantial factor" in causing the October 7, 2023 attacks and that the attacks would have been "reasonably foreseeable" to the defendants as a "natural consequence" of the defendants' actions, Rothstein, 708 F.3d at 91. At most, the plaintiffs' allegations plausibly support the following inferences: Hamas and PIJ (and affiliates of Hamas and PIJ) engaged in cryptocurrency transactions on the Binance platform to fund the groups' operations; the defendants knew that terrorist groups and affiliates were transacting on the platform; the defendants knew that Hamas and PIJ might use those funds for terrorist activity; and the defendants nonetheless continued to facilitate these transactions. However, the Amended Complaint is "devoid of any factual, non-conclusory allegations that demonstrate, for example, that [the defendants] provided money directly to [Hamas and PIJ] to carry out the attacks; ... or that [Hamas and PIJ] would not have been able to carry out the attacks absent those specific funds." Kaplan v. Lebanese Canadian Bank, SAL, 405 F. Supp. 3d 525, 532–33 (S.D.N.Y. 2019), vacated in part on other grounds, 999 F.3d 842 (2d Cir. 2021); see also In re Terrorist Attacks, 714 F.3d at 124 ("We ... are not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks or plaintiffs' injuries."); Zapata v. HSBC Holdings PLC, 414 F. Supp. 3d 342, 356–57 (E.D.N.Y. 2019) (finding no proximate cause between HSBC's alleged money laundering for Mexican drug cartels and the acts of violence committed by individuals affiliated with the cartels where the plaintiffs did not allege, for example, that the cartels "require[d] laundered money to carry out any acts of violence in Mexico, let alone the specific atrocities inflicted upon Plaintiffs," and where there was "no plausible inference that the [c]artels would not be able to commit these acts of violence without HSBC first laundering their money").

In sum, the plaintiffs have failed to plead that the defendants committed an act of international terrorism or that the defendants proximately caused the plaintiffs' injuries. Therefore, the motion to dismiss Counts Two and Three, charging primary liability for providing material support to terrorists and FTOs in violation of the ATA, is **granted**.

### C.

**\*18** The defendants also argue that the Amended Complaint fails to state a claim for aiding-and-abetting liability under JASTA.

In 2016, Congress enacted JASTA, which provided for a form of secondary civil liability. Under 18 U.S.C. § 2333(d), "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance" to an act of international terrorism. [19] The act of international terrorism must have been "committed, planned, or authorized by an organization" designated as a FTO "as of the date on which such act of international terrorism was committed, planned, or authorized." Id. § 2333(d)(2).

In enacting JASTA, Congress pointed to 🔖Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), "as providing the proper legal framework for civil aiding and abetting and conspiracy liability." 🔖Twitter, Inc. v. Taamneh, 598 U.S. 471, 485 (2023). To state an aiding-and-abetting claim under the Halberstam framework, a plaintiff must allege that: (1) "the party whom the defendant aid[ed]" committed "a wrongful act that cause[d] an injury," (2) the defendant was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance," and (3) the defendant "knowingly and substantially assist[ed] the principal violation." 🔖705 F.2d at 477. The Halberstam court also set forth six factors to help determine whether the assistance provided was "substantial." 🔖Id. at 488. [20] However, the court in Halberstam cautioned that its formulations should "not be accepted as immutable components," but rather that they "w[ould] be adapted as new cases test their usefulness." 🔖Id. at 489.

In its recent decision in Twitter, the Supreme Court considered and clarified when JASTA's aiding-and-abetting liability attaches. It warned that, although the Halberstam framework served as a useful "guidepost for understanding the scope of § 2333(d)(2)," "any approach that too rigidly focuses on Halberstam's facts or its exact phraseology risks missing the mark." 🔖598 U.S. at 493. Rather, the Court explained, the Halberstam factors and JASTA's provisions could be distilled to "the same conceptual core": "that the defendant consciously and culpably participated in a

wrongful act so as to help make it succeed." Id. In other words, "the phrase 'aids and abets' in § 2333(d)(2) ... refers to a conscious, voluntary, and culpable participation in another's wrongdoing." Id.

