IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LISHAY LAVI, NOACH NEWMAN, ADIN GESS, MAYA PARIZER, NATALIE SANANDAJI, YONI DILLER, HAGAR ALMOG, DAVID BROMBERG, LIOR BAR OR, AND ARIEL EIN-GAL,<br><br>Plaintiffs,<br><br>v.<br><br>UNRWA USA NATIONAL COMMITTEE, INC.,<br><br>Defendant. | Civil Action No. 24-312-RGA |

MEMORANDUM OPINION

Theodore Allan Kittila, HALLORAN FARKAS AND KITTILA LLP, Wilmington, DE; David I. Schoen, THE LAW OFFICE OF DAVID I. SCHOEN, Montgomery, AL; Jason B. Torchinsky, John Cycon, Erielle Davidson, Zack Henson, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC, Washington, D.C.; Mark Goldfeder, NATIONAL JEWISH ADVOCACY CENTER, INC., Brentwood, TN; Ben Schlager, GOLDFEDER AND TERRY, LLC, West Hempstead, NY;

    Attorneys for Plaintiffs.

Joseph E. Brenner, Michael C. Heyden, Jr., GORDON REES SCULLY MANSUKHANI, LLP, Wilmington, DE; Maria LaHood, Diala Shamas, Judith Brown Chomsky, Beth Stephens, CENTER FOR CONSTITUTIONAL RIGHTS, New York, NY; Joseph Pace, J. PACE LAW PLLC, New York, NY; Luna Droubi, BELDOCK LEVINE & HOFFMAN LLP, New York, NY;

    Attorneys for Defendant.

August 8, 2025

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendant's Motion to Dismiss. (D.I. 21). I have considered the parties' briefing. (D.I. 22, 31, 34). On June 19, 2025, I held oral argument. (D.I. 47). For the following reasons, Defendant's motion is GRANTED without prejudice.

## I. BACKGROUND[1]

Plaintiffs are ten individuals, all citizens of the United States, Israel, or both. (D.I. 1 ¶¶ 6–15). Defendant, UNRWA USA National Committee ("UNRWA USA"), is a non-profit organization operating in the United States with "the stated mission of 'supporting the humanitarian work of the United Nations Relief and Works Agency for Palestine Refugees in the Near East [("UNRWA")] through fundraising, advocacy, and community engagement in the United States.'" (*Id.* at 2). UNRWA is an organization established by the United Nations "to carry out [. . .] direct relief and work programmes" for "Palestine refugees." (*Id.* ¶ 35) (citation omitted).

Plaintiffs' Complaint arises out of the injuries each suffered in connection with the October 7, 2023 Hamas-led attack on Israel. (*Id.*).[2] The Complaint alleges, "Hamas exercises a strong and direct influence over UNRWA and its personnel" (*id.* ¶ 50), and that Defendant, in providing funding to UNRWA, (i) aided and abetted Hamas's terrorist activities in violation of 18 U.S.C. § 2333(d)(2) (*id.* ¶¶ 123–37), (ii) conspired with UNRWA and Hamas in violation of the same statute (*id.* ¶¶ 138–141), (iii) violated the International Convention for the Suppression of the Financing of Terrorism ("Financing Convention"), over which Plaintiffs contend I have

---

[1] I have subject matter jurisdiction pursuant to 28 U.S.C. § 1331. (D.I. 1 ¶ 5).

[2] Those injuries are horrific. Seven Plaintiffs' friends or family members were either kidnapped or killed. (D.I. 1 ¶¶ 6–9, 12–14). Six Plaintiffs personally fled from violence on October 7th. (*Id.* ¶¶ 8, 10, 11, 13, 14, 15).

jurisdiction under 28 U.S.C. § 1350 (*id.* ¶¶ 142–156), and (iv) caused Plaintiffs "severe emotional distress" for which Defendant is liable under Delaware law for negligent infliction of emotional distress. (*Id.* ¶¶ 157–60).[3]

## II. LEGAL STANDARD

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's

---

[3] The third claim is brought by Plaintiffs Lishay Lavi, Hagar Almog, and Ariel Ein-Gal (the "Israeli Plaintiffs"). (D.I. 1 ¶¶ 142–156). The other claims are brought by Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalie Sanandaji, Yoni Diller, David Bromberg, and Lior Bar Or (the "U.S. Plaintiffs"). (*Id.* ¶¶ 1, 123–41, 157–60).

