# Exhibit A



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

April 24, 2025

**By ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *Estate of Tamar Kedem Siman Tov, et al. v. UNRWA*, No. 24 Civ. 4765 (AT)

Dear Judge Torres:

  The complaint in this case recounts atrocious crimes committed by Hamas on October 7. And its factual allegations, taken as true, detail how the United Nations Relief and Works Agency for Palestine ("UNRWA") played a significant role in those heinous offenses. Previously, the Government expressed the view that certain immunities shielded UNRWA from having to answer those allegations in American courts. The Government has since reevaluated that position, and now concludes UNRWA is not immune from this litigation. Nor are the bulk of other defendants, as the Government previously explained.

## I. UNRWA IS NOT ENTITLED TO IMMUNITY.

### A. Background.

  The Constitution does not grant immunity to foreign sovereigns or organizations. Instead, such immunity "'is a matter of grace and comity on the part of the United States.'" *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018) (quoting *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)). The interactions among two treaties, one statute, and one proposed convention govern whether UNRWA is entitled to such grace here.

  *First*, the International Organizations Immunities Act of 1945 ("IOIA") creates the "default rules" for the immunity enjoyed by international organizations in the United States. *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 214 (2019). Although apparently aimed at many of the same entities that now comprise the United Nations ("UN") system, *id.*, the IOIA applies to any "public organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress … and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in this subchapter." 22 U.S.C. § 288. In other words, Congress controls in the first instance whether the United States participates in such "public organizations," and it empowered the President to decide whether to extend immunity to those organizations, including whether "at any time to revoke the designation" entitling the organizations to immunity. *Id.*

1

Where it applies, the IOIA provides the same immunity to international organizations as is available to foreign governments at the time of a given lawsuit. *Jam*, 586 U.S. at 209. That can change over time, *id*. at 210, but it currently excludes commercial acts. *Id*. at 213; *see also Samantar v. Yousuf*, 560 U.S. 305, 313 (2010) (stating that one of the "primary purposes" of the FSIA was to "endorse and codify the restrictive theory of sovereign immunity").

*Second*, also ratified in 1945, the UN Charter defines how the UN is structured. Specifically, it establishes six "principal organs of the United Nations," and provides for the establishment of "[s]uch subsidiary organs as may be found necessary." UN Charter art. 7. And it later specifies that two of the six principal organs—the General Assembly and Security Council—may establish "subsidiary organs" as each "deems necessary for the performance of its functions." *Id.* arts. 22, 29. The UN Charter also recognizes, however, the existence of "specialized agencies" that are "established by intergovernmental agreement and hav[e] wide international responsibilities, as defined in their basic instruments, in economic, social, cultural, educational, health, and related fields." *Id.* arts. 57, 63. Under the Charter, the General Assembly approves "financial and budgetary arrangements" with these specialized agencies and examines their "administrative budgets," but they remain independent entities. *Id.* art. 17. Since 1945, a "UN System" has grown up around the UN itself. This "system" "includes the UN along with "many funds, programs and specialized agencies, each of which have their own area of work." *UN System*, United Nations, https://www.un.org/en/about-us/un-system (last visited Mar. 28, 2025).

The UN Charter provides that the UN "shall enjoy in the territory of each of its Members such privileges and immunities as necessary for the fulfillment of its purposes." UN Charter, Ch. XVI, art. 105, https://www.un.org/en/about-us/un-charter/full-text. But the Charter does not specify whether "[t]he Organization" that "shall enjoy" immunity includes that system's principal bodies, its subsidiary bodies, its specialized agencies, or all three. UN Charter, ch. XVI, art. 105. Regardless, the Charter is generally not self-executing. *See, e.g.*, *United States v. Khatallah*, 160 F. Supp. 3d 144, 151–53 (D.D.C. 2016). It thus does not create any binding obligations under federal law. *See Medellin v. Texas*, 552 U.S. 491, 507 (2008); *United States v. Bahel*, 662 F.3d 610, 629 (2d Cir. 2011).

