**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------------- X

LISHAY LAVI, NOACH NEWMAN, ADIN GESS,
MAYA PARIZER, NATALIE SANANDAJI, YONI
DILLER, HAGAR ALMOG, DAVID BROMBERG,
LIOR BAR OR, and ARIEL EIN-GAL,

                              Plaintiffs,

                  -against-

UNRWA USA NATIONAL COMMITTEE, INC.,

                              Defendant.

----------------------------------------------------------------- X

Civil Case No.
24-cv-00312 (RGA)


**DEFENDANT UNRWA USA NATIONAL COMMITTEE, INC.'s OPENING BRIEF IN**
**SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED**
**COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS........................................................... 2

SUMMARY OF THE ARGUMENT........................................................................ 2

MOTION TO DISMISS STANDARD...................................................................... 3

STATEMENT OF FACTS....................................................................................... 3

    I.      Allegations that UNRWA USA Aided and Abetted the October 7 Attacks..... 4

    II.    Allegations Concerning UNRWA's Relationship With Hamas...................... 8

        1.   UNRWA's Alleged "Role" in the October 7 Attacks..................................... 8

        2.   UNRWA's Adversarial Relationship With Hamas.......................................... 9

        3.   The "Money Laundering Scheme"................................................................. 14

        4.   US Government Audits of UNRWA Operations Confirm that UNRWA Was Not Supporting Hamas During the Time Period Relevant to Plaintiffs' Claims…………………………………………………………………………... 16

        5.   UNRWA and October 7's Aftermath............................................................ 18

ARGUMENT.......................................................................................................... 23

    I.      The FAC Fails to State an Aiding-and-Abetting Claim Against UNRWA USA. …………………………………………………….................... 23

       A.   The FAC Fails to Plead General Awareness.................................................. 24

       B.   The FAC Fails to Plead Knowing and Substantial Assistance...................... 30

    II.    The Complaint Fails to State a Conspiracy Claim Under the ATA................ 35

    III.   The FAC Fails to State an ATS Claim........................................................... 35

CONCLUSION…….………………………………………………………………... 35

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Ashley v. Deutsche Bank AG.*,
  144 F.4th 420 (2d Cir. 2025) ................................................................................... *passim*

*Averbach v. Cairo Amman Bank*,
  No. 19-cv-0004-GHW-KHP, 2020 U.S. Dist. LEXIS 10902 (S.D.N.Y. Jan. 21, 2020) .. 26

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022) ................................................................... 25,26,32

*Doe v. Cisco Sys.*,
  73 F.4th 700 (9th Cir. 2023) ........................................................................... 36

*George v. Rehiel*,
  738 F.3d 562 (3d Cir. 2013) ........................................................................... 35

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................................... 24,29

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ....................................................................... 25,27,29

*Lamm v. State St. Bank & Tr.* ,
  749 F.3d 938 (11th Cir. 2014) ....................................................................... 25

*Leisrael v. Educ. for A Just Peace in the Middle E.*,
  66 F.4th 1007 (D.C. Cir. 2023) ................................................................... 26,32

*Linde v. Arab Bank, Pub. Ltd. Co.*,
  882 F.3d 314 (2d Cir. 2018) ....................................................................... 25,26,27

*O'Sullivan v. Deutsche Bank AG*,
  No. 17 CV 8709-LTS-GWG, 2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. Mar. 28, 2019) . 26

*Ofisi v. BNP Paribas, S.A.*,
  77 F.4th 667 (D.C. Cir. 2023) ................................................................... *passim*

*Owens v. BNP Paribas, S.A.*,
  897 F.3d 266 (D.C. Cir. 2018) ....................................................................... 26

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ........................................................................... 32

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos* ,
  605 U.S. 280 (2025) ................................................................................... 24

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ............................................................................. *passim*

**Statutes**
18 U.S.C. § 2333 ............................................................................................. 23

**Other**
31 C.F.R. §§ 549.511-597.515 ...................................................................... 14

## PRELIMINARY STATEMENT

This Court has previously dismissed Plaintiffs' claims for failing to allege that UNRWA USA's humanitarian donations aided the October 7 attacks, or that UNRWA USA intended its contributions to advance Hamas's terrorist operations. *See* Aug. 8, 2025 Mem. Opinion (D.I. 50) ("Opinion") at 12–13. The Court further held that Plaintiffs couldn't plausible allege that UNRWA USA knew about any hypothetical role it was playing in Hamas's terrorist operations, given that the United States government—with vastly superior intelligence resources—was simultaneously providing hundreds of millions of dollars to UNRWA after certifying its compliance with rigorous anti-terrorism protocols. *Id.* at 10-12.

The First Amended Complaint ("FAC") adds 147 paragraphs yet cures none of these foundational defects. The FAC rehashes the same baseless theory—that UNRWA USA aided and abetted the October 7 attacks by doing, on a vastly smaller scale, what the United States and 71 other donor-governments have done for decades: funding UNRWA's humanitarian operations. Once again, the FAC fails to allege that a single cent of UNRWA USA's donations—which were earmarked for projects like *orphan support* and *clean drinking water*—was expended in a manner that benefited Hamas terrorist operations, let alone used in the October 7 attacks. Once again, it fails to allege a single fact supporting the inference that UNRWA USA aided UNRWA to further Hamas's terrorist operations rather than advance UNRWA's humanitarian mission. Instead, Plaintiffs propose a theory so sweeping that it would indiscriminately make the United States, its allies, and countless private charitable givers accessories to terrorism.

Where the FAC does add new allegations, they are either immaterial as a matter of law or outright distortions. Plaintiffs pad the FAC with *post*–October 7 accusations against UNRWA, notwithstanding this Court's ruling that liability may not be established based on information that came to light after the attacks. Opinion at 8. They allege that UNRWA "ignored" evidence that an

employee had ties to Hamas, but footnote an article showing that UNRWA had suspended that individual months earlier. They accuse an UNRWA USA board member of "justifying" the October 7 attacks based on a post that, read in full, condemns those attacks in unequivocal terms. They attempt to portray a global consensus that UNRWA is irredeemably compromised by Hamas, but ignore that the agency enjoys the support of 158 countries, including virtually every US ally. Most brazenly, they invent a fictitious "money laundering scheme" based on UNRWA's payment of its Gazan staff in US dollars, and then incorporate an audit report that not only refutes every premise of that scheme—it confirms that the *Israeli government* authorized and oversaw the importation of the dollars used to pay UNRWA staff.

Gaza is in the throes of a humanitarian catastrophe. Meanwhile, Plaintiffs persist in leveling frivolous allegations against a UN agency which, by near-universal consensus, is a vital and irreplaceable backbone of relief efforts, and against a nonprofit that enables charitable givers to contribute to that vital work. What happened on October 7 was an unspeakable tragedy—but neither UNRWA USA nor UNRWA bear responsibility for those heinous acts.

Plaintiffs' claims have no merit and should be dismissed in their entirety.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed the original complaint against Defendant UNRWA USA on March 8, 2024. (D.I. 1). On August 8, 2025, the Court granted Defendant's motion to dismiss all claims without prejudice. (D.I. 50 & 51). On August 22, 2025, Plaintiffs filed their FAC. (D.I. 52). UNRWA USA now moves to dismiss Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## SUMMARY OF THE ARGUMENT

1.        Plaintiffs fail to state an Anti-Terrorism Act ("ATA") aiding-and-abetting claim. The FAC fails to plead that either UNRWA USA or UNRWA played any role in the October 7

attacks: it does not plausibly allege that UNRWA USA supplied any support to Hamas's terrorist operations, that UNRWA USA intended its financial contributions to UNRWA to aid Hamas, or that UNRWA supported or facilitated the attacks that injured Plaintiffs.

2.      Plaintiffs fail to state an ATA conspiracy claim. The FAC fails to allege any agreement between UNRWA USA, UNRWA, and Hamas.

3.      Plaintiffs fail to state an ATS claim because the FAC fails to plead that UNRWA USA provided assistance that had a "substantial effect" on the October 7 attacks, nor that it did so knowing or intending to assist those attacks.

## MOTION TO DISMISS STANDARD

UNRWA USA incorporates its prior discussion of the Rule 12(b)(6) standard from its initial Motion to Dismiss and the Court's Order. Opinion at 3-4; Defs. Br. in Support of Motion to Dismiss ("Defs. Br.") at 3-5 (D.I. 22).

## STATEMENT OF FACTS

The United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA") is a humanitarian agency established by the UN General Assembly and entrusted with providing food, shelter, education, medical care, and other humanitarian services to the 5.9 million Palestinian refugees living in the West Bank, the Gaza Strip, Jordan, Lebanon, and Syria. FAC ¶¶ 52-55.[1] UNRWA USA is an independent US-based charity that—along with 72 countries, including the United States—provided financial contributions to UNRWA. UNRWA is funded almost entirely from contributions by UN member states. *Id.* ¶ 54. In 2023, for example, it received

---

[1] Congressional Research Service ("CRS"), "UNRWA: Overview and the U.S. Funding Pause," (Feb. 9, 2024), https://crsreports.congress.gov/product/pdf/IN/IN12316; UNRWA, 2023 Confirmed Pledges towards UNRWA's Programmes, https://www.unrwa.org/sites/default/files/list_of_2023_confirmed_pledges_by_all_donors.pdf.