The Court also instructed that determining whether the defendant provided knowing and substantial assistance called for the balancing of "the nature and amount of the assistance on the one hand and the defendant's scienter on the other." 🔖Id. at 492–93. That is, a lesser showing of substantial assistance would require a greater showing of scienter, and vice versa. 🔖Id. at 491–92. Furthermore, the defendants must have "aided and abetted the act of international terrorism that injured the plaintiffs," not just the terrorist organization more generally—"though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act." 🔖Id. at 497. Put differently, the defendant need not have known "all particulars of the primary actor's plan." 🔖Id. at 495. For example, a defendant who aids and abets a tort can be held liable for other torts that were "a foreseeable risk" of the intended tort. 🔖Id. at 496. Thus, while a "close nexus" between the assistance and the tort might present a more straightforward case of aiding-and-abetting liability, "even more remote support can still constitute aiding and abetting in the right case." Id.

**\*19** Applying these principles to the case before it, the Supreme Court held that the Twitter plaintiffs had failed to state an aiding-and-abetting claim under JASTA. The plaintiffs, victims of a terrorist attack carried out by ISIS at a nightclub in Istanbul, Turkey, sued three social media companies—Facebook, Google, and Twitter—under JASTA, claiming that the defendants aided and abetted ISIS in carrying out the attack. Id. at 478–79. The plaintiffs alleged that ISIS used the defendants' social media platforms to recruit terrorists and to raise funds for terrorism, and that the defendants knew that ISIS was using their platforms but failed stop ISIS from doing so. Id. at 478–82. Specifically, the plaintiffs alleged that the defendants permitted ISIS to upload content to their platforms, set up recommendation algorithms to match ISIS-related content to users most likely to be interested in that content, and took insufficient steps to ensure that ISIS-related content was removed from their platforms. Id. at 498. In finding that none of the plaintiffs' allegations suggested that the defendants "culpably associated themselves with the ... attack, participated in it as something that they wished to bring about, or sought by their action

to make it succeed," the Court noted that the defendants' platforms were "generally available to the internet-using public," which meant that "ISIS was able to upload content to the platforms and connect with third parties, just like everyone else." Id.

The Court observed that the plaintiffs' claim rested less on allegations of affirmative misconduct and more on the defendants' alleged failure to stop ISIS from using their platforms. Id. at 500. Although the plaintiffs attempted to portray the defendants' use of recommendation algorithms as an affirmative act, the Court disagreed, noting that the algorithms appeared "agnostic as to the nature of the content" and were therefore part of the same general infrastructure that the defendants provided to all its users. Id. at 499. "[L]eery of imposing aiding-and-abetting liability for mere passive nonfeasance," the Court concluded that the plaintiffs had no reason to think that the defendants were trying to help or otherwise participate in the attack. Id. at 500. There were no allegations that the defendants treated ISIS any differently from anyone else or that the defendants otherwise "encourag[ed], solicit[ed], or advis[ed] the commission" of the attack. Id. And the Court found that the plaintiffs' inability to identify some independent duty that would have required the defendants to act further weakened the plaintiffs' claim. Id. at 501. [21]

That said, the Court did not "rule out the possibility" that in some situations "the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack." Id. at 502. In such cases, the Court explained, "the defendants would arguably have offered aid that is more direct, active, and substantial" than what the Twitter defendants were alleged to have provided. Id. Such "direct, active, and substantial" aid might establish liability even with "a lesser showing of scienter." Id.

In this case, the parties do not dispute that the first Halberstam aiding-and-abetting liability element—that Hamas and PIJ committed an act of international terrorism that allegedly injured the plaintiffs—is satisfied. Rather, at issue on this motion are Halberstam's second and third elements: namely, whether the plaintiffs have alleged that the defendants were generally aware of their role in Hamas's or PIJ's terrorist activities, and whether the plaintiffs have alleged that the defendants knowingly and substantially assisted the October 7, 2023 attacks.