3

liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

## III. DISCUSSION

Defendant submitted fifteen exhibits with its motion to dismiss. (D.I. 23). Defendant asked me to take judicial notice of them. (D.I. 22 at 4; D.I. 34 at 11-15). Plaintiffs object. (D.I. 31 at 2-8). Limiting my review of the Complaint to its four corners and the materials "explicitly relied upon in the [C]omplaint," *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002), I find that none of Plaintiffs' four claims for relief satisfy Rule 8.[4] It is therefore unnecessary to determine whether I should take notice of other documents cited in the briefing.

### A. Count I: Plaintiffs Fail to Plead a Violation of 18 U.S.C. § 2333(d)(2) Under the Substantial Assistance Predicate.

Count I alleges that Defendant violated 18 U.S.C. § 2333(d)(2), which imposes civil liability on persons who "aid[] and abet[], by knowingly providing substantial assistance," any designated foreign terrorist organization. Hamas is a designated foreign terrorist organization. (D.I. 1 ¶ 30). In enacting § 2333, Congress specifically referred to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "provid[ing] the proper legal framework" for "civil aiding and abetting and conspiracy liability." Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016). *Halberstam*'s framework is as follows:

---

[4] In addition, I take judicial notice of the date on which Ms. Karen AbuZayd stopped working as UNRWA's Commissioner-General. *See* Section III.A.2, *infra*. Ms. AbuZayd was replaced in that role on January 20, 2010. Press Release, UNRWA, Secretary General Appoints New Commissioner-General and Deputy Commissioner-General (Jan. 20, 2010), https://www.unrwa.org/newsroom/press-releases/secretary-general-appoints-new-commissioner-general-and-deputy-commissioner (last visited Aug. 8, 2025). I consider this to be "a fact that is not subject to reasonable dispute" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

4

> Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam*, 705 F.2d at 477. *Halberstam* also provided six factors to help determine whether a defendant's assistance was "substantial": "(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486 (2023) (cleaned up) (citing *Halberstam*, 705 F.2d at 488).

Congress's incorporation of *Halberstam* should not be overstated, however. "JASTA itself points only to *Halberstam*'s 'framework,' not its facts or its exact phrasings and formulations, as the benchmark for aiding and abetting." *Id.* at 488 (citing JASTA, § 2(a)(5)). With that being the case, in *Twitter*, the Supreme Court noted that "any approach that too rigidly focuses on *Halberstam*'s facts or its exact phraseology risks missing the mark." *Id.* at 493. Instead, the main inquiry of a § 2333 aiding-and-abetting analysis is centered on the "common-law principles" that "*Halberstam*'s framework reflected and distilled. . . ." *Id.* at 492. Describing those principles at length, the *Twitter* Court concluded, "The phrase 'aids and abets' in § 2333(d)(2), as elsewhere, refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493. There must exist a "nexus . . . between the alleged assistance and the wrongful act." *Id.* at 496.

> In summary:
>
> The point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue. The focus must remain on assistance to the tort for which plaintiffs seek to impose liability. When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance. But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that

5

substantially furthered the tort. And, if a plaintiff's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise.

*Id.* at 506.

Applying the *Twitter* standard here, I conclude that Plaintiffs have failed to allege plausibly that Defendant knowingly provided substantial assistance to Hamas in its carrying out of the October 7th attack. I address each of the *Halberstam* elements in turn.

### 1. Wrongful Act that Causes an Injury

The first element for aiding-and-abetting liability is, "[T]he party whom the defendant aids must perform a wrongful act that causes an injury. . . ." *Halberstam*, 705 F.2d at 477. Defendant argues, "[T]he party whom UNRWA USA aided is UNRWA, not Hamas. Thus, the Complaint must allege that UNRWA performed a wrongful act that caused the October 7th attacks. It alleges none." (D.I. 22 at 32) (cleaned up). Plaintiffs respond that UNRWA's "provi[sion of] material support to Hamas" is the wrongful act causing an injury. (D.I. 31 at 10). Given that Plaintiffs' theory rests on the assertion that Defendant indirectly aided Hamas, it is sufficient merely to allege that Hamas itself "committed attacks causing Plaintiffs' injuries." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021). Therefore, this first element "merits little attention." *Id.*