*Third* is the Convention on the Privileges and Immunities of the United Nations (the General Convention), a treaty that Congress ratified in 1970. *See Brzak v. United Nations*, 597 F.3d 107, 112 (2d Cir. 2010). The General Convention provides that "[t]he United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity." GC art. 2, § 2. Because, unlike the UN Charter, the General Convention has been held to be self-executing, it is understood to supplement the IOIA as applied to the "United Nations." The General Convention's grant of immunity is broader in certain respects than that afforded by the IOIA. *Brzak*, 597 F.3d at 112. In particular, it is not subject to the President's authority to revoke immunity granted by the IOIA, and likely extends even to commercial acts.

*Fourth* is the Convention on the Privileges and Immunities of the Specialized Agencies (CPISA), which the United States has never ratified. *See* 33 U.N.T.S. 261 (1947). As both courts and the State Department have recognized, the existence of this distinct treaty implies that "specialized agencies" are *not* protected under the General Convention. *See Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 719 (D.C. Cir. 2022); S. Exec. Rep. No. 91–17, App. at 37 (Statement

2

of State Department Legal Advisor John R. Stevenson assuring the Senate Foreign Relations Committee that specialized agencies were "not covered" by the General Convention). Instead, they are subject to this separate convention to which the United States is not a party.

The takeaway is that certain UN organs are immune under the General Convention, but certain other UN bodies (like specialized agencies) are not provided immunity by the General Convention, and are only immune to the extent they "have been designated by the President through an appropriate Executive order as being entitled to enjoy the privileges, exemptions provided by th[e IOIA]." 22 U.S.C. § 288.[1]

### B. Discussion.

UNRWA has not been designated by the President under the IOIA. Whether UNRWA can claim immunity therefore depends on whether it is part of the "United Nations" as that term is used in the General Convention, GC art. 2, § 2. It is the present view of the United States that UNRWA is not; instead, it is a mere "affiliate or instrumentality" of the UN, analogous to the specialized agencies referenced in the UN Charter. As a result, UNRWA is not subject to the General Convention, and is not immune from suit under that treaty or current U.S. law.

**1.** UNRWA is not shielded by the General Convention. There is no dispute that UNRWA is not one of the six "principal organs" of the UN. Even assuming that "subsidiary organs" also qualify as part of the "United Nations," and are thus entitled to immunity under the General Convention, UNRWA still falls outside the ambit of that protection because it is not a subsidiary organ.[2]

To start, it is highly doubtful that the UN Charter even authorizes the General Assembly to create a subsidiary organ such as UNRWA, because its functions are not the type of functions performed by the General Assembly. Moreover, although the UN retains some control of its leadership, it does not control UNRWA's day-to-day activities. As a result, it is best analogized for these purposes to a specialized agency.

**a.** In determining whether UNRWA is part of the UN, the first place to look is the Charter. *National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 630 (1983) (noting that "duly created instrumentalities of a foreign state are to be accorded a

---

[1] None of this is to say that UNRWA is currently eligible for designation under the IOIA. That statute only applies to international organizations where the United States is a member, or otherwise participates. *See, e.g.*, 22 U.S.C. § 288. Following the President's recent executive order concerning UNRWA, it is not apparent how that organization can still qualify for IOIA eligibility. *See* Executive Order 14199, "Withdrawing the United States From and Ending Funding to Certain United Nations Organizations and Reviewing United States Support to All international Organizations," 90 Fed. Reg. 9275 (Feb. 10, 2025).

[2] It is not a given that subsidiary organs are covered by the General Convention's immunity. By analogy, under international law, political subdivisions such as cities, towns and counties are ordinarily not entitled to sovereign immunity. *See* Restatement (Third) of Foreign Relations Law § 452 comment b (1987).