$1.46 billion in contributions. Of that amount, the U.S. Government supplied $371 million; UNRWA USA supplied $22.3 million, or just over 1%. *Id.* n.27.[2]

### A. Allegations that UNRWA USA Aided and Abetted the October 7 Attacks

The FAC merely repackages the same theory of liability this Court has already rejected—namely, that UNRWA USA aided the October 7 attacks by contributing to UNRWA which, in Plaintiffs telling, distributed some undisclosed portion of its operating budget (1) to pay the salaries of its 13,000 staff members, some dozen of whom are alleged to have participated in the October 7 attacks; (2) to operate schools in which Hamas stored weapons (years earlier, without UNRWA's authorization); (3) to produce educational materials that are "designed to recruit young Gazans to Hamas"; and (4) to a "money laundering scheme that allows Hamas to barter in U.S. dollars." FAC ¶ 7, *compare* Compl. Intro at 2 (D.I. 1)

Plaintiffs, however, do not allege that any of *UNRWA USA*'s funds were spent in the above manner. Like the Complaint, the FAC's sole factual descriptions of the aid consist of the sum total ($34.1 million between 2020 and 2023, FAC ¶¶ 15, 57, 245), and a description of two grants in 2022 and 2023, totaling under a million dollars, for "education and training" in UNRWA schools. FAC ¶ 105. UNRWA USA's Annual Reports, which are incorporated by reference into the FAC, reveal that these funds were used for such purposes as: scholarship grants for university students, housing assistance for those rendered homeless after the 2023 earthquake in Syria, food assistance, a medical lab in a Lebanese refugee camp, orphan support, and solar-powered desalination units to provide clean drinking water in UNRWA schools. FAC nn.30-32. Plaintiffs do not allege that these funds were diverted from their intended, humanitarian purpose, that the funds' disbursement

---

[2] *See also* CRS, "UNRWA Overview and the U.S. Funding Pause," *supra* note 1, at 3; UNRWA, "Annual Operation Report 2023*,*" at 181 (2023), https://www.unrwa.org/sites/default/files/ aor_2023_remos.pdf.

inured to Hamas's benefit, or that they were used in the October 7 attacks—the same failings that led the Court to dismiss the prior Complaint. Opinion at 13.

The FAC also reproduces the Complaint's conclusory verbiage that "UNRWA USA raises and transfers such funds knowingly, willfully, and with the intention that the funds be used by [Hamas] and its members for terrorist purposes." *Compare* FAC ¶ 7 *with* Compl. Intro. at 2. But the FAC's factual allegations and the documents referenced therein refute that assertion. Once again, Plaintiffs selectively quote UNRWA USA's January 29, 2024 announcement that it was still committed to funding UNRWA after learning that several UNRWA employees had been accused of participating in the October 7 attacks, FAC ¶ 237; and once again Plaintiffs omit the two preceding paragraphs, which this Court previously found negates an inference that UNRWA USA was in sympathy with Hamas:

> **UNRWA USA is horrified by the recent allegations against twelve UNRWA staff members**. UNRWA leadership has taken prompt action to terminate the contracts of those allegedly involved. We welcome the UNRWA Commissioner General's request that the UN Office of Internal Oversight Services (the highest UN investigative authority) undertake an investigation into the allegations against the UNRWA staff who were allegedly implicated. **Anyone found to be involved in terrorism must be held accountable**.

> We also appreciate the far-reachingf efforts UNRWA makes in vetting its own staff, including screening its staff against the UN Security Council sanctions list and sharing its employee list with the State of Israel as obligated. UNRWA has informed us that the State of Israel has not raised any concerns or objections with regard to the content of those lists

*See* Opinion at 14; Press Release (cited in FAC n.193 and Compl. n.118) (emphasis added).

Confronted with the Court's finding, Plaintiffs now posit that these expressions of horror must have been "insincere and intended to mislead the public" because UNRWA USA increased its aid to UNRWA in 2024 and 2025. FAC ¶ 239. But there is an obvious explanation for that increase: the humanitarian crisis unfolding in Gaza has galvanized donors to increase their support

for the relief efforts that UNRWA is responsible for overseeing.[3] Plaintiffs offer nothing, beyond cynical speculation, to support the inference that UNRWA USA's increased contributions reflect anything but a commitment to supporting the humanitarian relief effort.

The FAC also newly acknowledges that UNRWA USA imposed a month-long funding freeze in March 2024, which undercuts Plaintiffs' preferred inference that UNRWA USA was somehow indifferent to the allegations against UNRWA. FAC ¶ 230. Plaintiffs try to spin the pause as too brief, but as the documents cited in the FAC attest, UNRWA USA acted in lockstep with Canada, Austria, Denmark, Sweden, France, Germany, Japan, and the European Commission—all of whom reversed their funding pauses around the same time.[4]

Unable to plead facts showing that UNRWA USA sought to aid Hamas, Plaintiffs resort to atmospherics and linguistic contortions. Thus, the FAC newly asserts that "the work and sentiments of the board members are suggestive of the notion that knowledge of Hamas's partnership and coordination with UNRWA would not be seen as problematic, insofar as many of UNRWA USA's board members are opposed to the existence of the State of Israel." FAC ¶ 240. This sentence, with its hedges and conditional phrasing, manages to allege nothing: it does not claim the board members knew of Hamas's supposed "partnership" with UNRWA, that they believed this "partnership" would enable Hamas to divert UNRWA USA's funds, or that they supported UNRWA *because of* rather than *in spite of* any benefit Hamas might extract from those donations.

---

[3] CRS, "UN Relief and Works Agency for Palestinian Refugees in the Near East: Background and Funding Trends," (Jan. 17, 2025), https://www.congress.gov/crs-product/IF12863.
[4] UN Watch, "UPDATED: List of Countries Suspending UNRWA Funding," (updated May 26, 2024) (cited in FAC n.158).

Plaintiffs' attempts to substantiate their critique of the board members' political predilections only underscores the emptiness of an already meaningless allegation. For example, Plaintiffs insinuate without outright alleging that board member Tasneem Manjra supports Hamas because she did graphic design work in 2024 for two pamphlets produced by NGO that was named as an unindicted coconspirator *seventeen years earlier*.[5] Plaintiffs identify nothing in the pamphlets evincing support for terrorism, nor do they allege that Ms. Manjra even shared CAIR's views about the Israeli-Palestinian conflict. The FAC also alleges—in the agentless passive voice—that board member Nadia Saah "has been regarded" as "a friend and comrade" of the musician Roger Waters, who allegedly advocates "dismantling Israel as a Jewish state." FAC ¶ 242. But Plaintiffs don't allege that Ms. Saah shares his views on the conflict, whatever they might be. Plaintiffs allege that an unnamed board member posted criticisms of Israel on social media, including retweets from "terrorist propaganda outlets." *Id.* ¶ 243. But the posts reproduced in the FAC do not endorse the targeting of civilians, and Plaintiffs do not allege that the posts (assuming they actually exist[6]) were known to or reflected the views of anyone else on UNRWA USA's board or staff.

Plaintiffs' attacks on two former board members fare no better. Plaintiffs again cite a stray 2006 remark by then-UNRWA Commissioner-General and later-UNRWA USA Board member Karen AbuZayd ("It doesn't make sense to reduce contacts when you've been asked to increase your activities" and that UNRWA had "no intention of changing" its operations, FAC ¶ 222) to suggest sympathy for Hamas. But as UNRWA USA pointed out in its prior motion to dismiss, the document from which Plaintiffs pulled this remark demonstrates that she was making a practical

---

[5] The NGO in question, Council on American-Islamic Relations, was initially named in a 2007 prosecution but never charged with wrongdoing. *See generally United States v. Holy Land Found.*, 2009 U.S. Dist. LEXIS 151359, at *23 (N.D. Tex. July 1, 2009)

[6] The footnote attached to this claim (FAC n.213) is blank.

point about the necessity of meeting the Hamas officials who were soon to run Gaza's ministries. Defs. Br. at 7 (D.I. 22) (citing Compl. n.120). Plaintiffs try to outrun this issue by simply deleting the footnote from the FAC. *Compare* FAC ¶ 222 *with* Compl. ¶ 119.

Finally, the FAC contains a new allegation attacking former board member, Lara Friedman, for supporting two Jewish peace groups (IfNotNow and Jewish Voice for Peace) in her capacity as president of the Foundation for Middle East Peace, and for an X post which Plaintiffs falsely cast as defending the October 7 attacks. FAC ¶ 224. In fact, the post in question unequivocally *condemns* Hamas's attacks on civilians and makes an impassioned call for mutual empathy. *See* Oct. 13, 2025 Post (describing October 7 as " heinous," arguing that one "can have compassion for Israelis without dehumanizing Palestinians or ignoring the structural violence and oppression of Israeli occupation and apartheid," and that one can "support Israelis' right to not be massacred by Hamas without giving Israel license to commit genocide.").[7]

### B. Allegations Concerning UNRWA's Relationship With Hamas

#### 1. UNRWA's Alleged "Role" in the October 7 Attacks

The FAC recycles the Complaint's section heading that the UN agency UNRWA "Was Directly Involved in the October 7 Hamas Terrorist Attacks." FAC at 46. Once again, however, the only factual allegation linking UNRWA to October 7 consists of an Israeli charge that around a dozen of UNRWA's 13,000 Gazan employees—*i.e.,* one in a thousand—participated in the attacks. *Id.* ¶¶ 201-03. This Court already rejected this as a basis for liability because Plaintiffs failed to plead that "UNRWA hired those individuals with knowledge of their connection to Hamas, or that these individuals' employment with UNRWA facilitated Hamas's terrorist attacks";

---

[7]    Lara Friedman (@LaraFriedmanDC), X (Oct 13, 2023, at 8:27AM) https://x.com/LaraFriedmanDC/status/1712807327840039296 (referenced in FAC ¶ 244).

because their involvement only came to light after the October 7 attacks; and because UNRWA terminated those employees. Opinion at 8-9, citing Compl. ¶ 99 (acknowledging that UNRWA fired employees accused of participating in October 7).