**1.**

General awareness denotes "something less than full, or fully focused, recognition," and does not require showing that the defendant "knowingly and intentionally supported" the FTO in carrying out an attack. Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 863 (2d Cir. 2021). "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." Honickman, 6 F.4th at 496 (emphasis omitted). The "general awareness" requirement is not an exacting one. See Twitter, 598 U.S. at 497 (stating that the plaintiffs satisfied this requirement by alleging that the defendants "knew they were playing some sort of role in ISIS'[s] enterprise").

**\*20** Because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," a complaint may "contain general allegations as to a defendant's knowledge." Kaplan, 999 F.3d at 864. However, a plaintiff is "required to include allegations of the facts or events [the plaintiff] claim[s] give rise to an inference of knowledge." Id. A plaintiff may rely on media articles and publications, for example, and need not allege at the pleading stage that the defendant "knew or should have known of the public sources." Honickman, 6 F.4th at 501; see also Kaplan, 999 F.3d at 864–65.

The Amended Complaint sufficiently alleges that the defendants were generally aware that they were playing a role in international terrorism at the time when Hamas and PIJ (and their affiliates) were transacting on the Binance platform. The State Department has designated Hamas and PIJ as FTOs since 1997, and the military wings of both organizations have allegedly perpetrated numerous terrorist attacks in Israel and the Palestinian territories since the 1990s. Id. ¶¶ 76–85. The plaintiffs allege that Binance "built and intentionally maintained woefully inadequate internal controls, ... created a platform on which it knew illicit actors transacted and transferred money," and "knew that it was providing services to terrorist groups such as Hamas and PIJ." Am. Compl. ¶ 200. The plaintiffs also allege that, from October 2020 to September 2023, Hamas and PIJ "executed thousands of transactions on Binance, with a total value of at least

approximately $60 million." Id. ¶ 194. The plaintiffs further allege that Hamas publicized its use of Binance, pointing to a 2019 video that Hamas used to solicit donations, which instructs viewers to "create a new account on one of the trading platforms," including, notably, Binance. Id. ¶¶ 201–02. Also in 2019, media and third parties allegedly flagged Hamas's use of the Binance platform. See id. ¶ 205. In June 2021, the Wall Street Journal published an article reporting on the "surge in cryptocurrency donations [to Hamas] since the start of the armed conflict with Israel in May 2021." Id. ¶ 206. Considered together and viewed in the light most favorable to the plaintiffs, these allegations support a plausible inference that the defendants were generally aware that they were playing a role in Hamas's and PIJ's overall illegal activity.

## 2.

Whether the Amended Complaint sufficiently alleges knowing and substantial assistance is a closer question. As explained above, at its core, this requirement asks whether the defendants "consciously, voluntarily, and culpably participate[d] in or support[ed]" the relevant wrongdoing." 🔖 Twitter, 598 U.S. at 505.

The defendants contend that the plaintiffs' allegations in this case are on "all fours" with those in Twitter. Defs. Br. at 16, ECF No. 19. It is true that there are some similarities between this case and Twitter. Like the social media company defendants in Twitter, Binance's services are generally available to the public, and according to the defendants, the Amended Complaint lacks allegations that the defendants treated Hamas or PIJ "differently than anyone else." See 🔖 Twitter, 598 U.S. at 500. Also, the defendants argue that they, like the social media companies and "mostly passive actors like banks," cannot "become liable for all of their customers' crimes" simply "by virtue of carrying out routine transactions." 🔖 Id. at 491. In addition, the defendants contend that the plaintiffs' principal theory of liability in this case, as in Twitter, is based not on alleged affirmative misconduct, but rather on inaction—that is, the defendants' alleged failure to stop Hamas and PIJ from transacting on the Binance platform. And, in the defendants' view, the nexus between the defendants' alleged assistance (failing to stop Hamas- or PIJ-associated accounts from transacting on Binance) and the terrorist attacks is not particularly close. See 🔖 id. at 500 (highlighting "the

distance between defendants' acts (or failures to act) and the [terrorist] attack").