A thorough discussion of the first *Halberstam* element is also unnecessary given that Plaintiffs' claim fails under the second and third elements. Therefore, I limit my comments in this section to the following clarification: if Defendant, in arguing that "UNRWA USA aided [] UNRWA, not Hamas" (D.I. 22 at 32), suggests that an intermediary theory of JASTA liability necessarily fails, that argument is rejected. Several courts have considered the cases involving JASTA liability in an intermediary context, and, while reaching different decisions on the merits, none suggested that a defendant's liability must be limited to the wrongful acts of those the

defendant directly supported. *See, e.g.*, *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023) (country of Sudan as intermediary); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022) (bank as intermediary); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019) (same).[5]

### 2. General Awareness

The next *Halberstam* element requires that the "the defendant [] be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance. . . ." *Halberstam*, 705 F.2d at 477. Where, as here, the defendant is alleged to have aided an FTO through an intermediary, this prong is satisfied if "(1) the defendant was aware of the intermediary's connection to the terrorist organization, and (2) the intermediary is 'so closely intertwined' with the terrorist organization's illegal activities as to give rise to an inference that the defendant was generally aware of [the defendant's] role in the organization's terrorist activities." *Bernhardt*, 47 F.4th at 867–68 (quoting *Honickman*, 6 F.4th at 501).

In support of the first prong—Defendant's awareness of UNRWA's connection to Hamas—Plaintiffs argue, "there is little daylight, if any, between UNRWA and [Defendant]." (D.I. 31 at 14). Pointing to "overlapping leadership and staff between the two organizations" (*id.*),

---

[5] *Siegel*, while expressly declining to decide the issue, expressed doubts that JASTA liability was limited to those providing direct support to terrorist organizations:

> [JASTA] does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations, and Congress wrote that its purpose in enacting the statute was "to provide civil litigants with the *broadest possible basis*" to seek relief against those who "have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States."

*Siegel*, 933 F.3d at 224 (citation omitted).

7

Plaintiffs suggest that Defendant would "be far privier" to UNRWA's alleged connection to Hamas than the general public. (*Id.* at 18). The allegations in the Complaint, however, do not support this conclusion. Apart from negligible concurrent staffing—a single "freelance content producer" (D.I. 1 ¶ 42) and Ms. Karen AbuZayd, a member of the UNRWA USA Board of Directors who served as the UNRWA Commissioner-General fifteen years ago (*id.* ¶ 117–20)—the Complaint provides no basis from which to conclude that Defendant was aware of UNRWA's connection to Hamas.

In support of the second prong, Plaintiffs cite to several allegations in the Complaint, which Defendant accurately summarizes as the following:

> (i) [] allegations that 12 to 30 UNRWA employees participated in the attacks [(D.I. 1 ¶¶ 95, 108)]; (ii) [] claims that 10% of its employees have "links" to Hamas or Islamic Jihad and 50% have relatives in those groups [(*id.* ¶¶ 46, 96)]; (iii) a report that 30 UNRWA teachers praised the attacks on a Telegram channel [(*id.* ¶¶ 62–69)]; (iv) a report that some UNRWA teachers promoted hate and violence on social media and in the classroom [(*id.* ¶¶ 60, 141)]; (v) Hamas's alleged control over the UNRWA employees' staff union [(*id.* ¶ 49)]; (vi) the arrest of 13 UNRWA staff members [] on suspicion of engaging in terrorism [(*id.* ¶ 48)]; and (vii) misuse of UNRWA facilities by militant groups. [(*Id.* ¶¶ 73–79)].

(D.I. 22 at 22). Defendant counters that Plaintiffs cannot rely on the first three sets of allegations because they occurred after the October 7th attack, rather than "at the time" it provided aid (*id.* at 23) (citing *Halberstam*, 705 F.2d at 477), and that, in any event, "these seven allegations, combined, still fail to establish the requisite level of intermediary intertwinement." (*Id.*). I agree with both of Defendant's arguments.

First, having failed to allege plausibly that Defendant and UNRWA were themselves "intertwined" (D.I. 1 ¶ 131), Plaintiffs may not plausibly argue that Defendant had advance notice or inside knowledge regarding claims that would not become public until after October 7th.

8

Second, the allegations in the Complaint do not support the conclusion that UNRWA was 'so closely intertwined' with Hamas's illegal activities as to give rise to an inference that "[D]efendant was generally aware of its role in [Hamas's] terrorist activities." *Bernhardt*, 47 F.4th at 867–68.