3

presumption of independent status" and that courts should refuse "to give effect" to any descriptions of the corporate structure where doing so would defeat "legislative policies"); *see* General Convention, Preface (explaining that Convention implements the Charter).  The Charter limits the creation of subsidiary organs to those that "may be found necessary," and are "established in accordance with the present Charter." UN Charter art. 7(2).  For UNRWA to be "established in accordance with" the Charter, the General Assembly must "deem[] [UNRWA] necessary for the performance of its functions." UN Charter, art. 22.  As a textual matter, that specific, limited authorization both *permits* the General Assembly to establish subsidiary organs necessary for the performance of its own functions, and simultaneously *precludes* doing so for other purposes.  *See United States v. Nixon*, No. 23-4207, 2025 WL 747286, at *7 (4th Cir. Mar. 10, 2025) (explaining that the use of "may" as authorization prior to a seemingly exhaustive list of circumstances constitutes a limitation); *Halverson v. Slater*, 129 F.3d 180, 188 (D.C. Cir. 1997) (same).  The same result—that the General Assembly may only establish subsidiary organs for the performance of its own functions—flows not just from the text of the Charter, but from the fundamental maxim "*nemo dat qui non habet*—no one may transfer more than he owns." *Comm. Bank, N.A. v. Chrysler Realty Corp.*, 244 F.3d 777, 780 (10th Cir. 2001).[3]

The "functions and powers" of the General Assembly as set out in articles 10-17 do not include anything approaching the direct administration of a comprehensive, economic, social, infrastructural, educational, and public works regime of the sort operated by UNRWA.  To the contrary, those General Assembly functions include the power to "discuss" various questions, to "make recommendations" to member States or the Security Council, to "consider" certain principles, to "call" to the attention of the Security Council certain situations, to "initiate studies," to "recommend" certain measures, to "receive and consider" various reports, and to "consider and approve" the budgets of the UN and the specialized agencies. UN Charter, arts. 10-17.  That list is telling: It includes exclusively deliberative and budgetary functions that are a subset of what is traditionally understood as *legislative* power.  Notably absent is the traditionally *executive* authority to conduct large-scale operational activities, much less create and directly administer a massive (and now, semi-permanent) system of schools, hospitals, social services, physical infrastructure, and employment service for an entire population.).  Because the Charter does not grant that authority to the General Assembly, it would make little sense to say that an institution created and entirely devoted to such activities is a "subsidiary organ" of the General Assembly that is "necessary" to executing the General Assembly's functions.

Unsurprisingly, then, the substantial majority of General Assembly "subsidiary organs" are deliberative bodies, such as committees, councils, and working groups.  *See* https://www.un.org/en/ga/about/subsidiary/index.shtml.  And scholars have long questioned the legal basis for the General Assembly's practice of occasionally purporting to create operational "subsidiary organs." Khan, at 995 ("[I]t is not at all unproblematic whether and to what extent genuine operational . . . functions can be assigned to sub-bodies."); William Dale, *UNRWA - A*

---

[3] *See also, e.g.*, *Hendrie v. Sayles*, 98 U.S. 546, 551 (1878) (applying that "maxim"); Daniel-Erasmus Khan, Article 22, *The Charter of the United Nations: A Commentary*, 995 ("[T]he general principle applies that no one can transfer more competences than they themselves possess.  And thus it is not at all unproblematic whether and to what extent genuine operational . . . functions can be assigned to sub-bodies.").

*Subsidiary Organ of the United Nations,* 23 Int'l & Comp. L.Q. 576, 582 (1974) ("If one construes the Charter literally it is difficult to see wherein lies the Assembly's authority to establish UNRWA, or any other operating agency."). But even among the handful of other operational entities treated as "subsidiary organs" of the General Assembly, none have functions that even approach the comprehensive, quasi-governmental functions of UNRWA.

In contrast, the comprehensive operational program carried out by UNRWA is precisely the sort of activity the Charter envisions for "specialized agencies." As noted above, the Charter describes those agencies as "having wide international responsibilities, as defined in their basic instruments, in economic, social, cultural, educational, health, and related fields." UN Charter, art. 57. That would almost entirely describe UNWRA.[4]

**b.** Even assuming the General Assembly *can* administer a comprehensive economic, social, infrastructural, educational, and nationalist political program as a subsidiary organ, UNRWA has not functioned like such a subsidiary organ as the Senate would have understood that term when it agreed to ratify the General Convention.