The FAC includes additional details about the attackers, but it adds no facts supporting the inference that UNRWA had prior knowledge of, condoned, or encouraged the attacks, nor that it knew of those individuals' ties to Hamas. FAC ¶¶ 202-04. Plaintiffs again concede that UNRWA fired those accused. *Id.* ¶ 205, n.167 (noting that UNRWA immediately terminated 12 accused staff even before receiving evidence supporting Israel's accusations). And Plaintiffs face the same immovable temporal hurdle: all of the information about UNRWA staff participation came to light long after the attacks. *Id.* ¶¶ 202-04 (citing reports from 2024 and 2025).

### 2. UNRWA's Adversarial Relationship With Hamas

Plaintiffs repeat the Complaint's conclusory assertion that  UNRWA (not UNRWA USA) worked "hand-in-hand" with Hamas "to provide Hamas members with employment, to educate future Hamas members, and to finance terrorism activities." *Id.* ¶ 51. The Court already rejected that characterization, Opinion 8-12, and Plaintiffs plead no new facts warranting a revisitation of that finding.

Most of the FAC simply rehashes claims already deemed deficient. Plaintiffs repeat the Complaint's allegations that an unidentified Palestinian group hid weapons in a handful of UNRWA schools during the 2014 war, FAC ¶¶ 123-28, and the claim that Hamas built tunnels under or "within [the] close vicinity" of UNRWA schools. *Id.* ¶ 129. The Court explicitly rejected the former, Opinion at 9-10 (noting that UNRWA responded by investigating the misuse and strengthening its inspection regime); *see also* FAC ¶ 130, and FAC's sources again confirm that UNRWA thwarted tunnel construction by exposing and publicly protesting Hamas's efforts to

build underneath its facilities.[8] Plaintiffs also repeat the same allegations of staff overlap that this Court rejected in its August 8 Order. Opinion 7-8; *compare* Compl. ¶¶ 42-44, 120 *with* FAC ¶¶ 61-62. And they falsely assert a—second time—that UNRWA's Deputy Commissioner General gave a statement in 2021 "'affirm[ing] her solidarity' with Hamas on behalf of UNRWA," *id.* ¶ 81, when the document cited in the FAC confirms that she affirmed her solidarity with "all the Palestinian people."[9]

Plaintiffs again allege that Hamas uses its control over the UNRWA union to "exercise[] a strong and direct influence over UNRWA and its personnel" and to prevent UNRWA from "policing its ranks." *Id.* ¶¶ 79, 86.[10] But the only *new* allegations about the union consist of the claim that Hamas provided "background checks" on prospective hires, FAC ¶ 5, which is hardly surprising given that Hamas was the local governing authority; a conclusory allegation that "Hamas's control of the UNRWA Gaza staff union has allowed it to heavily influence UNRWA's mission (as opposed to its stated one), its culture, and its operational style in favor of Hamas," *id.* ¶ 73; and an anonymous and unverified whistleblower complaint claiming that Hamas vetted and

---

[8] "Tunnels Under Schools: NGO Human Rights' Monitoring for Palestinian Children Ends When Israel is Not to Blame," NGO Monitor (Jan. 18, 2023) (cited in FAC n.101).

[9] *UNRWA official expresses understanding to Sinwar*, Al Mayadeen (June 3, 2021) https://english.almayadeen.net/news/politics/1485841/unrwa-official-expresses-understanding-to-sinwar (cited in FAC ¶¶ 80-81, nn.53-54). This was previously flagged in UNRWA USA's Motion to Dismiss. D.I. 22 at 12.

[10] The only *new* allegations about the union in the FAC consists of the claim that Hamas provided "background checks" on prospective hires, FAC ¶ 5, which is hardly surprising given that Hamas was the local governing authority; a conclusory allegation that "Hamas's control of the UNRWA Gaza staff union has allowed it to heavily influence UNRWA's mission (as opposed to its stated one), its culture, and its operational style in favor of Hamas," *id.* ¶ 73, and an anonymous and unverified August 2025 whistleblower complaint claiming that Hamas vetted and approved candidates for employment. *Id.* ¶ 75.

approved candidates for employment. *Id.* ¶ 75. The "background checks" and whistleblower complaint cannot be considered in any event because both came to light *after* the attacks.[11]

Plaintiffs still fail to plead any facts supporting the inference that "Hamas used its control over the employees' union so persistently as to further its illegal activities or facilitate the October 7th attack." Opinion at 10. Like the Complaint, the FAC pleads only two concrete examples of Hamas arguably wielding control over personnel decisions, FAC ¶¶ 80, 83[12] versus a dozen-plus occasions where UNRWA suspended or fired its employees for Hamas-related activities. *See, e.g.*, *id.* ¶ 101 (UNRWA terminated teacher elected to Hamas leadership position); *id.* ¶ 104 (UNRWA places school principal on leave); *id.* ¶ 205 (UNRWA terminated employees accused of participating in the October 7 attacks), *id.* n.167 (noting that UNRWA terminated the 12 accused participants *before* Israel provided evidence substantiating its allegations).

The FAC again alleges that UNRWA was "riddled with Hamas 'activists.'" *Id.* ¶ 78. Here, too, its factual pleadings fall short. Plaintiffs cite post-October 7 claims by Israeli authorities that 12% of UNRWA employees and 15% of principals or deputy-principals are "members of Hamas, PIJ, or another terrorist organization." *Id.* ¶ 258. These are virtually identical to the statistics that this Court already held were insufficient to show that Hamas and UNRWA were "closely intertwined." Opinion 9, citing Compl. ¶ 46 (alleging that "10% of Gaza's employees have links

---

[11] The source of these allegations are, respectively, a 2024 New York Times article, FAC ¶ 74, n.46, and an August 2025 Jerusalem Post article. *Id.* ¶ 76, n.49.

[12] Both belie Plaintiffs' claims of a collaborative relationship. One involved a decision to reassign UNRWA's Gaza Director after his statements praising Israel's "very precise" bombing campaign prompted protests and death threats, *id.* ¶ 80, n.52; the second involved a decision to reverse the suspension of a teacher (in Lebanon, not Gaza) after boycotts and protests "paralyzed UNRWA operations." *Id.* ¶ 83, n.56. In both cases, numerous Palestinian factions (not just Hamas) participated in the protests that compelled UNRWA to act. *Id.* nn.52, 56 (describing how UNRWA reinstated a fired teacher and re-assigned a director in response to protests by Fatah, Hamas, Islamic Jihad, and other "Palestinian factions").

to the Hamas or Palestinian Islamic Jihad terrorist organizations").[13] Plaintiffs attempt to conjure the illusion of pervasive Hamas infiltration by devoting fulsome paragraphs to the handful of individuals UNRWA staff accused of being Hamas fighters. *See* FAC ¶¶ 95-104. But the plural of anecdote is not data—and where the FAC offers anything akin to data, it belies Plaintiffs' claims of widespread militant infiltration. For example, the FAC highlights Israeli officials' claim that 24 employees across 24 different schools were members of a militant group, and that "[a]lmost all . . . were fighters in Hamas's military brigade." *Id*. ¶ 94. But UNRWA operated 288 schools in Gaza, *see* n.64, which means that this allegation amounts to one employee in less than one-tenth of UNRWA's schools—hardly evidence of systemic infiltration across an organization employing over 13,000 staff in Gaza.

Bereft of facts, Plaintiffs resort to distortion. The FAC contains a new  accusation by the head of UN Watch (a partisan NGO on whose reports much of the FAC is built) that UNRWA disregarded evidence that the head of its teachers' union in Lebanon had ties with Hamas leadership. FAC ¶ 85. The article referenced in the FAC, however, confirms that this teacher had been "put on administrative leave without pay" months earlier, "[a]s soon as UNRWA received information about his possible involvement with Hamas at a senior level.[14] In yet another distortion, Plaintiffs newly claim that UNRWA only conducted 66 neutrality investigations between 2022 and February 2025, "despite the fact that UNRWA has been made aware of hundreds of its employees either celebrating Hamas, having ties to Hamas, or being a member of Hamas."

---

[13] The statistics are also meaningless: since Hamas is also a political party that has operated Gaza's ministries since 2007, *id*. ¶ 48, these figures (assuming they are correct) would sweep up anyone involved in Hamas's non-military operations.

[14] "UNRWA can't fully vet staff for Hamas ties, because it lacks police, intelligence unit," Jewish News Syndicate (Oct. 1, 2024), https://www.jns.org/unrwa-cant-fully-vet-staff-for-hamas-ties-because-it-lacks-police-intelligence-unit-united-nations-says/ (cited in FAC n.57).