**\*21** However, there are key differences between this case and Twitter.

First, insofar as the defendants' alleged wrongdoing can be characterized principally as a failure to act, the defendants in this case allegedly had an independent duty to act that was not present in Twitter. The Amended Complaint includes ample allegations that United States laws and regulations required Binance to implement robust anti-money laundering programs, perform due diligence on its customers, and file SARs with regulators flagging suspected illicit activity, all to prevent terrorists from accessing the United States financial system through the Binance exchange. See Am. Compl. ¶¶ 158–73. The plaintiffs allege that the defendants failed to comply with—indeed, intentionally evaded—these regulatory requirements, thus fostering a financial ecosystem on which illicit actors, including terrorist organizations like Hamas and PIJ, transacted freely. See id. ¶¶ 174–92. For example, between July 2017 and July 2023, Binance allegedly failed to file any SARs with FinCEN regarding "significant sums" transmitted to and from Hamas and PIJ (and affiliated accounts) on the platform, despite Binance's legal obligation to do so. Id. ¶¶ 211–14. And the plaintiffs allege that, in April 2019 and July 2020, after one of Binance's third-party service providers identified Hamas-associated transactions, Binance not only failed to file SARs but also attempted to influence how the service provider reported these transactions. Id. ¶ 214.

The defendants respond that these allegations indicate that the defendants learned only in hindsight that Hamas and PIJ were transacting on the platform, not that the defendants had contemporaneous knowledge—when they allegedly failed to file SARs—that they were providing services to terrorists. However, the Amended Complaint alleges that the defendants knew in real-time that terrorists were transacting on the platform. For example, in February 2019, a Binance officer allegedly received information "regarding HAMAS transactions." Id. ¶ 216. That officer then purportedly explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." Id.

Second, construed in the light most favorable to the plaintiffs, the Amended Complaint alleges more than mere "passive nonfeasance" in the provision of "routine services." 🔖 Twitter, 598 U.S. at 500, 502. Rather, the plaintiffs claim

that the defendants took affirmative actions to enable terrorist groups to transact on the Binance platform. For starters, the plaintiffs allege that the defendants intentionally engaged in a scheme to evade anti-terror financing regulations in order to retain illicit actors on the platform. See, e.g., Am. Compl. ¶¶ 177–78 (describing Binance's "international circumvention of KYC," as directed by Zhao, and strategies to operationalize this scheme); id. ¶ 184 (alleging that, in August 2021, Binance launched a customer due diligence program that "by design still contained massive gaps to allow criminal activity to take place"). In fact, according to the plaintiffs, Binance's systemic circumvention of relevant regulations reflected a widespread "culture of impunity" and "contempt for U.S. regulators" at the company. Id. ¶ 191; see also id. ("Zhao keeps saying that compliance is here to make Binance APPEAR compliant."); id. ¶ 187 (alleging that, in 2020, Binance's CCO stated, "Like come on. They are here for crime."); id. ¶ 188 (alleging that a Binance compliance engineer wrote, "[W]e need a banner 'is washing drug money too hard these days – come to [B]inance we got cake for you' "). And on one occasion, Binance allegedly went out of its way to protect a user associated with Hamas: in July 2020, after a third-party service provider flagged "accounts associated with ISIS and Hamas" on the platform, Binance's CCO instructed company personnel to "check if he is a VIP account, if yes, to offboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him." Id. ¶ 215.

**\*22** In short, the plaintiffs have alleged that the defendants provided services that might otherwise be considered routine—cryptocurrency transaction services—in an "unusual way"—designed to evade government detection and regulation. Twitter, 598 U.S. at 502. Like a "registered morphine distributor" who may be "liable as a coconspirator of an illicit operation to which it mailed morphine far in excess of normal amounts," Binance, in providing financial services that intentionally circumvented anti-terrorist-financing regulations, offered "such dangerous wares that selling those goods could constitute aiding and abetting a foreseeable terrorist attack." Id.