Those allegations fall into three categories. Allegations (i)–(iv) and (vi) establish that UNRWA employed members of Hamas and people who were sympathetic to Hamas's terrorist efforts. The Complaint provides no basis from which to conclude plausibly, however, that UNRWA hired those individuals with knowledge of their connection to Hamas, or that these individuals' employment with UNRWA facilitated Hamas's terrorist activities. To the contrary, the Complaint notes at least two instances in which Hamas-affiliated employees were terminated following the discovery of their involvement in Hamas. (D.I. 1 ¶¶ 55, 99). Even assuming as true the Complaint's assertion that "10% of UNRWA's Gaza employees have links to the Hamas or Palestinian Islamic Jihad terrorist organizations" (*id.* ¶ 46) (citation omitted), the assertion that UNRWA employs Hamas-linked workers does not lead to the reasonable inference that UNRWA was closely intertwined with Hamas as an organization.

The next category, allegation (vii), suffers from the same deficiency. The fact that Hamas operatives used UNRWA facilities does not plausibly support the conclusion that UNRWA itself was involved in Hamas's terrorist activities. Instead, the Secretary-General's summary of the UN Board of Inquiry Report on which the Complaint relies (D.I. 1 ¶ 75) states,

> [F]ollowing the discovery of weaponry at [a UNRWA school on] on 16 July, UNRWA management issued an instruction on 17 July that daily inspections should be conducted of all UNRWA schools, including those that were not being used as shelters, to ensure that no weapons were being stored in them and that the premises were not being misused. Two UNRWA staff members were then tasked to conduct daily inspections of all the schools in the area concerned. School attendants present at the schools were instructed to ensure that the daily inspections were conducted.

9

U.N. Secretary-General, Letter dated Apr. 27, 2015 from the Secretary-General addressed to the President of the Security Council, U.N. Doc. S/2015/286, at 17 of 25 (Apr. 27, 2015), https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2015_286.pdf. Plaintiffs do not allege sufficient factual support for the allegation that Hamas misused UNRWA facilities with UNRWA's consent.

Finally, allegation (v) claims that Hamas controlled UNRWA's Gaza staff union and exercised "direct influence over UNRWA" as a result. (D.I. 1 ¶¶ 49–53). This allegation carries more weight than the others because it suggests that Hamas used its position to exert influence over UNRWA, at one point "pressur[ing] UNRWA to re-assign its Gaza Director" and at another point "pressur[ing] UNRWA to reinstate a suspended teacher who endorsed terrorism." (*Id.* ¶ 50). Even granting inferences in Plaintiffs' favor, however, this showing is insufficient to support the conclusion that UNRWA and Hamas were so closely intertwined as to put Defendant on notice "of [Defendant's] role in the organization's terrorist activities." *Bernhardt*, 47 F.4th at 868. The Complaint does not allege that Hamas used its control over the employees' union so persistently as to further its illegal activities or facilitate the October 7th attack. Unlike the complaint in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 221 (D.C. Cir. 2022), *cert. granted, judgment vacated*, 144 S. Ct. 2675 (2024), for example, the Complaint here does not provide nearly enough factual support to conclude plausibly that Hamas "dominat[ed]" UNRWA, or that its intertwinement with UNRWA allowed Hamas fighters to "circulate[] openly" inside UNRWA offices, *id.*, such that "they were effectively the same entity[,]" *Bernhardt*, 47 F.4th at 870.

Even if I did conclude that the Complaint sufficiently alleged that UNRWA and Hamas were intertwined to some extent, there would still remain the question of whether they were so intertwined as to put Defendant on notice of its role in illegal activities. UNRWA's involvement

in "carry[ing] out [. . .] direct relief and work programmes" (D.I. 1 ¶ 35) counsels against making such a finding. Per *Bernhardt*, "[g]iven the extensive legitimate operations of [the intermediary,]" among other reasons, "[the defendant] had little reason to suspect that it was assuming a role in [the terrorist organization's] terrorist activities." *Bernhardt*, 47 F.4th at 869. In that vein, this case closely resembles *Keren Kayemeth LeIsrael - Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1017 (D.C. Cir. 2023), *cert. denied sub nom. LeIsrael v. Educ. for a Just Peace in the Middle E.*, 144 S. Ct. 713 (2024). The plaintiffs in that case sued an American non-profit, the U.S. Campaign for Palestinian Rights, under the ATA for the non-profit's "material support and fiscal sponsorship to the Boycott National Committee," a coalition of "various Palestinian political parties, unions, associations, and other organizations" which the plaintiffs alleged was intertwined with Hamas. *Id.* at 1012. With respect to the "general awareness" *Halberstam* element, the court concluded, "[Plaintiff's allegations] alone [are] not enough to support a finding that [the defendant] was aware that its donations to the Boycott National Committee were used unlawfully, given that the Boycott National Committee also engages in lawful civil resistance." *Id.* at 1017.