In its report recommending ratification of the General Convention, the Senate Committee on Foreign Relations emphasized that the immunity granted therein would be "substantially the same" as that granted to foreign sovereigns. S. Exec. Rep. No. 91-17 at 2 (March 17, 1970). And when it comes foreign sovereigns, U.S. courts have long distinguished between state-controlled agencies or instrumentalities, and parts of the state government itself. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 624 (1983).[5] Where a foreign state's own law establishes an entity's "separate juridical status," courts should "decline" to "give conclusive effect to the law of the chartering state." *Id.* at 621–22. Instead, the Court has recognized only "a presumption of independent status" that can be overcome by "the application of internationally recognized equitable principles," such as those that preclude an entity from claiming immunity from suit while bringing suits of its own. *Id.* at 633. Conversely, when a foreign state's own law does not expressly grant an entity separate juridical status, there must be a

---

[4] At most, UNRWA does not meet what is nominally the second element of a specialized agency—namely, that it was created separately and subsequently "brought into relationship with the United Nations." *Id.* But it is unclear how much weight to give that supposed requirement given the UN's repeated disregard of such formalities. For instance, the United Nations Industrial Development Organization was "established as an organ of the General Assembly," but is listed as a specialized agency, and was designed to "function as an autonomous organization within the United Nations." GA Res. 2152 (Nov. 17, 1966). In any event, the point here is not that UNRWA constitutes a specialized agency, but rather than UNRWA is more analogous to such an agency for purposes of immunity (or lack thereof) under the General Convention and related laws.

[5] *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994); *see also Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 32 F.2d 195, 199 (2d Cir. 1929); *see also* William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes?*, 65 Tul. L. Rev. 535, 540-550 (1991) (discussing the "separate entity rule," which "provides that foreign state-owned entities with separate legal personalities generally are not entitled to assert sovereign immunity").

5

substantive analysis of "whether the defendant is the type of entity that is an integral part of a foreign state's political structure, [or rather] an entity whose structure and function is predominantly commercial." *Transaero,* 30 F.3d at 151 (quoting *Segni v. Commercial Office of Spain*, 650 F. Supp. 1040, 1041–42 (N.D. Ill. 1988)); *see also Garb v. Republic of Poland*, 440 F.3d 579, 591 (2d Cir. 2006) (adopting *Transaero*).

Foreign and international courts have long applied similar tests. On the one hand, "[c]lose links with the structure of government and performance of core public functions," "active supervision" by the government, and "employees hired in accordance with public employment conditions" may indicate that an entity is "an organ of state." Hazel Fox & Philippa Webb, *The Law of State Immunity* 357 (3d ed. 2015). On the other hand, however, an entity's "constitution, its powers, its duties, source of funding, its activities and relationship with the home State, particularly the capacity to sue and be sued, independence to make contracts and dispose of property" might indicate a "a private entity not enjoying State immunity." *Id.*[6] These same commentators have pointed out, moreover, that where (as here) immunity is not limited to commercial acts, courts have been more apt to characterize government-affiliated agencies as mere agencies or instrumentalities—often based on an entity's primary purpose and function. Courts do so because it is one of the few means of keeping "the conferment of immunities within reasonable bounds." Fox & Webb at 357–58; *see also see also* Council of Europe, et al., *State Practice Regarding State Immunities* 5 (2006) (explaining "the paradox of States adhering to the restrictive approach embracing a wider concept of the State, and the States adopting the absolute doctrine of immunity as readily accepting a narrower one").

In UNRWA's case, four factors that courts have traditionally considered show that it is a separate entity from the General Assembly—and thus better analogized for immunity purposes to a specialized agency within the typology created by the UN Charter. *First*, UNRWA's "structure and function"—which is designed to effectuate a comprehensive economic, social, infrastructural, educational, and nationalist political enterprise—differ markedly from the General Assembly's own structure and function, which formally consist entirely of deliberation and budgetary oversight. *Second*, most UNRWA employees appear to be exempt from the general staff rules and regulations of the UN, and instead operate under UNRWA's own distinct rules and regulations. G.A. Res. 302 (IV)(8)(b); *see also* William Dale*, UNRWA - A Subsidiary Organ of the United Nations,* 23 Int'l & Comp. L.Q. 576, 606 n.88 (1974) ("The rules relating: to, the Agency's local staff depart considerably, from the UN common system."). *Third*, as UNRWA itself acknowledges, over 90% of its "core funding is provided on the basis of voluntary contribution" rather than from UN's budget. Pls.' Mem. 14 n.11. And *fourth*, UNRWA maintains the capacity and independence to "enter[] into innumerable commercial contracts" in its own name.