FAC ¶ 86. In fact, that "66 investigations" figure was published in February *2024*.[15] This is not some harmless oversight, since the vast majority of the neutrality violations described in the FAC only came to light long after the attacks. *See, e.g.*, *id.* ¶¶ 66, 92 (allegation that 12% of UNRWA staff and 15% of UNRWA school leaders are members of terrorist organizations first made in April 2025); *id.* n.40 (reporting that "Israel did not consider uncovering Hamas ties to UNRWA an intelligence priority" and would only "occasionally uncover evidence of Hamas's infiltration and pass it along" to UNRWA). Plaintiffs offer no facts supporting its preferred inference that 66 neutrality investigations in 2022 and 2023 demonstrate an institutional indifference to Hamas's penetration of its ranks—and as explained below, the US government reauthorization of UNRWA funding supports the inference that UNRWA diligently investigated neutrality violations.

Finally, Plaintiffs newly allege that UNRWA officials "met with Hamas and other terrorist organizations" who "frequently influenced UNRWA's decisions." FAC ¶¶ 143-44. This strained effort to transform diplomatic engagement into something nefarious or unlawful fails at every turn. US law expressly authorizes UN personnel to interface with groups designated as foreign terrorist organizations ("FTOs") during the course of official business, *see, e.g.*, 31 CFR §§ 549.511, 597.515 & 594.519, and the FAC merely describes routine, public-facing meetings with powerholders in places like Gaza and Lebanon, where UNRWA operates refugee programs and must, as a matter of course, maintain contact with local political factions. *See, e.g.*, UN Watch, The Unholy Alliance at 15 (cited in FAC nn.103-47) (UNRWA Commissioner Lazzarini met with "protest leaders" in Beirut who were trying to shut down Hamas's operations); *id.* at 15-16 (describing Commissioner Lazzarini's interlocutors as "a consortium of local leaders who created

---

[15]     UNRWA, "Claims versus Facts—Press Release," Feb. 2024, *available at* https://www.un.org/unispal/document/unrwa-claims-versus-facts-press-release-26feb2024/

a joint coordination body"). And while Plaintiffs recite UNRWA's diplomatic platitudes about the importance of "cooperation and coordination" with these groups, *see* FAC ¶¶ 149, 158, 161, 171, 175, they do not identify a single UNRWA decision that was influenced as a result of these meetings—let alone explain how those meetings assisted Hamas's ability to carry out the October 7 attacks.[16]

### 3. The "Money Laundering Scheme"

Plaintiffs newly allege that UNRWA facilitated Hamas's money laundering scheme by "unnecessar[ily] . . . choos[ing]" to pay its Gazan staff salaries in locally unusable US dollars. FAC ¶¶ 141-42. Plaintiffs claim that UNRWA staff were forced to use Hamas-linked moneychangers to convert their dollar-denominated salaries into shekels, that Hamas assessed an unspecified "fee" on these transactions, and that Hamas used the dollars to buy weapons. *Id.* ¶¶ 134-36. Plaintiffs also allege that a 2018 UNRWA-commissioned audit put the agency on notice that its salary payments were subject to "leakage"—*i.e.*, that they were being "diverted to terrorist or other nefarious actors." *Id.* ¶ 137.

Plaintiffs do not allege that UNRWA USA was aware of this scheme, nor do they quantify the dollar amounts that Hamas purportedly skimmed or allege that the scheme enabled Hamas to purchase weapons they couldn't have otherwise obtained.

More importantly, the 2018 audit report referenced in the FAC gives lie to every premise of this theory. *See Lungu v. Antares Oharma Inc.*, 2022 U.S. App. LEXIS 2117, n.14 (3d Cir.

---

[16] In fact, virtually all of the meetings referenced in the FAC took place in Lebanon. Plaintiffs' assertion that UNRWA met FTOs in Lebanon "to be more discreet," FAC ¶ 143, is fatuous: as the UN Watch report attests, the meetings were almost always covered by local press and concluded with public statements. *See generally* UN Watch, *The Unholy Alliance: UNRWA, Hamas, and Islamic Jihad*, (2024), https://www.unwatch.org/wp-content/uploads/2025/01/UNW-129-%E2%80%94-The-Unholy-Alliance-%E2%80%94-2025-01-09-%E2%80%94-Web-%E2%80%94-Singles.pdf (cited in FAC nn.103-47).

2022) ("When an allegation in the complaint is contradicted by a document incorporated in it by reference, the document controls and the allegation is not accepted as true.") (citing cases). The report confirms that the US dollar is the *second most widely used* currency in Gaza, *see* Key Aid Consulting, "Social Transfers in the Gaza Strip" (Nov. 2018) at 48 & n.109,[17] and the preferred currency for rental payments. *Id.* at 7, 53, 77 (noting shekels are used mainly for staple foods). It explains that residents "consider USD the safest and least volatile currency during periods of instability," contradicting Plaintiffs' claim that employees rush to convert dollars into shekels. *Id.* at 52. The report says nothing about Hamas or any other militant group siphoning dollars through moneychangers and, in fact, concludes that there is no "documented evidence" supporting the "perception" that cash payments carry greater "leakage" risks. *Id.* at 58-59.[18] Finally, the report confirms that not only was the Israeli government aware that UNRWA was paying its Gazan staff in dollars, it expressly approved and oversaw those payments—which, by Plaintiffs' logic, would make the Israeli government, not UNRWA USA, a co-conspirator in this phantom scheme. *Id.* at 4, 49 (explaining that "Israel authorises UNRWA to import USD on a monthly basis to pay staff salaries," and oversees and "coordinate[s]" UNRWA's "monthly cash import").

---

[17]    Key    Aid    Consulting,    *Social    Transfers    in    the    Gaza    Strip*    (Nov.    2018), https://www.unrwa.org/sites/default/files/unrwa_social_transfers_study_in_the_gaza_strip.pdf (referenced in FAC ¶ 137).

[18] Official US sources confirm all of the above. *See* International Trade Administration, *West Bank and Gaza Country Commercial Guide* (Oct. 6, 2023), https://www.trade.gov/country-commercial-guides/west-bank-and-gaza-trade-financing? ("Banks operating in the West Bank and Gaza routinely deal in the . . . U.S. dollar"; "Palestinians prefer U.S. dollar and Jordanian dinar-denominated savings accounts"; dollars "legal tender in the West Bank and Gaza"). Those sources also confirm that exchanges in Gaza are done at banks overseen by the Palestinian Monetary Authority, which has strict anti-money laundering procedures in place. US Dept. of State, *2023 Investment Climate Statements: West Bank and Gaza,* (2023), https://www.state.gov/reports/2023-investment-climate-statements/west-bank-and-gaza/ ("Despite Hamas's control of the Gaza Strip, Palestinian banks operating in Gaza follow strict PMA measures in order to maintain their operations and avoid running afoul of AML/CFT regulations.")

### 4. US Government Audits of UNRWA Operations Confirm that UNRWA Was Not Supporting Hamas During the Time Period Relevant to Plaintiffs' Claims

The judicially noticeable, public record further confirms that UNRWA diligently protected itself from Hamas's attempts to infiltrate its staff and operations or influence curriculum prior to the October 7 attacks. The clearest evidence of this comes from the UNRWA's largest financial backer—the US Government—which repeatedly certified that UNRWA was complying with rigorous anti-terrorism protocols in the years prior to the October 7 attacks.

Since at least 2003, Congress has conditioned aid on the U.S. Government Accountability Office ("GAO") submitting yearly reports certifying that UNRWA contributions comply with Section 301(c) of the Foreign Assistance Act, which requires the Executive to take "all possible measures to assure that no part of the United States contribution shall be used to furnish assistance to any refugee who is receiving military training as a member of . . . any other guerrilla type organization or who has engaged in any act of terrorism." 22 U.S.C. § 2221(c); *see, e.g.*, Consolidated Appropriations Resolution 2003, Pub. L. 108-7a, sec. 580. Moreover, in every appropriations bill from FY 2015 to FY 2024, Congress has included a provision requiring the Secretary of State to submit a report confirming that UNRWA, *inter alia*, (1) regularly inspects its installations and "report[s] any inappropriate use"; (2) addresses staff violations of UN "neutrality and impartiality" policies;[19] (3) implements a "no-weapons policy" in its facilities; and (4) takes steps to "ensure the content of all educational materials currently taught in UNRWA-administered schools and summer camps is consistent with the values of human rights, dignity, and tolerance

---

[19] UN "neutrality" principles "dictate that humanitarian actors must not take sides in hostilities or engage in controversies of a political, racial, religious, or ideological nature." UNRWA, Neutrality, https://www.unrwa.org/neutrality.

and does not induce incitement." *See, e.g.*, Consolidated Appropriations Act, 2022, Public Law No. 117-103, Sec. 7048(d)(1)-(7) 136 Stat 663 (March 15, 2022).