The defendants contended at oral argument that allegations like the ones in this case are "routinely dismissed," but that characterization is not entirely accurate. Oral Arg. Tr. at 3. [22] In Kaplan, for example, a pre-Twitter case, the Second Circuit Court of Appeals found comparable allegations sufficient to state a plausible claim under JASTA. See 999 F.3d at 866. The Kaplan plaintiffs alleged that Lebanese Canadian

Bank ("LCB") gave "special treatment" to customers closely affiliated with Hizbollah, which allowed those customers to deposit large sums of money in various accounts without disclosing their source and "thereby circumvent[ ] sanctions imposed to hinder terrorist activity." 999 F.3d at 866. The Court of Appeals held that such allegations "adequately pleaded that LCB knowingly gave the Customers assistance that both aided Hizbollah and was qualitatively and quantitatively substantial." Id.

**\*23** Post-Twitter, courts in this District have found similar allegations sufficient to state a JASTA aiding-and-abetting claim against banks that were closely linked to terrorists, although not to the specific terrorist act that caused the plaintiffs' injuries. For example, in King, the plaintiffs, who were injured in terrorist attacks in Afghanistan, sued the largest commercial bank in Pakistan, which allegedly provided banking services to terrorists. 2022 WL 4537849, at \*1. The King plaintiffs alleged that the defendant bank had for years flouted anti-money laundering and KYC requirements designed to stem the flow of funds to terrorists. Id. The court in King held that the plaintiffs sufficiently alleged a secondary liability claim under JASTA, finding that the defendant allegedly gave terrorist-affiliated customers "special treatment" that allowed those customers to "deposit large sums in various accounts[,] thereby circumventing sanctions imposed in order to hinder terrorist activity." Id. at \*8–10. [23]

And in Bonacasa v. Standard Chartered PLC, the court applied Twitter and held that the plaintiffs stated an aiding-and-abetting claim against Standard Chartered with respect to terrorist attacks that killed United States servicemen in Afghanistan. No. 22-cv-3320, 2023 WL 7110774, at \*10–12 (S.D.N.Y. Oct. 27, 2023). Standard Chartered was alleged to have provided "specialized, individualized financial services" to a company known to supply al-Qaeda with materials used to make explosive devices. Id. at \*10. The Bonacasa court found that the plaintiffs alleged "affirmative misfeasance, rather than merely passive nonfeasance"—that is, that Standard Chartered provided routine banking services " 'in an unusual way,' which thus enabled the provision of 'dangerous wares.' " Id. at \*11 (quoting Twitter, 598 U.S. at 502).

The plaintiffs' allegations against the defendants in this case are closer to the allegations against the banks in King and Bonacasa than to the allegations against the social

media companies in Twitter. In this case, as in King, the defendants at best allegedly failed to prevent groups like Hamas and PIJ from using the Binance platform, despite having an independent legal obligation to do so, and arguably took deliberate steps to enable such users evade regulatory scrutiny. Also, like the defendant in Bonacasa, the defendants in this case allegedly provided routine financial services in an unusual, dangerous way. Binance, directed by Zhao, allegedly "tailored financial instruments" to circumvent regulatory supervision and controls. Cf. 🚩 Bonacasa, 2023 WL 7110774, at *11.

On balance, the Amended Complaint's allegations capture the "essence" of aiding-and-abetting liability: that Binance and Zhao "consciously and culpably participated" in Hamas's and PIJ's wrongdoing. 🚩 Twitter, 598 U.S. at 504, 506. While a close nexus between the defendants' alleged assistance and the attacks is lacking, the defendants' alleged widespread, intentional circumvention of anti-terror financing regulations, considered with the defendants' purported knowledge that Hamas and PIJ were transacting on the Binance platform, support the inference that the defendants' assistance was knowing. And the financial assistance allegedly provided was substantial, even if not directly targeted at the October 7, 2023 attacks in particular: the Amended Complaint alleges that Hamas and PIJ-associated accounts engaged in transactions on the Binance platform "with a total value of at least approximately $60 million" from October 2020 to September 2023, Am. Compl. ¶ 194, a dollar amount that is "substantial by any metric," King, 2022 WL 4537849, at *9. Therefore, the plaintiffs have alleged plausibly that the defendants

knowingly and substantially assisted the October 7, 2023 attacks.

*24  In sum, the Amended Complaint adequately alleges that the defendants were generally aware that they were playing a role in Hamas's and PIJ's overall terrorist activities, and that the defendants provided knowing and substantial assistance with respect to the attacks. Accordingly, the motion to dismiss Count One for aiding-and-abetting liability under JASTA is **denied**.