In addition to its apparent engagement in legitimate operations, UNRWA has received hundreds of millions of dollars from donor states—in 2021 alone, it received $338 million from the United States and $176 million from Germany. *Frequently Asked Questions*, UNRWA, https://www.unrwa.org/who-we-are/frequently-asked-questions ("How is UNRWA Funded?") (last visited Aug. 8, 2025) ("Frequently Asked Questions" cited by Plaintiffs at D.I. 1 at 12 n.24). In the same year, UNRWA USA "disburse[d] nearly $5 million to UNRWA." (D.I. 1 ¶ 40)

(citation omitted). It would be difficult to accept that UNRWA USA was on notice of UNRWA's intertwinement with Hamas while donor states such as the United States and Germany were not.[6]

Finally, even if UNRWA's humanitarian operations were a front for terrorist activities, the same principle would apply: "That organizations . . . maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that [the defendant] understood these organizations' true nature and activities from the public record at the time." *Honickman*, 6 F.4th at 502.

Considering the above, I find that Plaintiffs have not plausibly alleged that Defendant was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance. . . ." *Halberstam*, 705 F.2d at 477.

### 3. Knowing and Substantial Assistance

Plaintiffs do not meet the third *Halberstam* element. For Defendant's alleged assistance to Hamas to have been "knowing and substantial," Defendant must have been "conscious, voluntary, and culpable" in Hamas's wrongdoing. *Twitter*, 598 U.S. at 493. In other words, Defendant must have "culpably associated [itself] with the [terrorist] attack, participated in it as something that [it] wished to bring about, or sought by [its] action to make it succeed." *Id.* at 498 (cleaned up).

Here, Plaintiffs argue,

> UNRWA USA knew that UNRWA [i] employed Hamas members, affiliates, and sympathizers; [ii] allowed Hamas to control UNRWA's employee union; and [iii] permitted Hamas to use UNRWA facilities, thereby promoting Hamas's infiltration. Despite this knowledge, UNRWA USA contributed to UNRWA anyway. Accordingly, UNRWA USA has committed wrongful acts. That is enough under the ATA's aiding and abetting liability provision. . . .

---

[6] At oral argument, counsel for Plaintiffs stressed that the federal government is exempt from liability under the ATA and that the United States engages in certification of its funds through the Government Accountability Office. (D.I. 47 at 19:20–22:13). I am not persuaded that this addresses the point: it is hardly obvious that a non-profit so heavily funded by the United States would be intertwined with a terrorist organization.

12

(D.I. 31 at 10) (citing D.I. 1 ¶¶ 49, 54–80). Drawing all inferences in Plaintiffs' favor, I disagree with Plaintiffs' arguments for four reasons.

First, Plaintiffs overstate the conclusions for which the factual allegations in the Complaint can plausibly provide support, for the reasons I outlined above. *See* Section III.A.2, *supra.*

Second, the Complaint does not allege that any of Defendant's aid was transferred to Hamas or otherwise used in connection with the October 7th attack. To hold Defendant liable under an aiding-and-abetting theory, Plaintiffs must show that there exists a nexus between Defendant's aid and the October 7th attack. *See Twitter*, 598 U.S. at 495. The Complaint, however, "did not advance any non-conclusory allegation that [the terrorist organization] received any of [Defendant's] funds or that [Defendant] knew or intended that [the terrorist organization] would receive the funds." *Siegel*, 933 F.3d at 225. *See Keren Kayemeth*, 66 F.4th at 1018 ("[T]he Complaint does not allege that the Boycott National Committee provided any funds to Hamas. Accordingly, our precedents clearly support the dismissal of appellants' Complaint.").