**3.** UNRWA is thus not properly characterized as a subsidiary organ, and therefore is not entitled to immunity. The Government appreciates that it previously took a different view on this issue, but it now believes the arguments in favor of that view are lacking.

---

[6] *See also* Restatement (Second) of Foreign Relations Law § 66 comment a (1965) ("In determining whether the agency is in fact a part of the government, the views of the government creating the agency are given great weight, but are not necessarily conclusive"); *id.* § 67 ("A constituent unit or political subdivision of a foreign state is not entitled to immunity.").

6

*First*, it is true that a number of General Assembly resolutions and UN publications refer to UNRWA as a "subsidiary organ." *See* DOJ Response (Oct. 18, 2024) at 2. But the document that created UNRWA does *not* refer to UNRWA as a "subsidiary organ." And it is actually inconsistent with such a designation: it expressly "[c]alls upon" Member States "to accord to [UNRWA] the privileges, immunities, exemptions and facilities which have been granted to the United Nations Relief for Palestine Refugees, together with all other privileges, immunities, exemptions and facilities necessary for the fulfilment of its functions." G.A. Res. 302 (IV) (17). Yet if UNRWA were already a subsidiary organ subject to the General Convention, that call would have been unnecessary.

Subsequent UN statements should not be given controlling weight. *See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 43 (2018) (holding that a "federal court is neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials"). To rule to the contrary would effectively allow the UN to manufacture immunity at will, nullifying the provision of the IOIA that empowers the President of the United States to decide who falls within the IOIA's ambit. And it would further negate the provisions specifically empowering the President to "revoke the designation of any international organization," if he finds "in his judgment" that the "international organization or its officers and employees" has "abuse[d] … the privileges, exemptions, and immunities provided." 22 U.S.C. § 288. The General Convention should not be interpreted to permit the UN "to avoid the requirements of international law simply by creating juridical entities whenever the need arises." *Bancec*, 462 U.S. at 633.

Such an argument is particularly troubling, because as commentators have noted: "[D]ue to an enormously wide range of organizational forms, of the fields and scope of activities, of duration and methods of appointment and termination, of the legal, institutional, and factual ties with the GA itself, and, finally, the lack of any kind of uniformity in the terminology used for denomination purposes, …. [e]ven the UN itself has not succeeded in producing any kind of classification." Daniel-Erasmus Khan, *Article 22, The Charter of the United Nations: A Commentary*, 982 (Bruno Simma et al., 4th ed. 2024); *see, e.g.*, Dan Sarooshi, *The United Nations and the Development of Collective Security* 87 (2000) ("Issues of form are not of major importance when considering what constitutes a UN subsidiary organ.").

It would be in considerable tension, if not entirely inconsistent with, background principles of sovereign immunity to allow UNRWA and the UN to leverage that poor recordkeeping to expand their own immunity. Immunity is an affirmative defense that the party claiming it must plead and ultimately prove. *E.g.*, *Hennessey v. Univ. of KS Hosp. Auth.*, 53 F.4th 516, 531 (10th Cir. 2022) (discussing who bears the burden of proof to show an entity is the arm of a state in a domestic context). Although the mechanisms and burdens of proof are slightly different—and still somewhat in flux, *see Republic of Hungary,* 145 S. Ct. at 490 n.1—the same general principle holds true in the foreign-immunity context. That is, "[a]lthough the plaintiff bears the ultimate burden of proving its substantive claims, the foreign-state defendant bears the burden of establishing the affirmative defense of immunity." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131 (D.C. Cir. 2004); *Frank v. Commonwealth of Antigua & Barbuda*, 842 F.3d 362, 367 (5th Cir. 2016); *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994)). If UNRWA cannot meet that burden because the UN has been sloppy in how it created its affiliated entities, the result is to deny immunity—not to change the test to accommodate the UN.