In addition, a Framework Agreement in place from 2010 to 2024 required UNRWA to submit semiannual reports to the US Government outlining steps it is taking to maintain compliance with Section 301(c). Among other things, UNRWA was required to submit proof that it: (1) conducted bi-yearly checks of all UNRWA staff against the Consolidated UN Security Council Sanctions List; (2) required UNRWA staff to undergo yearly trainings "on humanitarian principles, including neutrality"; (3) initiated investigations "upon receipt of credible information about alleged staff/personnel misconduct" and takes "appropriate action when misconduct is found"; (4) conducted routine inspections of UNRWA properties, "[i]mmediate[ly] investigat[es] . . . incidents of misuse of installations," and takes "immediate steps . . to assure non-recurrence"; and (5) provided staff lists to Israeli authorities on an annual basis, and to UN Member States on request.[20] The Framework Agreement also mandated "[m]onthly meetings or conversations between UNRWA and relevant State Department officials in which conformance with section 301(c) is discussed," and "[r]egular written communication between UNRWA and relevant State Department officials on section 301(c)-related issues."[21]

With the exception of a brief pause between 2019 and 2020, every Administration and every Congress re-authorized UNRWA's funding in the decades preceding the October 7

---

[20] CRS, "U.S. Foreign Aid to the Palestinians," (Dec. 12, 2018) https://sgp.fas.org/crs/mideast/RS22967.pdf; Framework for Cooperation between the UNRWA and the U.S.A. 2023-2024 (hereinafter "2023-2024 Framework Agreement"), https://www.state.gov/wp-content/uploads/2023/06/2023-2024-US-UNRWA-Framework-for-Cooperation-FINAL.pdf; Annex to 2023-2024 Framework Agreement, https://www.state.gov/wp-content/uploads/2023/06/2023-2024-U.S.-UNRWA-Framework-for-Cooperation-Annex-FINAL.pdf.
[21] Annex to 2023-2024 Framework Agreement, *supra* note 20, at 1.

attacks[22]—a strong, public affirmation that UNRWA was complying with its obligations under Framework Agreement and effectively insulating its operations from militant exploitation.

### 5.  UNRWA and October 7's Aftermath

Stuck with the U.S. government's pre-October 7 findings that UNRWA was in compliance with the requirements of Section 301(c), Plaintiffs rely on developments *after* the attacks to manufacture the impression that a global consensus exists that UNRWA is complicit in Hamas's operations. This Court, however, has already held that Plaintiffs cannot use post-October 7 revelations to plead that UNRWA USA aided and abetted those attacks. *See* Opinion at 8.

Plaintiffs will presumably argue that post-October 7 developments are relevant to establishing the ATS claims brought by Ms. Lavi, whose husband is still being held hostage in Gaza. FAC ¶ 9. To be clear, Plaintiffs have not alleged that UNRWA USA has furnished any aid—deliberately or otherwise—to Mr. Lavi's captors or otherwise contributed to the prolonging of his captivity. And even if they had pled such facts, the documents cited in the FAC and judicially noticeable record debunk Plaintiffs' apparent theory that the funding freezes and criticisms of UNRWA have somehow put UNRWA USA on notice that it has conferred a benefit on Hamas by supporting UNRWA. Far from it, that record shows that, while UNRWA has become a subject of *political* controversy in the United States, it continues to enjoy near-universal support from the international community, including America's most important allies, and a substantial contingent of Congress.

Plaintiffs' contrary account rests on rank cherry-picking. For example, Plaintiffs point to a decision by the EU and 16 countries to suspend UNRWA funding after several of its staff were accused of participating in the attacks. FAC ¶ 212. But their own citations show that, within

---

[22] CRS, "UNRWA Overview and the U.S. Funding Pause," *supra* note 1, at 3.

months, all but the United States had resumed funding.[23] And since that time, there has been an outpouring of international support including:

- A July 12, 2024 statement by 118 countries—including the United States—which "[r]ecogniz[ed] the important and indispensable role" UNRWA played "in assisting the Palestinian refugees and contributing to regional stability," called UNRWA "the backbone of [the] humanitarian response in Gaza," and expressed "concerns about the extremely critical financial situation of the agency";[24]

- An October 30, 2024 press release by the Members of the Security Council (which includes the United States) which praised UNRWA's role in providing "urgent . . . humanitarian assistance" and condemned "any attempts to dismantle or diminish UNRWA's operations and mandate," and;[25]

- A December 11, 2024 UN Resolution, signed by 158 members of the General Assembly—including France, Germany, the Netherlands, Norway, Spain, Switzerland, and the United Kingdom—approved a resolution calling UNRWA the "backbone of the humanitarian response in Gaza" and calling "upon all parties to enable the Agency to carry out its mandate."[26]

Likewise, Plaintiffs cite the State Department's January 2024 funding pause. FAC ¶ 207. But neglect to mention that, months later, the senior Biden Administration officials were commending UNRWA and repudiating many of the very accusations Plaintiffs advance here. *See, e.g.,* US Dept. of State, Department Press Briefing, July 24, 2024 (Matthew Miller, US State

---

[23] *See* "UPDATED: List of Countries Suspending UNRWA Funding," *supra* note 4. That document inaccurately states that New Zealand froze its funding. *See* Statement delivered by Perm. Rep. of New Zealand (March 6, 2024) https://www.mfat.govt.nz/en/media-and-resources/united-nations-general-assembly-informalmeeting- of-the-plenary-to-hear-a-briefing-on-unrwa.

[24] Statement of Shared Commitments on UNRWA, July 12, 2024, https://www.unrwa.org/resources/un-unrwa/statement-shared-commitments-unrwa and https://www.unrwa.org/sites/default/files/content/resources/shared_commitments_on_unrwa.pdf.

[25] Press Release, "UN Security Council Press Statement on the United Nations Relief and Works Agency for Palestine Refugees in the Near East" (Oct. 30, 2024), *available at* https://www.unrwa.org/newsroom/news-releases/united-nations-security-council-press-statement-united-nations-relief-and.

[26] United Nations General Assembly, *Demand for Ceasefire in Gaza*, A/RES/ES-10/26 (Dec. 11, 2024), https://digitallibrary.un.org/record/4070093?ln=en&v=pdf.

Department Spokesperson) ("UNRWA is not a terrorist organization . . . . The attacks that the Israeli Government has levelled on UNRWA are incredibly unhelpful. They do nothing to advance the cause of getting humanitarian assistance to civilians in Gaza. So we're going to continue to support the work that UNRWA does in the region");[27] White House Daily Briefing, July 25, 2024 (John Kirby, National Security Council Advisor) ("[I]t's clear to us that UNRWA has taken [the allegations that personnel were involved in October 7] seriously, they fully investigated it. They eliminated the employment of those that they believe were involved in terrorist activities . . . I know we're not providing–funding to [UNRWA] now because of legislation [freezing funds, FAC ¶ 2010]. But I think it's important for people to know that there are things that can't get done without UNRWA's cooperation and support on the ground.");[28] On-the-Record Press Gaggle by White House National Security Communications Advisor John Kirby, Sept. 21, 2024 ("In light of the fact that there is still an ongoing crisis in Gaza and the central role that UNRWA does play in the distribution of lifesaving assistance, . . . we're going to look forward to working with other partners—Japan, UK, Italy, Sweden, Germany, Canada, others—to ensure that those appropriate safeguards are adequate to the task and to help secure appropriate funding levels for UNRWA's humanitarian mission."); US Dept. of State, Department Press Briefing, October 29, 2024 (Kirby) (condemning Israeli legislation to "shutter UNRWA operations" and calling UNRWA a key partner in delivering food, water, and other humanitarian assistance to civilians in Gaza that wouldn't have anyone else to get it from if UNRWA were to go away");[29] Remarks At An Informal Plenary Of The General Assembly On UNRWA, Nov. 6, 2024 (Lisa Carty, Ambassador and US

---

[27] *Available at* https://2021-2025.state.gov/briefings/department-press-briefing-july-24-2024/

[28] *Available at* https://www.c-span.org/program/public-affairs-event/white-house -daily-briefing/645419 (timestamp: 37:35)

[29] U.S. Dept. of State, *Department Press Briefing*, (Tr., Oct. 29, 2024) https://2021-2025.state.gov/briefings/department-press-briefing-october-29-2024/.

Representative to UN) (describing UNRWA's "vital" role "to the humanitarian response in Gaza" and urging Israeli law stripping UNRWA of privileges and immunities).[30]

Plaintiffs also ignore that an independent review of UNRWA's operations (the "Colonna Report")[31] concluded in April 2024 that UNRWA has "a more developed approach to neutrality than other similar UN or NGO entities," Colonna Report at 5 that UNRWA "regularly inspects its installations and reports on any violations of neutrality," *id.* at 15, that all staff payments in Gaza are "processed through the Bank of Palestine, which vets against the EU sanctions list," *id.* at 21, that "UNRWA screens all active and recently separated personnel who receive monetary compensation from UNRWA against the UN sanctions list in a biannual screening exercise," *id.* at 21, and that UNRWA "has been responsive to allegations of neutrality breaches and criticism about the textbooks and initiated a range of initiatives to ensure neutrality of its teaching material and the teaching." *Id.* at 30.

Finally, Plaintiffs cite Congress's decision to cut UNRWA funding and spotlight policymakers' criticisms of the agency. FAC ¶¶ 208-10. But since that time dozens of Representatives and Senators have cosponsored bills to resume funding, *see* H.R.9649 & S.5388 (UNRWA Funding Emergency Restoration Act of 2024); S.5388 (UNRWA Funding Emergency Restoration Act of 2024); H.R.2411 & S.898 (UNRWA Funding Emergency Restoration Act of 2025), and repudiated the very allegations set forth in this Complaint. *See, e.g.*, Transcript: 118th Congress: Sen. Chris Van Hollen (D-Md.) ("[T]he United States should restore funding to

---

[30]    *Available at* https://usun.usmission.gov/remarks-at-an-informal-plenary-of-the-general-assembly-on-the-united-nations-relief-and-works-agency-unrwa/

[31] Independent Review Group on the UN Relief and Works Agency for Palestinian Refugees in the Near East, *Final Report for the UN Secretary-General: Independent Review of Mechanisms and Procedures to Ensure Adherence by UNRWA to the Humanitarian Principle of Neutrality* (Apr. 20, 2024), https://www.un.org/unispal/wp-content/uploads/2024/04/unrwa_independent_review_on_neutrality.pdf.