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss for lack of personal jurisdiction is **denied** without prejudice to renewal following jurisdictional discovery, and the motion to dismiss for failure to state a claim is **granted in part** and **denied in part**.

The parties should meet and confer regarding the appropriate scope of jurisdictional discovery, and provide a joint status update by **March 11, 2025.**

### SO ORDERED.

### All Citations

Slip Copy, 2025 WL 605594

---

### Footnotes

1    Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

2    N.Y. CPLR § 302(a)(1) provides, in relevant part, as follows: "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent: 1. Transacts any business within the state or contracts anywhere to supply goods or services in the state ...."

3    The plaintiffs cite only one case, 🚩 In re Tether & Bitfinex Crypto Asset Litigation, 576 F. Supp. 3d 55 (S.D.N.Y. 2021), in support of their argument that their claims, as alleged, arise from the defendants' transactions in New York. But Tether is inapposite. In that case, the plaintiffs alleged that the defendants engaged in a fraudulent scheme to inflate the price of the crypto-asset USDT by, among other things,

representing that USDT was backed by U.S. dollar reserves when USDT was in fact completely unbacked. See ▯ id. at 70, 77. One of the defendants moved to dismiss for lack of personal jurisdiction. ▯ Id. at 85. The Tether court found that it could exercise personal jurisdiction over the defendant pursuant to N.Y. CPLR § 302(a)(1) because the plaintiffs alleged that the defendant created and operated at least one New York bank account (as part of a broader "shadow" banking network in the United States) to execute exchanges with customers and maintain the illusion that USDT was backed by U.S. dollars. See ▯ id. at 88–89. In short, it was clear from the allegations in Tether that the New York bank account operated by the defendant played a substantial role in the alleged fraud. By contrast, in this case, the link between the defendants' alleged New York-based transactions and the wrongs alleged by the plaintiffs is not as evident, at least on these allegations.

4    The defendants also contend that the plaintiffs cannot rely on Rule 4(k)(2) because the plaintiffs have not served a summons or filed a waiver of service in this action. See Defs. Br. at 21, ECF No. 19. Instead, the parties entered into a Stipulation pursuant to which the defendants agreed to waive service, as well as any "objections to the absence of a Summons or of service of the Summons and Complaint in this action and any defense based upon the sufficiency of service of process"—provided, however, that the plaintiffs "agree[d] not to argue that the waiver affects any of the [defendants]' other rights, defenses, or objections (including but not limited to defenses based upon lack of personal or subject matter jurisdiction ...)." Stipulation ¶ 1, ECF No. 12 (emphasis added). The plaintiffs respond that the defendants' contention cannot be squared with that part of the Stipulation in which the defendants agreed to waive "any defense based upon the sufficiency of service of process." Id.

The plaintiffs have the better argument. It would be unfair to penalize the plaintiffs for the parties' efforts to streamline service in this case. If the defendants had their way, the plaintiffs would in effect be forgoing their ability to rely on Rule 4(k)(2) to establish personal jurisdiction over foreign defendants simply by virtue of entering into this Stipulation. There appears to be no authority in this Circuit on point, but one (out-of-Circuit) case that addresses this issue rejected the same argument advanced by the defendants in this case. In In re ZF-TRW Airbag Control Units Products Liability Litigation, the foreign defendants argued that their stipulation to accept service without the formalities required by the Hague Service Convention precluded the plaintiffs from asserting that there was personal jurisdiction over the defendants under Rule 4(k)(2). ▯ 601 F. Supp. 3d 625, 698 (C.D. Cal. 2022). The ZF-TRW court was unpersuaded, observing instead: "The Stipulation simply places Defendants in the same position as if service had been effected properly under the Hague Service Convention. Therefore, it does not foreclose Plaintiffs' argument that there is personal jurisdiction over the foreign Defendants under Rule 4(k)(2). Nor does the Stipulation estop Defendants from contesting such an argument." Id. The stipulation at issue in ZF-TRW was similar in all relevant respects to the one in this case.