Plaintiffs respond, "[I]f a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds." (D.I. 31 at 12) (quoting *Honickman*, 6 F.4th at 500). Because I have concluded that the general awareness element is not satisfied, this argument is unavailing. This argument also fails for another reason, which is that Plaintiffs' theory of Defendant's aid to Hamas is not logically limited to the October 7th attack. Therefore, "[P]laintiffs' claims would necessarily hold defendants liable as having aided and abetted each and every [] terrorist act [committed by the terrorist organization] anywhere in the world." *Twitter*, 598 U.S. at 501. Under those circumstances, "Plaintiffs thus must allege that [Defendant] so systematically and pervasively assisted [the terrorist organization] that [Defendant]

13

could be said to aid and abet every single [] attack [by that organization]. Viewed in that light, the allegations here certainly fall short." *Id.*

Third, the allegations do not allow the plausible inference that Defendant "wishe[d] to bring about" or "sought by [its] actions to make" the October 7th attack succeed through its financial aid, rather than intending to aid in UNRWA's humanitarian efforts. *Twitter*, 598 U.S. at 498 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). To the contrary, at least one of the sources relied upon in the Complaint (D.I. 1 ¶ 39) indicates that Defendant was "horrified" by allegations that twelve UNRWA staff members were involved in the October 7th attack, and states in bold print, "Anyone found to be involved in terrorism must be held accountable." Press Release, UNRWA USA National Committee, UNRWA USA Horrified by Allegations Against Some UNRWA Staff, Calls for Redoubled Efforts Amidst Catastrophic Humanitarian Crisis in Gaza to Aid Refugees (Jan. 29, 2024), https://www.unrwausa.org/unrwa-usa-press-releases/unrwa-usa-horrified-by-allegations-against-some-unrwa-staff-calls-for-redoubled-efforts-amidst-catastrophic-humanitarian-crisis-in-gaza-to-aid-refugees.

Fourth, the *Halberstam* factors suggest that Defendant's aid to Hamas was not substantial. Those factors are: "(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given." *Twitter*, 598 U.S. at 486 (cleaned up) (citing *Halberstam*, 705 F.2d at 488).

Here, application of the *Halberstam* factors largely follows the logic in *Ofisi*, 77 F.4th at 675. In that case, the D.C. Circuit considered whether an international bank ("BNPP"), through its relationship with Sudan, had provided substantial assistance to the terrorist organization al-Qaeda in its attacks on two U.S. embassies. The court determined that support was not substantial:

> First, Appellants do not allege BNPP "encouraged" the U.S. embassy attacks by al-Qaeda. Second, Appellants do not allege that *any* of the financial assistance provided by BNPP to Sudanese banking institutions flowed to al-Qaeda to fund its murderous plots. Third, Appellants do not allege, and indeed cannot plausibly allege, that BNPP was present during the bombings. Fourth, while Appellants spend a majority of their briefs attempting to connect BNPP with al-Qaeda, they fail to plausibly allege the two entities had any relationship whatsoever with one another. . . . Fifth, Appellants fail to plausibly allege BNPP knew of the plot to bomb the embassies or intended to support al-Qaeda in its mission. . . . [Sixth], Appellants do not plausibly allege any assistance from BNPP to al-Qaeda. Even if Appellants had, that "assistance" lasted a short period of time. . . . Appellants simply cannot bend this final consideration in their favor, especially in light of this Court's determination in *Bernhardt* that even "lengthy business relationships with the foreign banks" did not satisfy *Halberstam*'s final factor.

*Id.* (citations omitted). As in *Ofisi*, Plaintiffs do not plausibly allege that Defendant encouraged the October 7th attack, or that any of Defendant's aid to UNRWA made its way to Hamas. They do not allege that Defendant was present during the attack. As I discussed above, they do not plausibly allege that Defendant was related to Hamas. They do not plausibly allege that Defendant knew the October 7th attack was about to occur or intended to support Hamas in carrying out the attack. Finally, because Plaintiffs do not allege that any of Defendant's aid went to Hamas, the last factor—duration of assistance—is irrelevant, and, in any event, would not outweigh the other factors. *See, e.g.*, *Newman v. Associated Press*, 758 F. Supp. 3d 1357, 1373 (S.D. Fla. 2024) ("Here, even assuming the [defendant] had a series of transactions with the [freelance photographers alleged to be affiliated with Hamas] over a period of several years, [the p]laintiffs do not suggest that the length of such relationship aided terrorism, outside of the conclusory allegations that the [defendant] was a direct funding source for Hamas.").