7

*Second*, some have argued that UNRWA must be a "subsidiary organ," because it was set up by the General Assembly. But that is too simplistic. Not every entity created by the General Assembly qualifies as a subsidiary organ; the test is more demanding. For the reasons stated above, characterizing UNRWA as a "subsidiary organ" is inconsistent with the UN Charter. *See supra* Part II.B.1. Rather, as a matter of both its function and its operation, UNRWA is analogous to, albeit not identical with, a specialized agency.

*Third*, a number of scholars have made the related argument that article 7(2) provides the UN with the "general authority" to create subsidiary organs, including potentially subsidiaries of "the United Nations as whole." *See* Matthias Lippold, Article 7, *The Charter of the United Nations: A Commentary*, 558 (Bruno Simma et al., 4th ed. 2024); Dan Sarooshi, *The United Nations and the Development of Collective Security* 92–93 (2000). For the same reasons, this reading is implausible as a matter of both text and logic. *See* Khan, *supra*, at 995. Moreover, it would render those specific provisions allowing principal organs to create subsidiary organs surplusage. *Yoo v. United States*, 43 F.4th 64, 71–72 (2d Cir. 2022) ("In interpreting both statutes and treaties, courts seek to avoid readings that render statutory language surplusage or redundant."). The rule against surplusage carries particular weight here, because the UN member States empowered only certain principal organs to create such bodies. UN Charter, arts. 22; 29. That difference is presumed intentional. *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018).

*Fourth*, some have highlighted various factual ties between UNRWA and other UN bodies, including that the UN Secretary-General appoints UNRWA's Commissioner-General; that UNRWA staff regulations and rules, which are modeled on the UN Secretariat's own staff regulations and rules, are approved by the Secretary General of the UN; and that UNRWA is subject to the specific jurisdiction of the United Nations Appeals Tribunal. But none of those facts indicates that UNRWA is a subsidiary of the General Assembly (or otherwise a component of the UN), and several indicate precisely the opposite.

The law is clear that one entity's ownership and control of another is insufficient to transfer immunity from the former to the latter. *See e.g., Hennessey*, 53 F.4th at 528. In *Bancec,* for example, the Supreme Court noted that a government instrumentality "created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law" could nonetheless be considered juridically separate. 462 U.S. at 624. And the Court noted that British courts have demonstrated a "marked reluctance" to conflate foreign governments with their instrumentalities, even when the latter were entirely "state-owned." *Id.* at 627 n.18 (citing *I Congreso del Partido,* [1983] A.C. 244). Rather than passive ownership and nominal or high-level control, the question is one of "active supervision." Fox & Webb, at 357–59. And there is no sound argument that the UN's principal organs exercise any such role with respect to UNRWA, which (again) carries out a fundamentally different purpose and program.

Relying on the fact that UNRWA's staff regulations and rules are *modeled* after the UN's is even less persuasive. If UNRWA were part of the UN, it would be *subject* to the UN's own rules. Likewise, the point that UNRWA is *currently* subject to the specific jurisdiction of the United Nations Appeals Tribunal glosses over the inconvenient fact that such jurisdiction is the product of a December 11, 2009 special agreement between the Secretary General of the UN and UNRWA's Commissioner-General. Pls. Response 15 (citing *Nemrawi v. Comm'r-Gen. of*

8

*UNRWA*, Judgment No. 2018-UNAT-851 at 6 n.3). Even more harmful for UNRWA's immunity claim is that the special agreement was expressly entered into "pursuant to Article 2(10) of the Appeals Tribunal Statute," *id.*—a provision that only applies to agreements with "a specialized agency... or other international organization or entity established by a treaty and participating in the common system of conditions of service." Appeals Tribunal Statute, art. 2(10). In entering that agreement, both the UN Secretary-General and UNRWA appear to have understood UNRWA as distinct from a core component of the UN itself.