UNRWA . . . . [T]he claims that have been made by Prime Minister Netanyahu and others that somehow, UNRWA is a proxy or a front group for Hamas are just baseless.");[32] Press Release, "Reps. Carson, Jayapal, Schakowsky Introduce UNRWA Funding Bill," Sept 19, 2024.[33]

In short, accepting Plaintiffs' theory would, by necessity, require this Court to find it plausible that the Biden Administration, sitting members of Congress, and almost every US ally are either conscious and culpable participants in Hamas's terrorism, or that they aspire to be. The ATA does not countenance such absurdities.

## **ARGUMENT**

## **I.    The FAC Fails to State an Aiding-and-Abetting Claim Against UNRWA USA**

Section 2333(d) of the ATA imposes civil liability on a defendant "who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism" that is committed by a designated foreign terrorist organization ("FTO"). 18 U.S.C. § 2333(d)(2). Recognizing the "need to cabin aiding-and-abetting liability to cases of truly culpable conduct," the Supreme Court has explained that ATA liability will only attach where the defendant's conduct amounts to "conscious, voluntary, and culpable participation in" "the act of international terrorism that injured the plaintiffs." *Twitter*, 598 U.S. at 489, 493, 497.

To that end, *Twitter* imposed two guardrails. First, the defendant must have specifically "aided and abetted the act of international terrorism that injured the plaintiffs." *Id*. at 497; *id.* at 490, 498 (requiring a "nexus" between the alleged aid and the attack that caused plaintiff's injuries). Providing "assistance to [the FTO's] activities in general" will not suffice. *Id*. at 503; *id.* at 495 (It is "not enough . . . that a defendant have given substantial assistance to a transcendent

---

[32] *Available at* https://www.washingtonpost.com/washington-post-live/2024/04/23/transcript-118th-congress-sen-chris-van-hollen-d-md/
[33] *Available at* https://carson.house.gov/media/press-releases/reps-carson-jayapal-schakowsky -introduce-unrwa-funding-bill

'enterprise' separate from and floating above all the actionable wrongs that constitute it."); *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 675 (D.C. Cir. 2023) ("Aiding and abetting requires more than the provision of material support to a terrorist organization."). Second, the defendant must have undertaken an "affirmative act" "with the intent of facilitating the offense's commission." *Id*. at 490. Thus, aiding-and-abetting liability will not attach to "omissions, inactions, or nonfeasance," *id*. at 489, nor to instances where the defendant simply displays "indifference" or "lack of concern" to the possibility that services might inure to an FTO's benefit. *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 443 (2d Cir. 2025); *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 282 (2025) ("What Mexico has plausibly alleged is only that manufacturers know some unidentified dealers [they provided guns to] routinely violate the law— but this describes "indifference" rather than assistance, similar to the insufficient allegations in *Twitter*."). Rather, a plaintiff must plausibly allege that the defendants participated in the relevant attack "as something that they wishe[d] to bring about," or "sought by their action to make it succeed." *Twitter*, 598 U.S at 490.

When Congress enacted Section 2333(d), it pointed to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "providing the proper legal framework for civil aiding and abetting and conspiracy liability." *Twitter*, 598 U.S. at 485. To state an ATA aiding-and-abetting claim under the *Halberstam* framework, a plaintiff must allege that: (1) "the party whom the defendant aids [performed] a wrongful act"—i.e., an "act of international terrorism"—"that cause[d] an injury"; (2) the defendant was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance," and (3) the defendant "knowingly and substantially assist[ed] the principal violation." 705 F.2d at 477.

The FAC founders at *Halberstam* steps two and three.

A.  The FAC Fails to Plead General Awareness

After a detailed analysis of the Complaint, this Court found its allegations insufficient to establish "general awareness." Opinion at 7-12. The FAC does not alter that analysis or its conclusion. To satisfy *Halberstam*'s general awareness requirement, it is not enough that the defendant understood it was generally providing "material support to a designated terrorist *organization*." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (emphasis in original). Rather, it must be "generally aware that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." *Id.*; *Ashley*, 144 F.4th at 438 (defendant "must be generally aware of its role in some illegal activity *from which the terrorist attack was foreseeable*.") (emphasis added). Moreover, the defendant must have been "actually aware" of assuming this role. *Bernhardt*, 47 F.4th at 867 n.11 (rejecting "extreme recklessness" standard for general awareness); *see also Lamm v. State St. Bank & Tr*., 749 F.3d 938, 950 (11th Cir. 2014) ("Alleging that a bank disregarded 'red flags' such as 'atypical activities' on a customer's account is insufficient to establish knowledge" for purpose of aiding-and-abetting claim").

As a general rule, where a plaintiff alleges that the defendant aided an FTO through an intermediary, the plaintiff must plead that (1) the defendant "was aware of the [intermediary's] connections with [the FTO] *before* the relevant attacks;" and (2) the intermediary was "so closely intertwined with [the FTO's] violent terrorist activities that one can reasonably infer [that the defendant] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to the [intermediary]." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) (emphasis added). Courts have found that level of intertwinement where the intermediary and FTO "were effectively the same entity." *Bernhardt*, 47 F.4th at 870 (citing *Atchley v. AstraZeneca UK Ltd*., 22 F.4th 204, 224 (D.C. Cir. 2022)).

However, where—as here—the intermediary in question has *legitimate* operations in addition to their alleged FTO ties, courts will presume that the assistance was used for lawful purposes unless the plaintiff plausibly alleges actual receipt by the FTO. *See* Opinion 11 (UNRWA's legitimate operations "counsel against making . . . a finding" of general awareness); *see also Bernhardt*, 47 F.4th at 865 (allegation that bank transacted with Iranian banks with known ties to al-Qaeda insufficient because the aid "could just as plausibly benefit [the banks'] otherwise legitimate operations rather than al-Qaeda"); *Keren Kayemeth Lelsrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1017 (D.C. Cir. 2023) (fact that intermediary "engages in lawful civil resistance" defeats the inference that defendant's donations "were used unlawfully"); *Averbach v. Cairo Amman Bank*, 2020 U.S. Dist. LEXIS 10902, at *45-46 (S.D.N.Y. Jan. 21, 2020) (concession that intermediaries "take part in actual charitable activities and provide actual social services undermine any inference that [defendant] had general knowledge that by providing financial services to the [intermediaries] it was assuming a role in Hamas's terrorist activities."); *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275 (D.C. Cir. 2018) (refusing to infer general awareness that funds to Iran benefited FTO because Iran "is a government . . . [with] many legitimate agencies, operations, and programs to fund" and plaintiffs failed to allege that the funds "were in fact sent to [the FTO]"); *O'Sullivan v. Deutsche Bank AG*, 2019 U.S. Dist. LEXIS 53134, at *30 (S.D.N.Y. Mar. 28, 2019) (same).

To distill the above principles, Plaintiffs must allege each of the following: (1) that UNRWA USA's funds actually flowed to Hamas; (2) that UNRWA USA's funds furthered illegal conduct from which the October 7 attacks were foreseeable; and (3) that UNRWA USA was actually aware that it was playing a role in Hamas's "violent or life-endangering activities," *Linde*, 882 F.3d at 329, *before* the October 7 attacks. The FAC fails at each of these steps.

*First*, the FAC is devoid of any non-conclusory factual allegations that any UNRWA USA funds flowed to Hamas. Like the Complaint, the FAC's factual allegations about those funds are confined to the total amounts transferred, FAC ¶¶ 15, 57, 245, and links to UNRWA USA annual reports which detail the legitimate humanitarian services for which the funds were earmarked. FAC nn.30-32 (scholarship grants, housing aid for victims of Syria earthquake in Syria, food assistance, orphan support, clean drinking water, *etc.*). The FAC does not allege that any of these grants were diverted from their intended purpose, that any portion ended up in Hamas's hands, or that they were spent in a manner that benefited Hamas's illegal operations.[34] As this Court has already held, that alone is fatal to Plaintiffs' ATA claim. *See* Opinion at 13.

*Second*, even if the Court were to credit the FAC's conclusory allegations about how funds were used, Plaintiffs' claims would fail. The FAC alleges that:

> UNRWA knowingly redistributes [UNRWA USA's] funds (1) to the hundreds of terrorists on the UNRWA payroll, some of whom are directly engaged in acts of terrorism, including but not limited to, the October 7 Terror Attacks; (2) to schools that are used to store Hamas's weapons and other equipment; (3) to the production of violently antisemitic educational materials that promote the destruction of the state of Israel and are designed to recruit young Gazans to Hamas; and (4) to the elaborate money laundering scheme that allows Hamas to barter in U.S. dollars.

FAC ¶ 7. But the FAC never alleges that *UNRWA USA* was generally aware that *its* funds were being distributed in that fashion. And even if the Court overlooked that defect as well, none of these outlays amount to playing "a role in *unlawful* activities" from which the October 7 attacks "were *foreseeable*," *Honickman*, 6 F.4th at 501 (emphasis added), or a role in Hamas's "violent or life-endangering activities." *Linde*, 882 F.3d at 329.

---

[34] To the extent Plaintiffs rely on a theory that money is "fungible," that theory fails as a matter of law. *See, e.g.*, *Ashley*, 144 F.4th at 444 (unlike material support charge, JASTA claim cannot be predicated on theory of money's fungibility); *Honickman*, 6 F.4th at 498-99; *Bernhardt*, 47 F.4th at 866.