In any event, for the reasons stated above, the plaintiffs cannot rely on Rule 4(k)(2) at this point.

5    The parties refer to the plaintiffs' ability to sue under the ATA as "standing." The Supreme Court has clarified that "what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.' " Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 359 (2d Cir. 2016) (quoting ▯ Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127–28 (2014)).

6    Uri Raanan's citizenship is not alleged in the Amended Complaint. In a subsequently filed sworn declaration, Uri Raanan represents that he is a United States citizen. See Decl. of Uri Raanan ¶ 5, ECF No. 28-1.

7    The two cases that the plaintiffs cite in support of their position do not help them. In Lelchook v. Commerzbank AG, the plaintiffs were family members of a United States national who was killed in a terrorist attack. ▯ No.

10-cv-5795, 2011 WL 4087448, at *2–3 (S.D.N.Y. Aug. 2, 2011). Accordingly, the court in that case held that the decedent's family members, as heirs or survivors, had a cause of action under the ATA based on their loss of the decedent. See id. And in Goldstein v. Islamic Republic of Iran, a case involving the terrorism exception to the Foreign Sovereign Immunities Act, 🚩 28 U.S.C. § 1605A, the court concluded that a child born two days after a terrorist attack that killed his sibling could recover solatium damages. 🚩 383 F. Supp. 3d 15, 22–23 (D.D.C. 2019). Unlike plaintiffs Uri Raanan and H.B. in this case, the infant plaintiff in Goldstein was the family member of a decedent.

[8]    Sullivan v. Aventis, Inc., is even further afield. 📑 No. 14-cv-2939, 2015 WL 4879112, at *2 (S.D.N.Y. Aug. 13, 2015). The plaintiffs cite Sullivan for the proposition that prenatal injuries are legally cognizable harms. See id. ("Prenatal torts ... are recognized causes of action under New York law."). However, Sullivan was a pharmaceutical products liability action based on the plaintiff's mother's use of a fertility drug. Id. at *1. In this case, plaintiff H.B. does not allege that she suffered this kind of prenatal injury, only that she suffered emotional distress after her birth.

[9]    Shlomi's citizenship is not alleged in the Amended Complaint.

[10]    The Amended Complaint additionally alleges that Eran Shani and Amos Semama are the uncles of plaintiffs R.M., Shakked Sarah Mathias ("Shakked"), and Shir Tziporah Mathias ("Shir"); and that Susan Troen, Hadassah Troen, and Revital Mathias are the aunts of R.M., Shakked, and Shir. Am. Compl. ¶¶ 31, 33, 35, 40, 42. However, because R.M., Shakked, and Shir survived the attacks, see id. ¶¶ 23–27, Eran Shani, Susan Troen, Hadassah Troen, Revital Mathias, and Amos Semama lack the capacity to sue as R.M.'s, Shakked's, or Shir's "survivors" under the ATA. See supra section IV.A.1.

[11]    Plaintiffs Eran Shani, Revital Mathias, and Amos Semama are not United States nationals and therefore cannot recover under the ATA for any of their own alleged injuries.

[12]    "Immediate family" is a "[t]erm generally referring to one's parents, wife or husband, children, and brothers and sisters." Immediate family, Black's Law Dictionary (6th ed. 1990).

[13]    📑 28 U.S.C. § 1605A(c) provides:

A foreign state that is or was a state sponsor of terrorism ..., and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—

(1) a national of the United States, ...

for personal injury or death caused by acts [of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act] of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

[14]    The Second Circuit Court of Appeals has expressed no view on whether the analytical framework employed in the D.C. Circuit is correct. Hoglan v. Rafsanjani, 759 F. App'x 99, 104 (2d Cir. 2019).

[15]    But Jeffrey Ludmir cannot sue as a "survivor" of Daniel Levi under the ATA because Daniel Levi is not alleged to have been a United States citizen; the Amended Complaint alleges only that Daniel Levi was a "native of Peru." Am. Compl. ¶ 53. The language "his or her estate, survivors, or heirs" in section 2333(a) "represents a subclass who may, in a representative capacity, bring a claim on the injured American national's behalf."