### B. Count II: Plaintiffs Fail to Plead a Conspiracy Violation of 18 U.S.C. § 2333(d)(2).

Count II alleges that Defendant violated 18 U.S.C. § 2333(d)(2) (D.I. 1 ¶¶ 138–41), which imposes civil liability on persons who "conspire[] with the person who committed such an act of

15

international terrorism." To state a conspiracy claim under § 2333(d)(2), Plaintiffs must allege (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477.

Here, for the same reasons outlined above, *see* Sections III.A.2–3, *supra*, Plaintiffs fail to allege plausibly that there existed "an agreement" between Defendant, UNRWA, and Hamas to commit the October 7th attack. *Id.* The Complaint alleges that transactions from Defendant to UNRWA were "made with the explicit and implicit understanding and agreement that Defendant's contributions were provided to UNRWA to advance the common objectives and agenda of Defendant, UNRWA, and Hamas" (D.I. 1 ¶ 141), but provides no direct or circumstantial factual support indicating that such an agreement existed. Plaintiffs argue, "[P]roof of tacit, as opposed to explicit, understanding is sufficient to show agreement." (D.I. 31 at 24) (quoting *Halberstam*, 705 F.2d at 477). That is an accurate statement of the law, but inapt where, as here, Plaintiffs have not alleged that two members of the alleged conspiracy—Defendant and Hamas—ever interacted. *See Halberstam*, 705 F.2d at 481 ("[S]ince in most cases the court will have to infer a conspiracy from indirect evidence, it must initially look to see if the alleged joint tortfeasors are pursuing the same goal . . . and are in contact with one another."). Plaintiffs have not provided any factual allegations from which to reasonably infer that there existed a conspiracy between Defendant, UNRWA, and Hamas.

### C. Count III: Plaintiffs Fail to Plead a Violation of 28 U.S.C. § 1350.

Count III alleges that Defendant "violated the laws of nations, and this Court has jurisdiction to hear Israeli Plaintiffs['] claims under the Alien Tort Statute [("ATS")], [28 U.S.C.

§ 1350]." (D.I. 1 ¶ 143). Specifically, Plaintiffs allege that Defendant violated the Financing Convention under an aiding-and-abetting theory. (*Id.* ¶¶ 150–56). The Financing Convention prohibits the financing of attacks on civilians. (*Id.* ¶ 150–52).

Every circuit to have considered the question has concluded that the ATS recognizes aiding-and-abetting liability. *See Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 718 (9th Cir. 2023) (collecting cases). The standard for aiding-and-abetting liability is not necessarily the same, however, under the ATS as it is under JASTA (the standard for which is itself based on the common law, *see Twitter*, 598 U.S. at 486). Instead, the ATS "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). Therefore, "[t]he standard for accomplice liability is determined by customary international law." *Doe I*, 73 F.4th at 724.

Because determining which "international law [with] common law claims" the ATS recognizes requires delving into customary international law, *Sosa*, 542 U.S. at 712,[7] the courts of appeals have come to differing conclusions with respect to the standard necessary to satisfy aiding-and-abetting liability under the ATS. The "*actus reus* of aiding and abetting liability," the Ninth Circuit concluded in *Doe*, "is well established": "a defendant is liable for aiding and abetting a violation of international law when the accused provides assistance, encouragement, or moral support that has a substantial effect on the crimes." *Doe*, 73 F.4th at 724. With respect to *mens rea*, however, circuits are split on the question of whether "customary international law requires a

---

[7] Specifically, *Sosa* instructs that the ATS only recognizes claims that satisfy a two-part test: first, the claim must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to [violation of safe conducts, infringement of the rights of ambassadors, and piracy.]" Second, "courts are to consider foreign policy consequences and separation-of-power concerns before recognizing a cause of action or allowing a particular case to proceed." *Doe I*, 73 F.4th at 714 (cleaned up) (citing *Sosa*, 542 U.S. at 725, 728, 732–33).

defendant to act with the *purpose* of facilitating the crime" or whether "aiding and abetting liability requires only *knowledge* that a defendant's actions will assist in the commission of an international law violation." *Id.* at 729 (emphasis added) (citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) and *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011) for the "purpose" view and *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005) for the "knowledge" view). The Ninth Circuit, for its part, concluded "that customary international law imposes aiding and abetting liability for knowing assistance." *Doe*, 73 F.4th at 734.