*Fifth*, some have insisted that UNRWA is indistinguishable from other purported subsidiary organs of the General Assembly, including the World Food Programme, the UN Development Programme, and UNICEF. But the comprehensive, quasi-governmental character of UNRWA distinguishes it qualitatively from these other entities, placing it beyond even an expansive interpretation of "subsidiary organ." Moreover, publicly available information makes plain that there are additional legally significant distinctions between those entities and UNRWA with respect to immunity. For example, unlike employees of UNRWA, employees of the UN Development Programme appear to be subject the generally applicable UN staff rules and regulations. *See* https://popp.undp.org/regulations-rules-page/staff-regulations-and-staff-rules-including-provisional-staff-rules-united. And to the extent that some other UN-affiliated entity were similarly situated to UNRWA, that would be a problem of the UN's own making through its ignoring legal formalities when it created new entities. *Supra* p.7. More importantly, it is one for which Congress has already created a solution: To the extent that the UN wishes those entities to receive immunity from suit, it can seek a declaration that the entity is appropriate for such protection from the President pursuant to the IOIA.

## II. MOST REMAINING DEFENDANTS ARE NOT ENTITLED TO IMMUNITY.

The remaining defendants' immunity largely rises—and falls—with UNRWA's. For Defendant Lazzarini, any diplomatic immunity from his role as Commissioner-General of UNRWA would follow from UNRWA being part of the UN "Organization"; so too any official-act immunity for the Individual Defendants. *See* General Convention, art. V, §§ 19, 18(a); UN Charter Art. 105(2). Because UNRWA is not, those remaining defendants cannot benefit from the derivative immunity that attaches to certain UN officials. *See Brzak*, 597 F.3d at 113; *cf. Rodriguez*, 29 F.4th at 719 (explaining that certain entities' immunity would require the United States to ratify CPISA or for the President to designate an organization under the IOIA). Moreover, none of the remaining defendants' conduct on behalf of UNRWA would qualify as protected official action, since it would be action taken in an uncovered office.[7]

In its previous submission, although it maintained that the Individual Defendants were at least presumptively immune, the Government acknowledged that they may be liable under certain

---

[7] Defendant Grandi is currently the United Nations High Commissioner for Refugees (UNHCR). The United States does not presently take a position on whether UNHCR is a subsidiary organ of the UN. To the extent Defendant Grandi's current position entitles him to diplomatic immunity, *see Brzak v. United Nations*, 551 F. Supp. 2d 313, 318-19 (S.D.N.Y. 2008), that would shield him from suit here (at least so long as he is in that position), *see United States v. Khobragade*, 15 F. Supp. 3d 383, 387 (S.D.N.Y. 2014), even though his relevant conduct predated his time at UNHCR.

factual circumstances. While the Government no longer maintains those top-level positions, it does continue to agree that any official-act immunity would not protect any person who was complicit in the October 7 terrorist attacks by Hamas.

***

The complaint in this case alleges atrocious conduct on the part of UNRWA and its officers. Of course, such allegations are only the first step on a long road, where plaintiffs will be required to prove what they have alleged. But UNRWA is not above that process—nor are the bulk of the remaining defendants. The Government believes they must answer these allegations in American courts. The prior Administration's view that they do not was wrong.

Dated: April 24, 2025

Respectfully submitted,

| | |
|---|---|
| YAAKOV M. ROTH<br>Acting Assistant Attorney General<br>Civil Division | JAY CLAYTON<br>United States Attorney for the<br>Southern District of New York |
| /s/ Yaakov M. Roth<br>950 Pennsylvania Avenue<br>Washington D.C. 20530<br>Tel.: (202) 514-3301<br>Email: yaakov.m.roth@usdoj.gov | By: /s/ Tara Schwartz<br>TARA SCHWARTZ<br>Assistant United States Attorney<br>86 Chambers Street, 3rd Floor<br>New York, NY 10007<br>Tel.: (212) 637-2633<br>Email: Tara.Schwartz@usdoj.gov |