26

Plaintiffs never explain how mere employment of Hamas members foreseeably led to terrorism: they do not allege that UNRWA encouraged, condoned, or supported militant activities, nor do they allege that the staff members used their salaries to bankroll terrorist activities as opposed to paying for daily expenses. Indeed, the fact that only about a dozen of the thousands of October 7 attackers were UNRWA employees—despite UNRWA being "one of the largest employers in Gaza," FAC ¶ 5—undercuts any inference that UNRWA employment correlates with terrorist activity. Plaintiffs likewise fail to explain how the distribution of funding "to schools" foreseeably led to terrorism. As for the school-bound funds, in the absence of any allegations about how they were spent, it is far more plausible that any such funds were used to *safeguard* UNRWA schools from misuse by militants or simply educate Gazan children. *See* 2015 UNSG Report ¶¶ 64, 75 (cited in FAC n.96) (describing how UNRWA took remedial measures, including increased inspections, to stop militants from hiding weapons in its installations). Plaintiffs' allegations about the school curriculum are equally defective: there is nothing "unlawful" about funding UNRWA school curriculum, nor do Plaintiffs plausibly allege that the curriculum they object to—which consists of lesson plans from three of UNRWA's 700 *elementary schools, see supra* note 34— were the sort of "violent or life-endangering activities" from which the October 7 attacks were a foreseeable consequence.[35] The money laundering scheme allegation fares even worse: not only is every premise of the scheme demonstrably false, *see supra* at 14-15, Israel itself approved and coordinated the distribution of US dollars to UNRWA's Gazan staff. Plaintiffs' theory–that

---

[35] A 2021 report by a non-partisan, EU-commissioned research group found that UNRWA textbooks were compliant with UN neutrality rules and lambasted the very NGOs on whose report the FAC relies as prone to "generalising and exaggerated conclusions based on methodological shortcomings." Georg Eckert Institute for International Textbook Research, Report on Palestinian Textbooks ("GEI Report") (2021), at 14-15, https://www.gei.de/en/research/projects/report-on-palestinian-textbookspaltex.

UNRWA USA was "generally aware" it was aiding Hamas's terror operations by increasing the number of US dollars that the *Israel government* authorized and oversaw entering into Gaza–is not a serious one.

*Third*, Plaintiffs fail to allege any facts supporting the inference that UNRWA USA was cognizant of playing any role in Hamas's terrorist operations *prior to* the October 7 attacks. The US government repeatedly reauthorized UNRWA funding after its official audits determined that the agency was not using its funds to support Hamas and, as this Court has already held, "[i]t would be difficult to accept that UNRWA USA was on notice of UNRWA's intertwinement with Hamas while donor states such as the United States and Germany were not." Opinion at 12.

The FAC offers no reason for the Court to revisit that conclusion. As in the Complaint, the vast preponderance of the FAC's allegations against UNRWA only surfaced after October 7. These include: (1) allegations that UNRWA staff participated in the attacks, FAC ¶¶ 3-4, 201-03; (2) Israel's claim that 12% of UNRWA employees and 15% of UNRWA school principals were members of Hamas or other terrorist groups, *id.* ¶¶ 66, 92-104; (3) the report that 30 UNRWA teachers praised the October 7 attacks on a Telegram channel, *id.* ¶¶ 114-20; (4) the supposed paucity of UNRWA investigations into neutrality breaches, FAC ¶ 86; (5) the anonymous UNRWA employee whistleblower complaint, *id.* ¶¶ 75-76 (6) the US Government funding freeze and the State Department's criticism of UNRWA, *id.* ¶¶ 68-70; (7) the 2024 report laundry-listing the meetings between UNRWA and FTO leaders, *id.* ¶¶ 143-86, and (8) the claim that Hamas was responsible for providing "background checks" on UNRWA employees. *Id.* ¶ 74, 79. None of that information can be used to establish general awareness. Opinion at 8; *see also Halberstam*, 705 F.2d at 477 (general awareness required "at the time" aid that led to the attack was furnished); *Honickman*, 6 F.4th at 501-02; *Ofisi*, 77 F.4th at 675.

28

Once those inapposite allegations are redlined, all that remains are: (1) a subset of allegations that Hamas controlled the employee union, FAC ¶¶ 73, 78; (2) reports that some UNRWA teachers promoted hate and violence on social media and in the classroom, FAC ¶¶ 107-10; (3) the arrest of 13 UNRWA staff members, twenty years ago, on suspicion of engaging in terrorism, *id.* ¶ 72; (4) misuse of UNRWA facilities by militant groups, *id.* ¶¶ 123-30; and (5) the "money laundering scheme." *Id.* ¶¶ 131-42. But this Court has already held that (1)-(5) were insufficient to support the conclusion that UNRWA and Hamas were so intertwined as to put UNRWA USA on notice of its role supporting Hamas's terrorist activities. Opinion at 8-12. And the only new allegation—the "money laundering scheme"—fails for reasons already explained.

Because Plaintiffs have failed to (i) allege actual receipt, (ii) participation in illegal activities from which terrorism was foreseeable, or (iii) pre-October 7 knowledge, it is ultimately academic whether Hamas had and UNRWA were "intertwined" in the manner alleged in the FAC. But even this legally deficient contention lacks factual support. Plaintiffs allege that Hamas controlled the composition of UNRWA staff through its control of the union, but the FAC identifies over a dozen examples of UNRWA *terminating* individuals for Hamas-related activities, FAC ¶¶ 101, 104, 205, n.167, and only one example where Hamas successfully pressured UNRWA to reinstate a suspended staff member. *Id.* ¶ 83. They claim that UNRWA had "no interest in policing ranks," but the aforementioned terminations tell a different story, as do the 66 investigations that UNRWA launched into neutrality violations in 2022 and 2023. *Id.* ¶ 86.[36]

---

[36] Plaintiffs plead no facts supporting the inference that 66 was too few. They cite a report claiming that 133 UNRWA educators and staff "promote[d] hate and violence on social media," and 82 UNRWA teachers and staff affiliated with 30 UNRWA schools were "involved in drafting, supervising, approving, printing, and distributing hateful content to students." *Id.* ¶ 110. But those examples are accumulated over an 8-year period from 2015 to 2023 across Gaza, the West Bank, Lebanon, Syria, and Jordan. UN Watch & Impact-SE, *UNRWA Education: Reform or Regression?* (2023), at 42-44, unwatch.org/wp-content/uploads/2023/03/2023-Report-UNRWA.pdf (cited in

Plaintiffs claim that Hamas used UNRWA schools to hide weapons, but concede that those actions were "unauthorized" and—as this Court has already found—the record shows that UNRWA investigated the matter and took steps to protect its installations against misuse. Opinion at 9-10; FAC ¶ 130. Plaintiffs also assert that Hamas tunneled around its installations, but the documents cited in the FAC confirm that UNRWA exposed and thwarted tunnel construction.[37] The judicially noticeable, public record is equally devastating to Plaintiffs' claim that UNRWA USA should have been on notice that it was supporting Hamas by funding UNRWA. Seventy-two countries gave vastly greater sums of money to UNRWA in the years leading up to the October 7 attacks; and since October 7, the international community—including almost every US ally—has commended UNRWA's role in the Gazan humanitarian relief efforts and demanded that its mandate be protected. *See supra* at 18-21.

B.  The FAC Fails to Plead Knowing and Substantial Assistance to the October 7 Attacks

Even if Plaintiffs could establish general awareness, their claim would fail at the third *Halberstam* step. *See Twitter*, 598 U.S. at 481, 503 (affirming dismissal of complaint for failure to plead knowing and substantial assistance, even though complaint had pled defendant social media companies knew that ISIS exploited the platforms to recruit, fundraise, and spread its message); *accord Ashley*, 144 F.4th at 439 ("knowledge of one's role in terrorist activities by itself is insufficient to allege an aiding-and-abetting claim") (dismissing claim, notwithstanding fact that

---

FAC. n.73). Moreover, those figures are far less meaningful when viewed in context: UNRWA employs around 20,000 educational staff, almost all of whom are refugees themselves, and operates over 700 schools. UNRWA, "What We Do," https://www.unrwa.org/what-we-do/education.

[37] NGO Monitor, *Tunnels Under Schools: NGO Human Rights' Monitoring for Palestinian Children Ends When Israel is Not to Blame,* (Jan. 18, 2023), https://ngo-monitor.org/tunnels-under-schools-ngo-human-rights-monitoring-for-palestinian-children-ends-when-israel-is-not-to-blame/ (cited in FAC n.101).

plaintiffs pled general awareness). This Court's August 8 Order identified numerous defects in the Complaint's allegations directed at the knowing and substantial assistance element. The FAC corrects none of them.

i.    *The FAC Fails to Plead Any Assistance*

As this Court correctly found, the Complaint failed to "allege that any of Defendant's aid was transferred to Hamas or otherwise used in connection with the October 7th attacks." Opinion at 13. The FAC fails in the same manner.

As explained above, the FAC merely tabulates the total amounts UNRWA USA transferred to UNRWA, FAC ¶¶ 15, 57, 245, and links describing those funds' legitimate humanitarian purposes. *Id.* nn.30-32. Plaintiffs plead no facts to overcome the presumption that these funds were spent as intended, much less facts supporting the inference that they were used to assist Hamas's terrorist operations. *See* Opinion at 11, 13 *See Ofisi*, 77 F.4th at 675-76, 678 (funds to legitimate intermediary are presumed *not* to have reached FTO); *accord Bernhardt*, 47 F.4th at 871; *Siegel*, 933 F.3d at 225; *Keren Kayemeth Leisrael-Jewish Nat'l Fund*, 66 F.4th at 1017.