*Lelchook v. Lebanese Canadian Bank*, No. 18-cv-12401, 2024 WL 967078, at *9 (S.D.N.Y. Mar. 6, 2024) (emphasis added). In any event, Jeffrey Ludmir has the capacity to sue under the ATA for his own alleged injuries.

16    The defendants also make this argument as to plaintiffs Eran Shani, Revital Mathias, and Amos Semana. For the reasons explained in the preceding section, see *supra* section IV.A.2, plaintiffs Eran Shani, Revital Mathias, and Amos Semama cannot sue under the ATA for the independent reason that their relationship with victims of the attacks, as alleged, is too remote.

17    In fact, the Supreme Court has acknowledged, albeit in passing, that foreign nationals may in some circumstances be permitted to sue under the ATA. See *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 267 (2018) (describing the ATA as "[a] statute that excludes foreign nationals (with the possible exception of foreign survivors or heirs)" (emphasis added)).

18    But see *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 414–16 (S.D.N.Y. 2021) ("[W]hen banks ... route payments and maintain accounts for terrorist organizations to enhance their ability to commit terrorist attacks, they are committing 'acts dangerous to human life.' ").

19    The word "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; see also 18 U.S.C. § 2333(d)(1).

20    These factors are: (1) "the nature of the act assisted," (2) the "amount of assistance" provided; (3) whether the defendant was "present at the time" of the principal violation; (4) the defendant's "relation to the tortious actor"; (5) the "defendant's state of mind"; and (6) the duration of the defendant's assistance. *Halberstam, 705 F.2d at 488*.

21    The Court recognized that there may be some situations where such a duty exists, though it declined to address that issue further in *Twitter. 598 U.S. at 501*.

22    It is true, as the defendants argue, that some courts have dismissed JASTA claims based on allegations bearing some resemblance to those in this case, but those other decisions are either distinguishable or not binding. In *Siegel v. HSBC N. Am. Holdings*, for example, the Second Circuit Court of Appeals affirmed the dismissal of the complaint for failure to state an aiding-and-abetting claim under JASTA, finding inadequate allegations that HSBC aided and abetted terrorist attacks perpetrated by al-Qaeda in Iraq ("AQI") by providing financial services to Al Rajhi Bank ("ARB"), a prominent Saudi Bank with links to terrorist organizations. *933 F.3d 217, 219 (2d Cir. 2019)*. However, a "crucial[ ]" fact in *Siegel* was that HSBC ceased doing business with ARB ten months before the terrorist attacks, rendering it "implausible under the circumstances that HSBC had knowingly assumed a role in the [a]ttacks." *Id. at 224*; see also *Kaplan, 999 F.3d at 861–63* (describing other "conspicuous differences" between the allegations in that case and in Siegel).

Along similar lines, the district court complaint in *O'Sullivan* was "devoid of any factual allegations from which the Court c[ould] properly infer that [the bank defendants] knew that the financial services they provided to [various Iranian government entities] were destined to aid the FTOs responsible for the attacks that injured Plaintiffs." *2019 WL 1409446, at *10*. The *O'Sullivan* complaint alleged that the defendant banks provided financial services to the Iranian government and its agents and proxies, in violation of U.S. sanctions. *Id. at *1–2*. But the defendants' conduct in that case was at least one step further removed from the FTOs than the defendants' alleged assistance in this case: in *O'Sullivan*, the court found no facts from which it could infer that the defendants "knew that the financial services they provided to various Iranian entities would be

directed towards FTOs like Hezbollah." 🚩 Id. at *9. By contrast, in this case, the plaintiffs allege that the defendants provided financial services directly to Hamas and PIJ.

23    In a post-Twitter decision, the King court denied the defendant's motion for reconsideration, concluding that the Supreme Court's decision in Twitter "largely align[ed] with the Second Circuit precedent" cited in the court's earlier decision. King v. Habib Bank Ltd., No. 20-cv-4322, 2023 WL 8355359, at *2–3 (S.D.N.Y. Dec. 1, 2023).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

   © 2025 Thomson Reuters. No claim to original U.S. Government Works.