It is not necessary to determine where the Third Circuit would fall with respect to this circuit split. Because I conclude that the Complaint does not allege that Defendant provided substantial assistance to Hamas, *see* Section III.A.3, *supra*, Plaintiffs have not alleged the requisite *actus reus*. Because I conclude that Complaint does not allege that Defendant was generally aware of any role it had in illegal activities, *see* Section III.A.2, *supra*, the necessary *mens rea* is not satisfied either, under either the "purpose" or the "knowledge" standard.

The parties dispute whether a violation of the Financing Convention falls within the "very limited category [of claims] defined by the law of nations and recognized at common law[,]" *see Sosa*, 542 U.S. at 712, for which the ATS allows jurisdiction (D.I. 22 at 32–34; D.I. 31 at 30–34). Having determined that Plaintiffs have not plausibly alleged aiding-and-abetting liability, I do not reach this question.

### D. Count IV: Plaintiffs Fail to Plead a Claim for Negligent Infliction of Emotional Distress Under Delaware Law.

Count IV alleges negligent infliction of emotional distress ("NIED") under Delaware law. (D.I. 1 ¶¶ 157–60). The elements for a NIED claim are, "(1) negligence causing fright to someone; (2) that was in the 'zone of danger;' which, (3) produces physical consequences to that person

because of the contemporaneous shock." *J.S. v. Edgemoor Cmty. Ctr., Inc.*, 2024 WL 139236, at *1 (Del. Super. Ct. Jan. 11, 2024). "Delaware recognizes the traditional 'but for' definition of proximate causation." *Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 828 (Del. 1995). "A proximate cause is one 'which in natural and continuous sequence, *unbroken by any efficient intervening cause,* produces the injury and without which the result would not have occurred.'" *Id.* at 829 (quoting *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991)).

Here, the Complaint does not allege that, but for Defendant's donations to UNRWA, Hamas would not have carried out the October 7th attack. Plaintiffs' brief states, "If not for the millions of dollars [UNRWA] USA funnels to Hamas through [UNRWA], Hamas would be at least burdened in their efforts." (D.I. 31 at 35). The Complaint, however, fails to allege that any of the aid Defendant provided to UNRWA made its way to Hamas, let alone that October 7th would not have occurred but for Defendant's aid. This claim necessarily fails.

### E. Plaintiffs Have Leave to Amend.

At oral argument, Plaintiffs requested leave to amend the Complaint. (D.I. 47 at 19:16–19). Because it is plausible that Plaintiffs may be able to amend some of their pleadings to state a claim, leave to amend is granted. Plaintiffs are permitted two weeks within which to file an amended complaint.

Defendant submitted a letter arguing that Plaintiffs have not properly requested leave to amend, and that any request to amend would be dilatory, prejudicial, and futile. (D.I. 48). First, courts have authority to grant leave to amend of their own accord. *See, e.g., Gaughen v. United States*, 2011 WL 292019, at *3 (M.D. Pa. Jan. 27, 2011). The line of cases Defendant cites (D.I. 48 at 1–2) stands for the proposition that I am not required to consider leave to amend unless it is properly requested. It does not stand for the proposition that I cannot grant leave to amend

altogether. Any other interpretation would clearly violate Rule 15, which adopts a liberal view of amendment. *See* Fed. R. Civ. P. 15(a)(2).

Second, I disagree that any request to amend would be dilatory, prejudicial, and futile. With respect to undue delay and dilatory motive, Defendant suggests that Plaintiffs had ample time to amend the Complaint after receiving the motion to dismiss and fully briefing the same. (D.I. 48 at 2). True, but this is hardly evidence of "[t]actical decisions and dilatory motives." *Leary v. Nwosu*, 2007 WL 2892641, at *4 (E.D. Pa. Oct. 2, 2007). Plaintiffs' failure to amend the Complaint could also be attributed to the belief that their arguments would prevail.

With respect to prejudice, Defendant suggests that "the reputational consequences of being publicly accused of aiding and abetting a brutal act of international terrorism" would be unduly prolonged by amendment. (D.I. 48 at 3). I agree with Defendant that Plaintiffs' allegations may have caused reputational harm, but since the Complaint was filed in March of 2024, it is unlikely that the further delay of amendment would add significantly to any prejudice Defendant has already suffered.

Finally, with respect to futility, Defendant states, "Plaintiffs cannot possibly plead facts" satisfying their various claims. (*Id.* at 3). Maybe, maybe not. I will consider that argument when Plaintiffs' proposed amendments are before me.

## IV. CONCLUSION

An appropriate order will issue.