Even if the Court were to credit the FAC's conclusory allegations about the expenditure of UNRWA USA's funds and its exaggerated account of Hamas's penetration of UNRWA, Plaintiffs would still fail to plead cognizable assistance. Plaintiffs fail to articulate any nexus between the destination of the funds (Hamas member salaries, schools, and the fictitious "money laundering scheme") and the October 7 attacks, as is required to state an aiding-and-abetting claim. *See, e.g.*, *Ashley*, 144 F.4th at 444 ("[I]t is not enough to say that the defendant assisted the terrorist organization's 'activities in general' . . . . [The complaint must offer] a discernable nexus between the [assistance] and the attacks committed against Plaintiffs"); *accord Twitter*, 598 U.S. at 490, 498. And even if the Court credited Plaintiffs' baseless "money laundering" allegations, that

wouldn't establish assistance for purposes of the ATA. UNRWA USA is at least four steps removed from the money launderers: UNRWA USA is alleged to have transferred funds to UNRWA, which paid dollars to its employees, who took the dollars to moneychangers, who allegedly paid a fee to Hamas. Courts have dismissed aiding-and-abetting claims predicated on far less attenuated money laundering schemes. In *Ashley*, for example, plaintiffs brought ATA claims against several banks that *directly* provided financial services to an individual who laundered money for a terrorist network. Unlike here, the *Ashley* plaintiffs alleged that the money laundering services were "critical" to the network's ability to engage in terrorism because the network relied on US dollars to purchase weapons, supplies, and pay personnel.[38] 144 F.4th at 443-43. Even so, the Second Circuit found that the plaintiffs failed to offer a "discernable nexus between the money laundering and the attacks committed against Plaintiffs." *Id.* at 444. The court noted that while it was "*possible* that some of the Bank's transactions in the money laundering scheme produced money" that was used in terrorist attacks that injured the plaintiff, the complaint failed to offer enough "information about the Banks' transactions in the money laundering operations" for the court to infer aiding-and-abetting. *Id.* at 444-45 (emphasis added). The same is true here, only more so: Plaintiffs offer no facts supporting the inference that Hamas's moneychangers skimmed any money whatsoever from UNRWA USA's contributions.

    ii.    *The FAC Fails to Plead The Requisite* Mens Rea

This Court separately deemed Plaintiffs claims nonviable because the Complaint pled not facts allowing "the plausible inference that Defendant 'wishe[d] to bring about' or 'sought by [its] actions to make' the October 7th attack succeed through its financial aid, rather than intending to

---

[38] By contrast, UNRWA USA only contributed around 1% of UNRWA's budget and Plaintiffs don't allege that UNRWA USA-sourced funds enabled Hamas to buy arms it couldn't otherwise access.

aid in UNRWA's humanitarian efforts." Opinion at 14 (quoting *Twitter*, 598 U.S. at 498). Plaintiffs haven't fixed this defect either.

The FAC contains no new allegations indicating that UNRWA USA intended to facilitate the October 7 attacks. In fact, Plaintiffs do not bother alleging an intent to further Hamas's terrorism at all. Instead, they claim that UNRWA USA was indifferent to Hamas's infiltration of UNRWA. *See, e.g.,* FAC ¶ 227-30, 239-40. That is not a viable theory of intent: the ATA requires "the defendant consciously and culpably participated in a wrongful act so as to help make it succeed," *Twitter*, 598 U.S. at 493—mere "lack of concern" or "indifferen[ce]" to the possibility that aid might flow to an FTO terrorist is not sufficient. *Ashley*, 144 F.4th at 443.

Further, even Plaintiffs' legally deficient indifference theory lacks factual support. Plaintiffs speculate that some board members have views about Israel that *might* lead them to be comfortable with "Hamas's partnership and coordination with UNRWA." FAC ¶ 240. But they plead no facts supporting that hollow claim: they don't allege that any Board member or staff supported terrorism, or—more importantly—that they supported *UNRWA* as some stalking horse to advance Hamas's terrorist activities.

Plaintiffs' allegations on this point range from desperate to sanctionable misrepresentation. They allege that one board member did a facially innocuous graphic design project for an entity that was named as an unindicted co-conspirator (but never charged) in a material support case *17 years prior* to her engagement. FAC ¶ 241. They criticize a board member for being "regarded" as the "friend" of a celebrity with vaguely unsavory views about Israel. *Id.* ¶ 242. They accuse another board member of retweeting content from "terrorist propaganda outlets," but do not identify the board member, reproduce any retweets that endorsed the killing of civilians, or allege that the retweets were known to or reflected the views of anyone else on UNRWA USA's board

33

or staff. *Id.* ¶ 243. Finally, they suggest another board member justified October 7 on Twitter when her full post unambiguously condemns those attacks. *Id.* ¶ 244.

In fact, the FAC directly undermines Plaintiffs' indifference theory. UNRWA USA unequivocally condemned the attacks. *See* Opinion at 14 (UNRWA USA's condemnation of attacks undermines the inference that it supported Hamas terrorism). Plaintiffs counter that this condemnation must have been "insincere and intended to mislead the public" because UNRWA USA subsequently increased its support for UNRWA. FAC ¶ 239. But Plaintiffs overlook the obvious reason for the increase in aid: the humanitarian catastrophe unfolding in Gaza has spurred an increased demand and supply for aid. *See George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013) (plaintiff cannot cross the plausibility threshold where "obvious alternative explanation" exists for allegedly unlawful conduct). Plaintiffs also acknowledge that UNRWA USA suspended contributions in March 2024, FAC ¶ 230, and only lifted the pause after Canada, Austria, Denmark, Sweden, France, Germany, Japan, and the European Commission did the same.

### iii.    The Aid Was Not Substantial Under the *Halberstam* 6-Factor Test

The FAC adds no allegations that would alter the analysis of six *Halberstam* factors, which this Court held confirmed the insubstantiality of UNRWA USA's assistance to Hamas. Opinion at 13-14. Plaintiffs do not plausibly allege "that any of Defendant's aid to UNRWA made its way to Hamas," much less "to fund its murderous plots," as is required to state an aiding-and-abetting claim, Opinion at 15 (*Halberstam* factors 1 & 2); they do not allege that UNRWA USA was present at the time of October 7 attacks, *id.* (factor 3); they fail to allege any relationship whatsoever between UNRWA USA and Hamas, *id.* (factor 4); and they don't add a single factual allegation supporting the inference that UNRWA USA sought to further Hamas's terrorist activities. *Id.* (factor 5); *id.* ("duration" factor (factor 6) is "irrelevant" because no aid pled).

* * *

At most, FAC alleges that Hamas sought to infiltrate and influence UNRWA. But the fact that "some bad actors took advantage" of UNRWA operations is not enough to render UNRWA or its supporters aiders-and-abettors of terrorism. *Ashley*, 144 F.4th at 420 (citing *Twitter*, 598 U.S. at 481, 503). Accordingly, the ATA aiding-and-abetting claim must be dismissed.

## II.    The Complaint Fails to State a Conspiracy Claim Under the ATA

This Court dismissed the conspiracy for failing to provide any "direct or circumstantial factual support indicating" that any "agreement existed" between UNRWA USA, UNRWA, and Hamas to further the October 7 attacks. Opinion at 8. The FAC pleads no new facts establishing a cognizable agreement and, additionally, fails for the reasons already set forth in UNRWA USA's original motion to dismiss, which are incorporated herein. Defs. Br. at 28-31.

## III.    The FAC Fails to State an ATS Claim

Plaintiffs' ATS claims fail for the reasons set forth in this Court's August 8 Order. Plaintiffs fail to plead any support to Hamas, let alone support that had a "'substantial effect'" on the October 7 attacks. Opinion at 17 (quoting *Doe v. Cisco Systems, Inc.*, 73 F.4th 700, 724 (9th Cir. 2023). While this Court previously acknowledged a circuit split regarding the *mens rea* requirement, Plaintiffs now concede that ATS claims are governed by the higher "purpose" standard. FAC ¶ 300. The concession, however, makes no practical difference because Plaintiffs have failed to plead that UNRWA USA "knowingly" *or* "purposefully" supported UNRWA to facilitate Hamas's terrorist activities. Opinion at 17-18. Accordingly, the ATS claim must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the FAC should be dismissed in its entirety.

Dated: October 10, 2025

Respectfully submitted,

/s/ Joseph E. Brenner___
Michael C. Heyden, Jr. (#5616)
Joseph E. Brenner (#6643)
GORDON REES SCULLY MANSUKHANI
824 N. Market St., Suite 220
Wilmington, DE 19801
(302) 992-8955
mheyden@grsm.com
jbrenner@grsm.com

Joseph Pace (admitted *pro hac vice)*
PACE FREEMAN LLP
30 Wall St, 8th Floor
New York, NY 10005
(917) 336-3948
joseph@pacefreeman.com

Maria LaHood (admitted *pro hac vice*)
Diala Shamas (admitted *pro hac vice*)
Judith Brown Chomsky (admitted *pro hac vice*)
Beth Stephens (admitted *pro hac vice*)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6430
mlahood@ccrjustice.org

Luna Droubi (admitted *pro hac vice*)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Ave., PH/26th Floor
New York, NY 10016

36